CLERK'S OFFICE U.S. DISTRICT COURT
AT CHARLOTTESVILLE, VA
FILED

AUG 3 1 2026

LAURA A. AUSTIN, CLERK
BY: [signature]
DEPUTY CLERK

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
**CHARLOTTESVILLE DIVISION**

CLAUDE DAVID CONVISSER,

Plaintiff,

v.

Civil Action No. 3:26cv90

S&P GLOBAL MARKET INTELLIGENCE, INC.
Serve:
Corporation Service Co.
100 Shokoe Slip, Floor 2
Richmond, Virginia 23219,

Jury Demand on Counts 3, 4 and 5

S&P GLOBAL MARKET INTELLIGENCE, LLC
Serve:
Corporation Service Co.
100 Shokoe Slip, Floor 2
Richmond, Virginia 23219,

JOHN FRAZEE
212 7th Street, N.E.
Charlottesville, Virginia 22902,

INTERFAITH MOVEMENT PROMOTING ACTION BY CONGREGATIONS TOGETHER
Serve:
Aidan Workman, Registered Agent
1901 Thomson Road
Charlottesville, Virginia 22903,

RECTOR AND VISITORS OF THE UNIVERSITY OF VIRGINIA
Serve: Rector Carlos M. Brown
Office of the Board of Visitors
Northwest Wing, The Rotunda
Charlottesville, Virginia 22904,

TIMOTHY J. LONGO, JR., Associate Vice President for Safety & Security and Chief of Police, University of Virginia
Serve:
Zehmer Hall, 104 Midmont Lane
Charlottesville, Virginia 22903,

JENNIFER "JJ" WAGNER DAVIS, )
Executive Vice President & Chief )
Operating Officer, University of Virginia )
Serve: )
O'Neil Hall, 445 Rugby Road, First Floor )
Charlottesville, Virginia 22904, )

STEPHEN T. PARR, )
Senior Associate Dean & Chief Operating Officer, )
University of Virginia School of Law )
Serve: )
580 Massie Road )
Charlottesville, Virginia 22903, )

AMY WHARTON, Director, )
University of Virginia Law School Library )
Serve: )
580 Massie Road )
Charlottesville, Virginia 22903, )

JEFFERSON-MADISON REGIONAL LIBRARY )
Serve: )
David Plunkett, Director )
201 East Market Street, Third Floor )
Charlottesville, Virginia 22902, )

and )

DAVID PLUNKETT, Director, )
Jefferson-Madison Regional Library )
Serve: )
201 East Market Street, Third Floor )
Charlottesville, Virginia 22902, )

Defendants. )

## VERIFIED COMPLAINT

Plaintiff Claude David Convisser ("Convisser"), by counsel, states as his complaint against defendants S&P Global Market Intelligence, Inc.; S&P Global Market Intelligence, LLC (together "defendant S&P Global Intelligence"); John Frazee; and Interfaith Movement Promoting Action By Congregations Together ("IMPACT") (together four defendants "the S&P

Global Intelligence defendants"); Rector and Visitors of the University of Virginia ("UVA" or "the University"), by its officers functioning in their official capacities Timothy J. Longo, Jr., Chief of Police; Jennifer "JJ" Wagner Davis, Executive Vice President & Chief Operating Officer; Stephen T. Parr, Senior Associate Dean & Chief Operating Officer, UVA School of Law; and Amy Wharton, Director, UVA Law School Library (together five defendants "the University of Virginia Law defendants"); and Jefferson-Madison Regional Library, by its Director, defendant David Plunkett, functioning in his official capacity (together two defendants "the JMRL Library defendants"), as follows:

Commonwealth of Virginia )<br>
) ss.:<br>
City of Charlottesville )

I, Claude David Convisser, the plaintiff herein, do swear under oath or affirm under penalty of perjury that, speaking about myself in the third person and occasionally in the first person, the factual matter stated following is true:

## OVERVIEW

1. Plaintiff alleges, but does not claim under Virginia common or statutory law, that all of the defendants conspired against him with and through others who are not defendants herein aligned with those interests in America that seek to perpetuate our self-damaging use of fossil fuels (described below as "Fossil Fuel Forces") to injure his reputation, ability to earn a living in his chosen business and profession, property interest in the companies he has run since 2008 Plant Oil Powered (POP) Diesel, and the potential for the eternal salvation of his soul from perdition.

a. In Count 4, plaintiff claims that John Frazee, as an employee and agent of defendant S&P Global Intelligence, and as the principal of IMPACT on the issue of shelter for

homeless people, assaulted and battered him to silence plaintiff's dissenting voice to a planned, 80-bed emergency low-barrier shelter for homeless people owned by the City of Charlottesville at 2000 Holiday Drive in a hotel the City purchased in 2025 facing the Route 250 Bypass with Hydraulic Road behind it, which is opening on September 1, 2026. In service to the Fossil Fuel Forces' use of such a facility to house and cycle their intelligence and criminal agents through the Charlottesville area, the S&P Global Intelligence defendants combined to use that incident and their unlawful doctoring of the original video and audio documentation of it for the twin purposes of first, securing Mr. Frazee's acquittal at his criminal trial to thereby give them a stronger legal defense herein, and second, misrepresenting plaintiff's conduct and words to make them appear unreasonable as compared to theirs, to destroy his reputation in this community.

b. In the alternative that IMPACT did not function as herein described under the direction and control of Mr. Frazee, or he acted outside the scope of his employment for defendant S&P Global Intelligence, plaintiff claims in Count 5 that these S&P Global Intelligence defendants, to the extent they acted independently of each other, agreed to combine and conspire against him under Virginia common law to commit at least one unlawful act to injure him.

i. Unlawfully tampering with evidence it knew would be critical in criminal and civil litigation, defendant S&P Global Intelligence digitally remastered the original footage of IMPACT's video and audio recording of Mr. Frazee's assault and battery of plaintiff on the right side of his body that took place on March 24, 2026 to hide the facts that Deacon Don Gathers concurrently grabbed plaintiff's left arm and then declined plaintiff's appeal twice voiced to lend him Deacon Gathers's microphone for two minutes to speak to the public audience and the full Albemarle County Board of Supervisors gathered in the Martin Luther

King, Jr. Auditorium of Charlottesville High School on a matter of public concern on the agenda for that evening.

ii. In addition, in Count 5, plaintiff claims that the S&P Global Intelligence defendants and Deacon Gathers, a volunteer with IMPACT and first-time attendee at the Nehemiah Action acting in his personal capacity, then combined through Mr. Frazee and his criminal defense counsel Scott Goodman and IMPACT to have Deacon Gathers remain outside the courtroom of Mr. Frazee's criminal defense trial on August 13, 2026 while this doctored video played as evidence therein. That permitted Deacon Gathers to disclaim in his testimony having seen it, to conceal from evidence any examination of him about it that would have yielded his truthful testimony debunking the doctored video as fraudulent for its deleting his seizure of plaintiff's left arm and plaintiff's appeal to borrow his microphone.

iii. In the alternative, the S&P Global Intelligence defendants suborned Deacon Gathers's perjury, since he had, in fact, seen the edited and doctored video before Mr. Frazee's criminal trial, according to his recorded testimony thereat.

c. For the foregoing torts against the S&P Global Intelligence defendants, plaintiff claims at least $50 million in monetary damages.

2. Plaintiff claims against the University of Virginia and JMRL Library defendants for injunctive relief under Title 42, United States Code, section 1983, for denying him access to the UVA Law Library and all University Grounds except the Medical Center for four years and all JMRL branch libraries for three months, plus lesser infractions by these public institution defendants, in violation of his First Amendment rights to free speech and to petition the Government, and in breach of his Fourteenth Amendment rights, in Count 1, to procedural and,

in Count 2, substantive due process.[1] In Count 3, he claims that the UVA and JMRL Library defendants acted in retaliation against his exercise of his First Amendment rights in violation of the Fourteenth Amendment's guarantee of equal protection of the laws.

3. The three forces aligned against plaintiff on account of his business promoting 100 percent biofuel are (A) the petroleum industry led by giant Exxon Mobil Corporation; (B) the biodiesel industry controlled by the organized crime Mafia headquartered in New York City, whose fuel is heavily processed from 100 percent plant oil to blend typically at 2 to 5 percent concentration with between 95 and 98 percent petroleum diesel fuel, both of which industries comprise the plaintiffs' business competitors identified in the Exxon Mobil lawsuit; and (C) the computer hardware and software technology industry ("Big Tech"), who rely on cheap fossil fuels to build and electrify their micro-circuitry (these three forces (A) through (C) together "the Fossil Fuel Forces"). The top ten companies in the S&P 500 Stock Index are all Big Tech companies. Together in 2025, they accounted for 41 percent of the S&P 500's market capitalization and 32 percent of its earnings. A witness who shall go unidentified in an attempt to avoid his being bought-out or otherwise compromised will testify that based on his research, the foregoing three Fossil Fuel Forces share common and overlapping, controlling or dominant ownership.

4. Retired FBI Special Agent Colin Derek Moncrieff Yeates explained to plaintiff from 2015 to 2018 that following the USA Patriot Act's repeal in 2001 of the post-Watergate

---

[1]Plaintiff distinguishes his claims herein from his claims in Claude David Convisser, et al., v. University of Virginia, 3:24-cv-83-JHY-JCH (W.D.Va. filed Dec. 2, 2024 and voluntarily dismissed Feb. 2, 2025) ("Plaintiff's first lawsuit against Law Library restrictions"). That Case challenged imposition of restrictions on access by members of the non-Law School public to the UVA Law Library during law student exam period; this Case challenges some of the rules adopted thereunder and more broadly, total denial of plaintiff's access for a four-year period.

restrictions on domestic surveillance adopted in 1974, many private, domestic surveillance organizations arose within the United States, some of which are also active overseas, including several aligned with the Fossil Fuel Forces. He said, in addition to (A) in-person observation, (B) they are adept at using means of electronic surveillance listening and video contemporaneous transmission and recording, which device usage in private hands is likely unlawful, and Internet and telecommunications monitoring and intercepts, and (C) they are very well-networked, like spider webs, within legitimate governmental security services, and receive intelligence thereby and –from, towards achieving their objectives.

5. Plaintiff alleges in Count 3 that the UVA defendants, bribed by a gift of $43.4 million finalized on June 15, 2026 by alumnus and Big Tech titan David LaCross, acted to thwart his ability to prosecute Claude David Convisser and POP Diesel Africa, Inc. v. Exxon Mobil Corporation, et al., Civil Action No. 3:24-cv-00072-JHY (filed September 9, 2024) ("the Exxon Mobil lawsuit"), or its appeal from denial of his second motion to vacate this Court's judgment against the plaintiffs, and to bring and defend himself in around forty related but distinct civil, criminal, and appellate legal actions in Virginia federal and state courts, plus three Bar complaints against him (the first dismissed in 2024) and a persistent effort to have him civilly committed to a mental institution. These related and descendant legal actions and initiatives followed or arose as a result of the facts that gave rise to the Exxon Mobil lawsuit and this Court's earlier findings, which plaintiff submits were in error, that his allegations therein are altogether implausible (though he recognizes he did not state all claims in the most artful way, and did not then have evidentiary facts to identify the most culpable co-defendants to Exxon and support all elements of all of his claims).

6. In addition, Plaintiff alleges in Count 3 that the JMRL Library defendants retaliated against his speech to the City Council on July 20, 2026 opposing the proposed 80-bed, low-barrier shelter at 2000 Holiday Drive.

7. Defendant S&P Global Intelligence aimed to silence plaintiff's dissenting voice to Big Tech and the Fossil Fuel Forces' interest in an additional 80-bed, low-barrier shelter in Charlottesville by all means necessary, including violence, tampering with evidence, and destroying plaintiff's reputation. From his experiences living as a homeless man in Charlottesville since June 25, 2024 and in Richmond for a couple of weeks while lobbying the General Assembly:

a. Plaintiff learned first, that preexisting capacity of approximately 60 low-barrier beds in Charlottesville, between the PACEM church shelters' 50 beds for men and women during the six colder months of the year and 10 spaces in the Salvation Army's warm room, is more than sufficient to serve this area's homeless population, in that during plaintiff's three months enrolled in PACEM during the winter of 2024 to 2025, no person who showed up in need was ever denied a cot for the night.

b. Second, organized crime infiltrates any so-called homeless population by sending its intelligence and criminal agents to live among them and by hiring poor, vulnerable people from the local population to do their bidding. For these reasons, according to Major Donny Wilson of the Salvation Army, which has been serving Charlottesville's emergency housing needs for more than 100 years, it will have nothing to do with low-barrier shelter, beyond offering 10 spaces in its warm room. He said the Salvation Army does not have the staff resources to monitor and prevent organized crime from taking over effective control of any low-barrier shelter, and from shuffling its agents into and out of it.

c. Third, the City is contracting with Central Arizona Social Services ("CASS") to open 2000 Holiday Drive as an emergency, 80-bed, low-barrier shelter starting September 1, 2026. CASS operates a 600-bed, low-barrier shelter serving the 5 million population of the Phoenix metropolitan area. Given that the population of Charlottesville and Albemarle County are combined 200,000, proportionately, this area should only need low-barrier shelter for the homeless one twenty-fifth the size of 600, or 24 beds in total, which is less than half this area's existing capacity of 60 beds during the six cooler months. Who will fill the extra 80 beds to come available tomorrow? Who has already filled Tent City with their agents? Corrupt police described herein and pliant elected officials enable this degradation of a community.

d. The reasons the Fossil Fuel Forces have targeted this area for opening of a permanent, low-barrier shelter whose population they will control are set forth in paragraph 87 below.

8. From any proceeds he will be fortunate eventually to secure from the Exxon Mobil lawsuit or any appeal, plaintiff proposed a $500 million gift to the University of Virginia, which because of its actions, he had to withdraw. Similarly, he has committed hundreds of millions of dollars, if not more, to establish churches in this area of Central Virginia to serve as permaculture hubs,[2] creating a model for the rest of the country to follow in bringing a swift end to fossil fuel use. He has spoken publicly about the latter idea to the Albemarle County Board of Supervisors, the Charlottesville City Council, and church leaders and groups since February 2026.

[2]Permaculture is a discipline turning on local resources: growing your own food; building with natural, local materials; and relying on renewable, rather than fossil fuel, energy. Plaintiff is a consultant in permaculture certified by the Traditional Native American Farmers Association.

9. **TABLE OF CONTENTS**


| | paragraph | page |
|---|---|---|
| OVERVIEW | 1 | 3 |
| SUBJECT MATTER JURISDICTION | 10 | 11 |
| VENUE | 14 | 11 |
| PARTIES | 15 | 11 |
| FACTUAL ALLEGATIONS | 40 | 20 |
| University of Virginia Defendants | 42 | 20 |
| JMRL Library Defendants | 59 | 43 |
| S&P Global Intelligence Defendants | 66 | 55 |
| Participation of Charlottesville Police Officer Matthew Ryan | 90 | 93 |
| LEGAL CLAIMS | 93 | 94 |
| COUNT 1 – Procedural Due Process | 95 | 95 |
| University of Virginia Defendants | 102 | 96 |
| JMRL Library Defendants | 103 | 107 |
| COUNT 2 - Substantive Due Process | 105 | 111 |
| University of Virginia Defendants | 109 | 112 |
| JMRL Library Defendants | 117 | 120 |
| COUNT 3 – Retaliation | 121 | 123 |
| University of Virginia Defendants | 123 | 125 |
| JMRL Library Defendants | 130 | 130 |
| COUNT 4 – Assault and Battery against the S&P Global Intelligence Defendants | 132 | 132 |
| COUNT 5 – Civil Conspiracy against the S&P Global Intelligence Defendants | 140 | 140 |
| PLAINTIFF'S DAMAGES AND RELIEF REQUESTED | 144 | 142 |
| University of Virginia and JMRL Library Defendants | 145 | 142 |
| S&P Global Intelligence Defendants | 157 | 147 |
| JURY DEMAND | 164 | 149 |
| PRAYER FOR RELIEF | | 150 |
| CERTIFICATE OF SERVICE AND PURSUANT TO RULE 65(b) | | 151 |

## SUBJECT MATTER JURISDICTION

10. Original subject matter jurisdiction in this Court is premised on Title 28 United States Code section 1331 and the cause of action arising under federal law, Title 42 United States Code section 1983.

11. Original subject matter jurisdiction in this Court is also premised on Title 28 U.S.C. section 1332 on diversity of citizenship between the plaintiff and defendants and an amount in controversy on plaintiffs' claims for monetary damages in excess of $75,000, exclusive of interest and costs.

12. Plaintiff Claude David Convisser is a citizen of the State of South Dakota and temporary resident of Virginia.

13. Defendants S&P Global Market Intelligence, Inc. and LLC were formed in Delaware with their principal place of business in New York. Defendants John Frazee and IMPACT are citizens of Virginia.

## VENUE

14. Venue lies properly in this Court pursuant to Title 28 U.S.C. section 1391(b)(1) and 1391(b)(2).

## PARTIES

### Plaintiff Claude David Convisser

15. Plaintiff is the Chairman, sole Director, Chief Executive Officer, and at this time, sole shareholder in trust for smallholder farmers in tropical areas of the world of POP Diesel Africa, Inc. ("POP Diesel"). He also serves presently as its General Counsel.

16. Convisser and POP Diesel are the world's foremost advocates for the use of pure plant oil, which is straight vegetable or fruit oil like the cooking oil in your kitchen, to power

compression ignition (diesel) engines, for which they secured the first-ever approval from the U.S. Environmental Protection Agency ("EPA") and the U.S. Department of Transportation in June 2013 to run in used engines, and which plant oil they call POP Diesel Fuel.

17. Plaintiff is an attorney at law on active status and in good standing with the Virginia State Bar and a 1991 graduate of the University of Virginia School of Law.

18. The Exxon Mobil lawsuit remains pending this Court's ruling on plaintiffs' second motion to vacate its judgment of dismissal, on which briefing was completed on December 23, 2025. They will appeal any part of this Court's ruling that does not reverse in their entirety its prior judgments of dismissal, on the theory (not having seen any ruling yet) that if the Court reverses course in part, then it must recognize its errors in concluding that all of their allegations were implausible and dismissing on the grounds of futility of amendment.

19. Plaintiff has been living homeless in the Charlottesville area since June 25, 2024 due to events set forth in the complaint of the Exxon Mobil lawsuit. For all but three months during the winter of 2024-25 and one month in early 2026, he has been living in a one-man tent in the Shenandoah National Park, commuting to Charlottesville and back 40 miles per day on his push-pedal bicycle, eating lunch meal four days per week at Charlottesville church soup kitchens, relying on food from local food banks to eat two days per week, and fasting the seventh day of the week.

20. Plaintiff had been doing all of his legal research and drafting on behalf of POP Diesel and himself in all of these legal actions at the only public law library located in Charlottesville and within as many as 110 miles hereof, the University of Virginia Law School Library. When it barred him on June 30, 2026 for a period of four years, he was able to continue to do his legal drafting and Internet and other book research at defendant Jefferson-Madison

Regional Library in downtown Charlottesville and at its other branches in Albemarle County, until it banned him on July 16, 2026.

**University of Virginia Defendants**

21. The University of Virginia is a publicly-funded, -regulated, and -staffed university owned and chartered by the Commonwealth of Virginia, as set forth in Chapter 22 of Title 23.1 of the Virginia Code. Its main campus is in Charlottesville. Its School of Law is a public institution dedicated to teaching and learning the profession of law. Defendants the Rector and Visitors are its governing body.

22. The University of Virginia's Law Library ("the Law Library") has, except perhaps for periods during the COVID pandemic, always been open to members of the public, as well as students, faculty and administrators of the School of Law, except for a brief period in 2017 or 2018 mentioned below, until a new policy began in December 2024 of closure to the public for 18 days surrounding fall and spring exam periods, in favor of serving exclusively law students, faculty, and affiliates of the Judge Advocate General ("JAG") School next door.

23. Defendant Timothy J. Longo, Jr., the University of Virginia's Associate Vice President for Safety & Security, is its Police Department's Chief of Police ("Chief Longo"). He communicated to plaintiff most of the decisions and measures taken against him, described herein.

24. Defendant Jennifer "JJ" Wagner Davis, the University of Virginia's Executive Vice President & Chief Operating Officer ("Ms. Davis"), participated in efforts to bar plaintiff from the Law Library.

25. Defendant Stephen T. Parr, the University of Virginia Law School's Senior Associate Dean & Chief Operating Officer ("Mr. Parr"), authored and coordinated plans to expel

plaintiff from the Law Library. Before entering university administration, he worked for Big Tech at IBM.

26. Defendant Amy Wharton, Director of the UVA Law Library ("Ms. Wharton"), implemented the plans to expel plaintiff. Her father was an early developer of LEXIS. A medium-term plan she is involved with is to convert the Law Library's book shelf space into faculty and administrative offices and force everyone to use online legal research tools in service to Big Tech, which plaintiff submits in paragraph 57 below are inferior.

27. The UVA defendants, or subordinate employees and agents of the University acting under their authority and on their direction such as Special Assistant to the Dean Edith L. "Diddy" Morris ("Ms. Morris"), are responsible for making the decisions and executing the actions of the University described herein injurious to plaintiff.

**<u>The Jefferson-Madison Regional Library Defendants</u>**

28. Defendant Jefferson-Madison Regional Library is a public institution with eight branches created pursuant to Virginia Code section 42.1-37 by contract between the City of Charlottesville and four neighboring and nearby counties.

29. Defendant David Plunkett is the Director of JMRL and has his office in its downtown Charlottesville branch, where all events giving rise to plaintiff's claim against the JMRL Library defendants took place

**<u>The S&P Global Intelligence Defendants</u>**

30. Defendant S&P Global Market Intelligence, Inc. is registered with the SCC as a foreign corporation. The New York authorities identify it as S&P Global Market Intelligence, LLC, the same name as is registered with the Charlottesville Regional Chamber of Commerce. Therefore, plaintiff sues both entities as alter egos of each other.

31. Defendants S&P Global Market Intelligence, Inc. and LLC employ defendant John Frazee as Associate Director of Product Management in their Charlottesville office.

32. Defendant IMPACT is an association of 29 churches and other religious congregations in Charlottesville and Albemarle County that select several issues on which to lobby the Charlottesville City Council and County Board of Supervisors in concert every year. Defendant John Frazee has volunteered as the point-person for IMPACT's advocacy on issues of affordable housing and homelessness. With its Board of Directors' consent and contrary to its ordinary members' interest, defendant John Frazee commandeered IMPACT's voice to suit the goal of S&P Global Intelligence in furthering the fossil fuel agenda of establishing a pass-through residential hub for intelligence and criminal agents at any low-barrier shelter the City might open on an emergency or enduring basis.

33. Plaintiff will not collect any monetary damages from IMPACT and joins it as a defendant only in the alternative that the trier of fact finds it acted with any independence from Mr. Frazee's will.

**<u>Additional Non-Party Participants Involved in a Conspiracy Against Plaintiff</u>**

34. Jeffrey Preston Bezos ("Jeff Bezos") is the owner of the Washington Post newspaper. He has altered its editorial slant to favor the continued consumption of fossil fuels as being more affordable than renewable energy sources, which furthers the business interest of the giant technology and marketing firm he founded and remains the largest shareholder of, Amazon.

a. As a result, because the Fossil Fuel Forces were aware from their surveillance of him that plaintiff had begun drafting the caption of this complaint on his Microsoft Windows laptop computer using Microsoft Word on July 30, 2026, or perhaps for other reasons on intelligence provided it that the time was propitious, the Washington Post's

news division made the decision to run a front-page feature article on August 5, 2026 about violent threats made to U.S. District Judge John McConnell, who ruled against the Administration of, and interests aligned with, President Donald Trump back in January 2025. https://www.washingtonpost.com/nation/2026/08/05/federal-judge-opens-up-about-threats-he-has-experienced-under-trump/.

b. Plaintiff does not dispute the newsworthiness of this story, and the grave threat it exposes for the independence of our Judiciary, only that they chose to run this article at that time, nineteen months after the event. He believes, without hard evidence, that this decision was to instill fear in this Court and attempt to intimidate against its issuing any ruling in plaintiff's favor.

c. To think that prominent news features like this published in a leading organ like the Washington Post, untethered to a recent news prompt, happen in a vacuum, without any thought to the strategic timing of their release, is to ignore reality. Plaintiff can recount with specificity how forces aligned with Exxon controlled the media's response to several press conferences he gave in Ghana from 2018 to 2020, by manufacturing stories to distract or bend coverage in a certain direction. Witnesses in Ghana have corroborated. See, e.g., paragraphs 13-14 of Docket No. 178-10 in the Exxon Mobil lawsuit (Rawlings murder to obscure Presidential corruption plaintiff exposed). Plaintiff prays for the safety and protection of this Court, its family and employees, no matter what the ruling in any particular case may be.

35. William Henry Gates III ("Bill Gates") is the founder and largest shareholder of Microsoft Corporation, like Amazon, one of the biggest corporations in America and an anchor of the S&P 500. Like Amazon, Microsoft Corporation unnecessarily ties its future to access to

cheap fossil fuels to manufacture computer micro-circuitry and power its computer applications installed ubiquitously thereon, the Internet, and artificial intelligence data centers.

a. His Bill and Melinda Gates Foundation has had a particular focus on plaintiff since its Senior Program Manager Lauren Good gained from him POP Diesel's business plan in 2017. On that inspiration and, plaintiff would say, misappropriation, Bill Gates and his Foundation established Gates One Agriculture to spread genetically modified crops to subsistence farmers. These are the same farmers with whom POP Diesel had planned to grow the tropical *jatropha curcas* tree, relying on natural, resilient and local genomes, for its inedible fruit-seed oil used to power diesel engines instead of fossil fuel petroleum.

b. (Gates One Agriculture's promotion of genetically modified varieties of food crops complimented the Fossil Fuel Forces' proactive and comprehensive decimation of all naturally-growing *jatropha* trees across West Africa in favor of their genetically-modified variety, West Africa being the place POP Diesel has identified as offering the best social and environmental conditions for launching large-scale *jatropha* cultivation.).

c. Bill Gates sent Mawuena Quarcoo, a Ghanaian national with a Ph.D. in public health statistics, to live among the homeless population in Charlottesville and befriend plaintiff, in furtherance of Bill Gates' promise to dedicate his personal fortune to imposing artificial intelligence on Africa and particularly its health sector. Since the primary medical needs of Africa are enormous and still going unmet, Bill Gates's mission is akin to giving a blind man night-vision goggles to help him see better. He means well, but lives in a Big Tech ecosystem that is divorced from care for the earth and its poorest inhabitants' first needs.

d. After plaintiff wrote the preceding paragraph, Jeff Bezos and Bill Gates displayed their alignment in a Washington Post editorial published on August 28, 2026 warning

that the United States must not let China gain an advantage in establishing data centers and artificial intelligence in Africa, which in another metaphor, is like giving a man in leg braces a ticket to run in the Boston Marathon.

e. Plaintiff singles out Bill Gates, but the other manufacturers of Big Tech products, from Internet browsers to smart phone apps, computer software and hardware, including the private organization that runs the Internet, may also bear direct responsibility for some of the shenanigans discussed herein and in plaintiff's other federal pleadings. For instance, blockage of access to his pacer.gov account, which he has not yet had the means to overcome, compels plaintiff to file herewith a motion for leave to make filings by paper.

36. People and Congregations Engaged in Ministry ("PACEM") is an organization of churches and other religious congregations that provide low-barrier shelter to 35-40 homeless men and 15 homeless women during the six colder months of the year in and around Charlottesville. Some of its staff owe allegiance to, and are agents of, the Fossil Fuel Forces, as exemplified by the account stated in paragraph 83(a) of Docket No. 313-1 in the Exxon Mobil lawsuit.[3]

37. The Haven at First and Market, Inc., as set forth beginning at paragraph 154 of Docket Number 313-1 of the Exxon Mobil lawsuit, runs the Haven Day Shelter for the Homeless ("the Haven") and offers other housing referral for low-income persons. Providing at least one all-you-can-eat meal per day *gratis* to all who show up, it functions as a home base for intelligence and criminal agents of the Fossil Fuel Forces in Charlottesville. Most of the Day

---

[3]Plaintiffs will refer periodically herein for more specificity to Docket entries in the Exxon Mobil lawsuit by their Docket and page or paragraph numbers, which references are incorporated as if restated herein.

Shelter staff are doubly employed by a private intelligence and police service loyal to the Fossil Fuel Forces, and work for it at its office near the Haven, as revealed to plaintiff by Day Shelter Supervisor Candace Williams.

38. Michael P. Kochis is the Chief of the City of Charlottesville's Police Department. Since he met with plaintiff at Christ Episcopal Church on or around late July, 2026 and they discussed these matters, he knowingly allowed Charlottesville Police Officer Matthew Ryan ("Officer Ryan") to continue to press bogus criminal charges Officer Ryan generated against plaintiff. These actions played an integral part to some of the other defendants' actions, as discussed below.

39. The Salvation Army of Charlottesville did not conspire against plaintiff, but it knowingly aided the Fossil Fuel Forces' current efforts to deprive plaintiff of food to eat and a place to conduct his legal research and writing and modestly secure Internet activities, in attempting to force him to surrender and give up the Exxon Mobil lawsuit and its offspring.

a. When the Haven barred plaintiff instead of the two men who were convicted of assaulting and battering him inside its men's room and on Officer Ryan's proposal, pressed a bogus charge of criminal trespass against plaintiff which the Charlottesville General District Court dismissed with prejudice,[4] plaintiff lost his main meal of the day, which had been the Haven's free, all-you-can-eat breakfast.

---

[4]So far, plaintiff has dispensed with two of the four sets of criminal charges the Fossil Fuel Forces have foisted upon him in Charlottesville, on a par with the four sets of criminal charges they orchestrated in Ghana, all of which amounted to nil, and his five arrests in Mali that caused him to spend 32 nights in its jails and prisons facing, initially, a charge of aiding terrorism, which the Judge would not accept, and then vagrancy. This last charge was baseless, as well, because at least in Mali, plaintiff had a hotel room.

b. The Salvation Army's dining hall then open to non-residents filled the void, until plaintiff in gratitude met in April 2026 with its Executive Director, Major Donny Wilson, in part to inquire of its progress towards completing a $28 million capital raise to build its new Center of Hope. Plaintiff offered to contribute the $14 million shortfall Major Wilson told him of from any proceeds he might gain from the Exxon Mobil lawsuit or its appeal.

c. As a result, the Fossil Fuel Forces induced the Salvation Army to close its dining hall to nonresidents one month later and contributed the missing $14 million to permit the Salvation Army to end its fundraising campaign.

d. Plaintiff has been reliant on the four church soup kitchen lunches, plus food pantry donations, to stay nourished and alive, since then.

## FACTUAL ALLEGATIONS

40. Plaintiff reiterates paragraphs 1 – 39 and incorporate these paragraphs by reference as if re-stated herein.

41. These Factual Allegations address firstly in detail the defendants against whom plaintiff seeks interim injunctive relief, and secondly, the S&P Global Intelligence defendants from whom he seeks damages.

### University of Virginia Defendants

42. Three times since August 2024, Chief Longo's UVA Police Officers issued plaintiff No Trespass Warnings, each time suspending him from access to some or all University of Virginia grounds, until Chief Longo rescinded such Warnings on appeal by plaintiff. The third warning came with a condition that if he committed a fourth infraction, he would be barred from all University premises for a period of four years. Following first is the sequence of events from

August 2024 through March 2026, before the events that gave rise to the third No Trespass Warning.

a. Upon the start of plaintiff's visits to the Law Library in July 2024 in preparation for filing the Exxon Mobil lawsuit, a front door to the Law School remained always unlocked and open to the public 24/7.

i. Then that door began to be locked on evenings and weekends.

ii. Aside from holidays, however, the Law Library inside the Law School building remained open seven days per week, with varying hours depending on whether classes were in session, or not.

iii. Signs posted on the exterior doors of the Law School building sometime in the fall semester of 2024 gave the hours they were unlocked as from 7 a.m. to 6 p.m. on weekdays, "Card access all other times," and requested visitors sign in at the Admissions Office or Library Circulation Desk. Exhibit 1.

A. The exterior door notices stated, "No trespassing" and, "Use of this building is reserved for students, faculty, staff, and authorized visitors." Exhibit 1.

B. No sign stated that a visitor to the public Law Library would be trespassing for entering the building after the exterior doors could only be opened by card key swipe, if a person with a card allowed him entry to go to the Law Library, which has been open to members of the public since time immemorial.

iv. Therefore, in the finest tradition of UVA Law School friendliness, students and faculty, almost without exception, invited plaintiff to enter the building and go to the Law Library every day of the week, no matter the hour.

v. Plaintiff remained in the Law Library working away after the exterior doors locked on weekdays at 6 p.m., sometimes as late as until the Law Library closed, at midnight seven days per week during session and at 9 p.m. Monday through Thursday and at 5 p.m. Friday through Sunday during the summertime. (The Law Library opens at 8 a.m. every morning.).

vi. No security guard, University Police Officer, or Library staff or administrator ever told plaintiff to leave then or on the weekends, once he was inside the Library. He would exit the building upon leaving the Law Library, with the exception(s) stated following.

b. Chief Longo's Police Officer issued plaintiff a first No Trespass warning in the early morning hours of a day in August 2024. Plaintiff had set up to work through the night on his laptop computer at a table sitting in one of two cubby holes astride the front entrance to the Law School building. A security guard passed by him several times working away after the exterior doors had locked at 6 p.m., without saying anything to him. At a certain point before dawn, plaintiff lay on the floor while leaving his laptop and papers spread on the table, to take a refreshing nap. That is when University Police arrived.

i. Plaintiff apologized in writing to Chief Longo, who rescinded the first No Trespass Warning right away.

ii. From that time until August 2025, with the knowledge of private security guards who in the 2025-26 school year started patrolling the Law School, plaintiff continued to work on occasion, when facing a court filing deadline, in the same cubbyhole after the Law Library closed at night and the exterior doors were locked, when finally, the private security guard told him he could no longer do so. He stopped utilizing that cubbyhole after-hours at that time.

c. On the day plaintiff received Chief Longo's rescission letter for the first No Trespass Warning, he received a second No Trespass warning, this one no fault of his own.

i. Two University Police Officers came upon him on the second floor of the Law Library and attempted to arrest him for trespassing. He showed them Chief Longo's rescission letter, and they backed down.

ii. Later that day, the same two University Police Officers gave him the second No Trespass Warning inside the Digestive Health Clinic at the University Hospital. Plaintiff had gone there in search of a medical expert who could give an opinion for use in litigation that his mother's para-esophageal hiatal hernia was not a fatal condition, but was a chronic condition that could be managed by a liquid or soft diet, provided she consumed 3-4 cartons of Ensure® fortified beverage per day to receive adequate nutrition. Plaintiff's college roommate, a gastroenterologist in Texas, had affirmed to him the foregoing truth, but was not qualified to render such opinion in Virginia.

iii. Fossil Fuel Forces knew from his activities the day before plaintiff's purpose in going to the Clinic and had communicated to its receptionist beforehand that if he showed up, she should call University Police.

iv. Plaintiff was not disruptive in any way.

v. Chief Longo rescinded the suspension shortly after receiving plaintiff's appeal letter, although plaintiff did not become aware of the rescission until sometime later.

d. On December 2, 2024, the Law Library instituted a new policy barring all members of the public who were not law students or faculty from the Law Library, aside from its reception area, for 18 days during student exam period.

i. According to Reference Librarian Ben Doherty, the Law Library had never before barred non-Law School enrollees during law student exam period (although intermediate steps had been taken, such as signage encouraging undergraduate students to study in a designated Law School classroom and discouraging them from entering the Law Library), and only once before in recent decades, for a single day, closed to members of the public.

ii. The latter occasion was after the Unite the Right march in downtown Charlottesville in 2017 in which a protestor drove his car into a crowd on a side-street leading to the downtown Mall and killed a pedestrian. According to Mr. Doherty, the Library closed to prevent a right-wing protester from conducting on-the-spot legal research, in discrimination against the protester's viewpoint.

iii. Plaintiff filed his first lawsuit against Law Library restrictions and later withdrew it after this Court allowed him continuances on court filings he needed to make in the Exxon Mobil lawsuit during the first planned, 18-day closure to members of the public, in December 2024, before the Law School implemented the Orange Pass discussed next.

e. Before the Law Library's closure to members of the non-Law School public during the next student exam period in May 2025, the Law School began a new policy, which plaintiff and the current President-Elect of the Virginia State Bar Bruce H. Russell, II had advocated for, of allowing outside members of the public, such as plaintiff, to receive an Orange Pass from the Circulation Desk that authorized them to retrieve printed research materials from the Law Library's second floor and bring them to the Klaus Reading Room next to the Circulation Desk to work with there. According to the letter from defendant Library Director Amy Wharton dated May 5, 2026 that is Exhibit 2 hereto, the Law School implemented this

policy in response to plaintiff's request for access to the Law Library's print collection during the student exam period closure.

f. On the occasion of a tornado warning during March 2026, the University closed during and for the rest of the day. Plaintiff was already in the Law Library on the day this happened and the Law School building closed to new entrants who did not have Card key access. Two UVA Police Officers came upon him and told him to leave, even though the Law Library remained open to other patrons. Officer T. Poe told plaintiff that defendant Stephen T. Parr had ordered him to leave. Plaintiff informed them that the Law Library was public and he was occupied in using its resources, as he read a law book therefrom. Officer T. Poe checked with his superiors in the line of command to Chief Longo and informed plaintiff that the Police were mistaken, he had done nothing wrong, and he could remain. As students and faculty continued to welcome plaintiff inside the Law School building to go to the public Law Library after its exterior doors locked, this incident informed plaintiff's future conduct.

43. Because the Law School had been so generous to plaintiff, indeed, the Law Library had knowingly permitted him to make unlimited prints and photocopies from its machinery for free without any warning to the contrary since his arrival there in July 2024, and the 35th Year Reunion of his Class of 1991 was coming up, he offered to Law School Foundation President and Chief Development Officer Jason Wu Trujillo to make a contribution of $500 million from any proceeds he might receive from the Exxon Mobil lawsuit. Classmate Timothy J. Heaphy loaned him the Reunion registration fee and funds to have his suit, stored in a plastic bag outdoors for the previous two years, dry-cleaned, and other clothes laundered for the Reunion weekend set to begin Friday, May 8, 2026. Plaintiff anticipated also, from reconnecting

with other old friends who would be in attendance, to be able to raise some investment funds to support POP Diesel and his conduct of the Exxon Mobil lawsuit.

44. The Fossil Fuel Forces plotted in two ways to prevent plaintiff from attending his Reunion.

a. On April 8, 2026, Izel Nelson, one of two agents along with Josiah Talley of the Fossil Fuel Forces who had been convicted of assaulting and battering plaintiff inside the men's room of the Haven, specifically in Mr. Nelson's case on behalf of the organized crime biodiesel Mafia, tested the Protective Order plaintiff secured against him specifying, "No Contact – NO EXCEPTIONS." He entered the downtown Charlottesville JMRL public library, which he hardly ever visited, walked right past plaintiff's chair, and sat down at the table behind him. Plaintiff called the Police, but they did nothing, and instead, Officer Ryan charged plaintiff with making a false Police report, which charge against plaintiff was dismissed on July 27, 2026.

i. When the Police did nothing about Mr. Nelson's seeming violation of the Protective Order on plaintiff's call to 9-1-1 on April 8, 2026, plaintiff filed a motion in the Charlottesville General District Court to modify the Protective Order by tightening it. When the Sheriff's Deputies, despite knowing Mr. Nelson and having his cell phone number to reach him, failed to serve notice of a hearing on Mr. Nelson for the April 27 hearing date, plaintiff himself undertook to serve Mr. Nelson a copy of the notice of the civil hearing continued to late May. Mr. Nelson has no fixed address.

A. Therefore, on or around May 1, 2026, plaintiff saw Mr. Nelson from afar walking near Fifth Street, N.W., pulled out the notice of hearing he had photocopied to serve on him, and rode to find and serve him it on his bicycle.

B. Mr. Nelson had disappeared.

C. However, those who surveil plaintiff knew what he was intending to do, and prepared accordingly for a counter-strike.

ii. Knowing of plaintiff's registration to attend his 35th Year Law School Class Reunion the following weekend and of his preliminary telephone conversations and meetings with Class leaders about both committing $500 million to the University and also seeking investment for POP Diesel, and knowing that plaintiff would be delivering papers to the Charlottesville City Attorney on or around Thursday, May 7, 2026, as is their *modus operandi*, Fossil Fuel Forces prepared a careful plan for Mr. Nelson.

A. They had Mr. Nelson wait near the Free Speech Wall on the downtown Mall outside City Hall and the City Attorney's Office for plaintiff to show up that morning, in anticipation of plaintiff's following him down the Mall on his bicycle to serve him the notice of civil hearing.

B. As soon as plaintiff arrived at City Hall, Mr. Nelson walked right past him westward on the Mall.

C. Plaintiff pulled out the notice of civil hearing and rode after him, catching him about half-way up the Mall, telling him, "We have a court hearing coming up;" touching the single-page notice to Mr. Nelson's abdomen; and when he did not grab it with his hand, dropping it to the ground while continuing away on his bicycle.

iii. Officer Ryan used the excuse of surveillance video recording of this service of a single-page notice of hearing by plaintiff on Mr. Nelson, Exhibit 3 hereto, to charge plaintiff with assaulting and battering Mr. Nelson on the morning of Friday, May 8, 2026.

A. At plaintiff's trial on July 27, the Charlottesville General District Court convicted plaintiff of this criminal offense, sentenced him to 10 days in jail, all

suspended on the condition of his good behavior for the next year, and also convicted him of riding his bicycle on the pedestrian Mall, for which the Court suspended any fine.

B. Plaintiff has appealed for a trial *de novo* in the Circuit Court.

C. This Court can watch the short video that is Exhibit V-1 to determine for itself whether plaintiff's touching of Mr. Nelson caused the latter any injury or offense, regardless of plaintiff's absolute right, even obligation under Rule 1:12 of the Rules of the Supreme Court of Virginia, to serve Mr. Nelson notice of a civil hearing by hand delivery to his person, since he has no address.

D. The arresting Charlottesville Police Officer, as is evident from his own body-worn camera video recordings in league with and carrying out Officer Ryan's personal animus against plaintiff, told the Magistrate that plaintiff had acted in concert with anti-ICE demonstrators, a complete falsehood, which prompted her to set a $2,500 secured bond, 10 percent of which plaintiff told her he did not have and would not be able to raise as security for a bail bondsman for his immediate release. His bond was reduced to unsecured upon his arraignment in the Charlottesville General District Court and release from custody on Monday, May 11, 2026, having spent his 35th Year Law School Reunion in Jail the preceding weekend.

b. The complimentary plot to exclude plaintiff from this Reunion materialized as follows.

i. The Orange Pass developed specifically to accommodate plaintiff during the Law Library's closure to members of the non-Law School public during the student exam period, which is the second page of Exhibit 2, does not state where the patron wearing it may or may not make photocopies and prints.

A. Utilizing the Orange Pass during the May 2026 student exam closure to the public, on May 4, 2026, plaintiff conducted book research and then went to print and collate some papers in the MyLab room on the second floor of the Law Library.

B. To that point, he had nearly always for the preceding year done his printing and photocopying at the machine in that room, because it was usually unoccupied, unlike the busy machines in the Klaus Reading Room next to the Circulation Desk.

C. A single student entered while plaintiff was there, or else she was already inside MyLab when he arrived. As any video recording will show, she finished her printing before plaintiff began his.

D. After finishing his printing, plaintiff sat in a chair at a low table in the then-vacant MyLab to collate and staple his papers. Plaintiff sat down because plaintiff has a bad lower back that has seized up in the past and left him immobilized for several days at a stretch, during which all he could do was to lie on his back on a hard floor until it calmed down; it could have exacerbated his bad lower back to have to stoop over a low table and sort and collate papers with his arms and hands stretched in front of him while bending forward.

E. Ms. Wharton entered and told him he needed to move to the Law Library's ground floor. He finished collating and moved downstairs.

ii. On May 5, 2026, Ms. Wharton sent plaintiff a letter suspending him until Monday, May 11 from access to the Law Library, which letter he received by email on the morning of May 6.

iii. Plaintiff responded by curt email he sent at 10:04 a.m. on May 6 (Exhibit 26) upon receiving Ms. Wharton's, asking her to remove her suspension, in part because student exams ended May 8, the day his Reunion started, and he might want to visit the Law

Library, which would remain open, with classmates during his Reunion over the weekend. Exhibit 26, at 1.

iv. That day, May 6, he needed to conduct legal research for two filings he had to make that afternoon. Without having received a reply to his email of that morning asking Ms. Wharton to please revoke her suspension, he went to the Law Library in the early afternoon to conduct this legal research; defendant Stephen Parr did not reply on behalf of the UVA defendants until 3:48 p.m. Exhibit 26, at 2.

A. Ms. Wharton and Ms. Morris had conversation with him while he was seated at the table on which rested the Virginia Code Annotated, conducting his necessary legal research.

B. He was not in any way aggressive with or hostile to them, and told them he would leave as soon as he finished.

v. Therefore, on Saturday, May 9, while plaintiff was in Jail, University Police served him the third No Trespass Warning barring him from all University Grounds except the Medical Center.

45. Plaintiff hand-delivered his letter of appeal of the third No Trespass Warning on May 12, 2026 to Chief Longo. Exhibit 8.

a. The third No Trespass Warning stated on its back side, under the heading, "Procedures to Appeal a Trespass Warning," the following: "The Associate Vice President shall issue the decision upholding, modifying, or withdrawing the Trespass Warning within twenty-one (21) calendar days of receipt of the written appeal." Exhibit 11.

b. However, when by June 3, 2026, twenty-two days later, plaintiff had not received any reply, he stopped by Chief Longo's office to inquire. His subordinate Christine

Haines said a response to his appeal had not been done. She said they needed to wait to hear from an organ she called "Threat Assessment."

c. Chief Longo rescinded the No Trespass suspension of plaintiff in writing that afternoon. Exhibit 5, at 6.

46. However, Chief Longo's repeal of the third No Trespass Warning dated June 3, 2026 contained the following condition: "[A]ny future violation of university policy with respect to trespassing will result in reinstatement for a period of four years." Exhibit 5, at 6.

a. Plaintiff now sensed that the recent suspension of his access to the Law Library for sitting in a chair to protect his back while collating papers on a low tabletop in the vacant MyLab during student exam period when he had a pass to be on the Library's second floor had been a pretext for imposing this condition, and that Fossil Fuel Forces would soon find some other pretext for barring him for that four-year period, which plaintiff adjudged to be unreasonably long, given the triviality of any misconduct he had committed as a Law Library patron or wannabe-patron.

b. Plaintiff delivered a 10-page to the Rector and Visitors of the University of Virginia and President Scott C. Beardsley on June 22, 2026 asking them to repeal this condition as unreasonable and unnecessary, but they never replied.

47. On June 22, 2026, plaintiff also delivered to the hands of Amy Wharton, Director of the Law Library, a letter formalizing his request for the reasonable accommodation under the Americans with Disabilities Act to be able to sit in a chair anywhere in the Law Library without limit on duration during law student exam period, when relying on an Orange Pass, due to his lower back disability. Exhibit 24. (Plaintiff had previously informed Chief Longo of his lower

back condition and its compelling him to sit in a chair in his letter dated May 12, 2026, on its pages 2 and 5. Exhibit 8.). She never replied.

48. Although plaintiff did not take any photographs of the Law Library's general seating areas during law student exam period, he estimates that at peak demand, two-thirds of all the chairs on the first, second, and mezzanine levels of the Law Library remained unoccupied. Exhibit 24.

49. On Saturday morning, June 27, 2026, plaintiff went to the Law School to enter the Law Library and conduct legal research. At the front side entrance nearest Slaughter Hall, a woman who told him she was a "law graduate" let him into the Law School building, whose exterior doors were locked, behind her, as she herself entered.

a. She told him as he approached after she had already swiped her Card key, "I am not supposed to let you in," which he assumed was out of duty to her job behind the Circulation Desk.

b. However, then, as video recording will show, she held the door open so he could grab it.

c. By her conduct, plaintiff reasonably believed she was inviting him to enter and go to the public Law Library, just as nearly all of her predecessor student Circulation Desk staff and law students had always done.

d. In their amicable conversation while walking together down Caplin Corridor to the front door of the Law Library, she did not state anything to contradict her act of holding the door open for him so he could then enter.

50. On June 30, 2026, Chief Longo emailed plaintiff a single-page letter stating that as a result of plaintiff's having gone to the Law School and Library on Saturday, June 27, when

the building doors were locked to Card key access only (though without any sign stating welcomed entrants would be trespassing), he was imposing a No Trespass Order precluding plaintiff from entering onto any University property except the Medical Center for four years. Exhibit 6.

51. Plaintiff hand-delivered a letter on June 10, 2026 asking Chief Longo to remove the condition of a 4-year suspension from any future No Trespass Warning University Police might issue him, Exhibit 4, and on July 2, 2026 a letter dated July 1, 2026, Exhibit 5, appealing the four-year ban imposed by Chief Longo's letter dated June 30. Exhibit 6.

a. Plaintiff's letter dated July 1 (Exhibit 5) pointed out that Chief Longo's imposition of the four-year ban relied on second-hand information. For instance, his letter referred to video footage reported to Chief Longo of the female "law graduate" who had just started working behind the Law Library's Circulation Desk speaking with plaintiff outside the Slaughter Hall entrance to the Law School, but failed to acknowledge that she had then held the door open for him to grab it and enter. Exhibit 5, point number 4. Plaintiff invited Chief Longo to investigate further, but Chief Longo, instead, summarily rejected plaintiff's final appeal by his letter dated July 2, 2026. Exhibit 7.

b. Chief Longo's letter of June 30, Exhibit 6, referred to a letter he wrote dated June 11 about plaintiff's "behaviors" during his "many visits to the University's Law Library and the School of Law." However, plaintiff had not previously received Chief Longo's June 11 letter.

i. Plaintiff had in the past repeatedly asked Chief Longo to communicate with him by email, as U.S. mail often takes longer than 10 days to reach his post office box. See, e.g., page 1 of plaintiff's letter to Chief Longo dated May 12, 2026 (Exhibit 8)

("please send any response by email, [] as mail sometimes takes longer than 10 days to reach my post office box"); plaintiff's letter to Chief Longo dated June 10, 2026, at 3 (Exhibit 4) ("I [] look forward to any reply you may be kind enough to email me"); Exhibit 5, at 1 ("[please] reply by email"). Delay surrounding delivery to his post office box was documented in plaintiff's voluntary dismissal of his first lawsuit against Law Library restrictions. Docket No. 18 therein.

ii. When plaintiff visited Christine Haines in Chief Longo's Office on July 2, on his request, she gave him a copy of Chief Longo's June 11 letter. Exhibit 9.

iii. Chief Longo's letter dated June 11 eventually showed up in plaintiff's post office box in an envelope post-marked June 15. Envelope, Exhibit 10.

iv. Although Chief Longo's letter dated June 11 (Exhibit 9) includes plaintiff's email address in the address block for him, it was never emailed to him; such letter or a cover email never reached plaintiff's email Inbox.

v. Therefore, plaintiff never had notice of its contents before he entered the Law School and Library on Saturday, June 27.

c. Plaintiff believes Chief Longo's letter dated June 11 was actually written days later (since the envelope, Exhibit 10, bears a post-mark of June 15), posted to his p.o. box, and purposely not emailed to him so that he would not be aware of its contents as an intentional trap, when and while the Fossil Fuel Forces knew he would, without having received it, continue to enter the Law School and its Library on weekends thanks primarily to the normal grace of its friendly and welcoming students, as he had done without prior Police reprimand nearly every weekend since July 2024.

52. Chief Longo's letter dated June 11, 2026 (Exhibit 9) states the following specifics, to which plaintiff's reply is printed *in italics*:

a. Chief Longo admitted that the Law Library "is a public resource, [but] it exists to primarily serve our students and faculty who are engaged in important work in pursuit of academic excellence." Exhibit 9, at 1.

b. Chief Longo characterized plaintiff's "behaviors" as "disturbing to me and ultimately disruptive to university operations, specifically as it relates to the Law School and the Law School's library." Exhibit 9, at 1. *Plaintiff's reply: It is not clear how any of the following of his 'behaviors,' except for the one stated in subparagraph (g) below which he disputes the truth of, have posed any disruption to the Law School or its Library, other than the aesthetic affront of having an older man who wears the same set of clothing for several days at a stretch and may not always smell nicely due to lack of a regular shower present inside the Law Library conducting legal research and writing on a near-daily basis.*

c. Chief Longo noted that on three prior occasions, plaintiff had "received No Trespass Orders preventing [him] from coming on to university property," each of which Chief Longo rescinded on plaintiff's appeal to him. Exhibit 9, at 1. *Plaintiff's reply: If Chief Longo rescinded them without, until the last one, imposing any threat of escalated punishment that plaintiff could appeal at that time, then how can each separate incident be said to justify a 4-year ban? While plaintiff apologized for sleeping on the floor which occasioned the first No Trespass Warning, as stated above, he disputes that the second and third No Trespass Warnings were issued for legitimate reasons.*

d. For the first time, Chief Longo or any person in a position of Law School or University authority criticized plaintiff's "repeated attempts to access the Law School during times when the library is not open to the public." Exhibit 9, at 1. *Plaintiff's reply: The Law School's private security guard said to him once that the building was closed on the weekends, to*

*which he replied that if someone let him inside, the public Law Library was open and that was where he was headed. She saw him many times after that enter on weekends in the same manner and go directly to the Law Library, but never after their first conversation did she reprimand him, bar him, or call University Police (though she may have been the person to do that on July 8, 2026).*

i. "[F]rom time to time you have banged on the locked exterior doors and windows to persuade others to permit you access." Exhibit 9, at 1. *Plaintiff's reply: He sometimes knocked on the glass panel of the exterior door to draw the attention of a passing student or other person, but he never banged, nor did he knock repeatedly in an annoying way, after the person noticed his first knock. While Circulation Desk staff, who were mainly LLM students, eventually informed plaintiff they were not authorized to come open the locked exterior door to let him in upon his phone call to them at the Circulation Desk phone, as they had been doing for some time, all of these same staff continued to let him in, if he was waiting outside when they showed up to card swipe open the exterior door for the start of their shift. In two years from July 2024 to June 2026, only twice did an ordinary law student decline to let him in and only twice did a faculty member (one a male professor of constitutional law and one a female professor of gender law) decline to let him in; in the same period, more than a hundred times, a law student or staff-member invited him inside the building with a smile.*

ii. "[O]r you gain entry by 'tailgating' after students and staff who are lawfully gaining access to the space using University credentials." Exhibit 9, at 1. *Plaintiff's reply: He did this twice that he can recall, without verbal objection from the student or professor whom he followed in. On all of the more than one-hundred other occasions, the person welcoming him to enter the building was fully aware of what he or she was doing and except for*

*the four instances stated in subparagraph (d)(i) above plus a fifth occasion when a professor stated an objection but nonetheless let him in, the welcoming person never stated any objection.*

iii. "If true, this not only is contrary to university policy, but also could be construed to be a violation of Virginia law for which you could be deemed a trespasser and subject to criminal prosecution." Exhibit 9, at 1. *Plaintiff's reply: If the University was going to make his weekend entries the cornerstone of expelling him for four years from all its Grounds, then why did any person in a position of authority, such as an administrator or Chief Longo, not inform him the Law School was going to treat the posted, exterior door-locking hours as a No Trespass Advisory or Warning before it imposed the condition of a four-year ban on him without advance warning of such enforcement, since Chief Longo's letter dated June 11, never emailed him, and posted on June 15 informing him of such change in enforcement, did not reach plaintiff until after the June 27 incident for which the University imposed the four-year ban.*

e. Referring to plaintiff's first No Trespass Warning, which Chief Longo rescinded as soon as he received plaintiff's appeal letter and apology: "[I]n 2024, you were found asleep inside the Law School early one morning. [] It appears that you entered the building the evening before and remained inside after closure." Exhibit 9, at 1. *Plaintiff's reply: See subparagraph (c) above and paragraphs 42(b) above and 102(c)(iii)(A)-(C) below.*

f. Despite no Law Library administrator ever having counseled him otherwise before, Chief Longo wrote: "[T]here have been many occasions when you not only make use of the equipment without permission or assistance, but you also make copies that far exceed the permissible amount." Exhibit 9, at 1. *Plaintiff's reply: Signs limiting outside patron printing and photocopying to 20 pages per day first appeared beginning August 2025, if plaintiff's memory serves him. However, someone, and not plaintiff, lowered the Venetian blinds*

*covering the glass walls of MyLab next to the print and photocopy machine to hide its use from exterior view. The blinds were left that way until May 2026. Plaintiff believes this was done to permit his continued use thereof, which he took advantage of. In addition, whenever he printed or photocopied from the machines in the Klaus Reading Room on the Law Library's ground floor, he did so notoriously. It was with the full knowledge and consent of Circulation Manager Rebecca Hawes Owen, whose office was next door, and her subordinates.*

g. Without giving a single specific example, Chief Longo wrote: "[W]hen policies are called to your attention you become confrontational, argumentative, and consequently, cause others to be uneasy and fearful for their safety because of your actions." Exhibit 9, at 1. *Plaintiff's reply: Chief Longo's subsequent letter dated June 30, 2026 stated that Law Library Director Amy Wharton had told plaintiff that he was "not allowed to access the facility on the weekends." Exhibit 9. If she told him this, he would have disputed it verbally to her expressly on the constitutional grounds underlying this complaint that the Law Library was at all times public and if someone invited him into the building, he was allowed to be inside the Law Library, as evidenced by the incident of the University's tornado warning closure in March 2026, discussed at paragraph 42(f) above. In such conversation, and at all other times, plaintiff's words and demeanor never gave, or never would have given, any cause or reason for another person to fear for his or her safety.*

53. Following is an explanation of circumstances that resulted in the University's eventually filing a trespass charge against plaintiff.

a. One of the sets of legal claims plaintiff has pursued in state court since this Court's first dismissal of the Exxon Mobil lawsuit on March 13, 2025 has involved legal guardianship of his parents.

i. As recounted in paragraphs 105(g) and 108 of Docket No. 313-1 in the Exxon Mobil lawsuit, Charlottesville Circuit Court Judge Claude V. Worrell, II ("Judge Worrell") ruled against plaintiff with prejudice in two civil cases after having received false, negative and improper *ex parte* communications originated by Officer Ryan about criminal charges Officer Ryan brought against him.

ii. Plaintiff's appeal to the Virginia Court of Appeals in part on this basis remains pending.

b. Meanwhile, another Circuit Court Judge, sitting in Albemarle County, ruled on some of the related Cases. To inform her that her sustaining of a demurrer would compel plaintiff to appeal therefrom, and because her ruling would apply *res judicata* in reliance on Judge Worrell's ruling in the Cases subject to appeal on the basis he had ignored his judicial ethical duty with regards to *ex parte* communications, plaintiff wanted to attach the three appellate briefs as exhibits for her to be aware of.

i. Lacking money to pay for this printing, he inquired of a Pastor at a friendly church if the church would allow him to print out the approximately 150 pages of appellate briefs to submit to the Circuit Court Judge as paper exhibits. She declined.

ii. Plaintiff had no choice but to return to the Law Library on July 1, 2026 to print out those exhibits to file in the Circuit Court. That was the day after he received Chief Longo's letter barring him for four years, but before he received Chief Longo's letter dated June 11 mailed to his p.o. box, which was the first-ever complaint about his Law Library printing. Plaintiff also needed to look a few cases up on LEXIS and pick up two law books which the Circulation Desk held for him.

c. As a result of this visit to the Law School and its Library on July 1, which plaintiff made out of the necessity, University Police charged him with trespassing.

d. Plaintiff has no regrets about going to the Law Library on July 1 to conduct this printing, never having received any criticism of his printing before that date. It led to the following positive development in his state litigation.

i. Furnishing the three Virginia Court of Appeals briefs about Judge Worrell's seeming lapse in professional judgment to the other Circuit Judge as exhibits seemingly prompted her to recuse herself from one of the six civil Cases involving plaintiff before her, due to a conflict of interest.

ii. That step in turn seemed to have prompted Judge Worrell to issue an order recusing himself from all matters before him involving plaintiff. Exhibit 12. Under Virginia procedure, the Chief Justice of the Virginia Supreme Court will now appoint a replacement Judge to hear all matters in Charlottesville Circuit Court involving plaintiff. Assuming that Judge comes from outside the 16th Judicial Circuit, it will better insulate that state Court from allowing corrupt pressures which plaintiff has been opposing to come to bear upon its rulings concerning him.

iii. The University Police Officer failed to show up at plaintiff's arraignment in the Charlottesville General District Court on the charge of trespassing, but the Judge, rather than dismissing, transferred the Case to the Albemarle County General District Court, where it now stands.

54. Of note is that the day after Chief Longo posted on June 15, 2026 (Exhibit 10) his letter to plaintiff dated earlier to June 11 giving thin, *ex post facto* justification for imposing the condition of a four-year suspension should plaintiff incur any more No Trespass Warnings, the

University announced that alumnus David LaCross had donated $43.4 million. Exhibit 13. Mr. LaCross made his fortune in data-mining, a field dominated by machine learning and now, artificial intelligence, pillars of the Fossil Fuel Forces. Exhibit 27. Gifts of that extraordinary magnitude are subject to sometimes lengthy courtship and negotiation. The University was able, with the donor's consent and complicity, to announce it at that time on the appreciation that Mr. LaCross's $43.4 million in hand would be worth plaintiff's $500 million in the bush. Satisfying a condition between the two of getting rid of plaintiff was the cause for Chief Longo's sending plaintiff a letter post-marked June 15 that he had to show falsely he had previously emailed to him on June 11. The appointment in 2026 of Carlos M. Brown, an Executive Vice President of the biggest purveyor of fossil fuels in the Commonwealth, Dominion Energy, as University Rector, and Elizabeth Haile Hayes, a partner retired the law firm of Akin Gump Strauss Hauer & Feld, LLP ("Akin Gump"), which firm represents Exxon Mobil Corporation in plaintiff's lawsuit against it, to the Board of Visitors, set the stage for the Fossil Fuel Forces to have their decisive influence on the University Administration when it came to dealing with plaintiff.

55. The Law School began to loosen its mooring in service to the citizens of Virginia, in favor of welcoming private funding from business sources who turn out thirty years later to be Big Tech, in the mid-1990s. Then-Dean Robert Scott eliminated the reservation of a minority of the seats in each student Class for Virginia residents. From pioneering the field of Law and Economics, today, the Law School has become a leader in technology law and related disciplines. One result is that as membership numbers in the Virginia Bar have taken a steep drop over the last 15 years, in a recent graduating Class of 375 from the Law School, a mere 13 sat for the Virginia State Bar.

56. The foregoing trend played out in microcosm in plaintiff's appeal that the Law Library keep a second copy of *Virginia Rules Annotated*, the previous year's edition, on its shelves, in addition to the one in the reference section. He would have liked to have been able to check it out on occasion to bring to a state court hearing. Leslie Ashbrook, Assistant Library Director, told him the Library lacked shelf space for such a book, a response he informed another Library staff member of at the time.

57. Plaintiff submits that online legal research tools favored by Big Tech and the Law Library are inferior to book research because:

a. The algorithms can be manipulated to give different results to different searchers based on the same search, as related to plaintiff by two law students and as based on his own experience.

b. The databases lack important resources found only in print, as evidenced by a search for a scholarly legal article included in a LEXIS print volume but not found in the online version.

c. Book research permits the human eye to see at once multiple content data points on two pages at a time and serendipitous flipping of pages forward and backwards, as compared to the sequence an online application presents on a screen, which only permits scrolling from page to page.

58. Thus, plaintiff alleges, his persistence with the Exxon Mobil lawsuit was the flashpoint for the University's retaliation set forth in Count 3, but he also represents a quainter past rooted in book learning, which modern Fossil Fuel Forces would be happy to see disappear, in favor of their digital mastery.

**The Jefferson-Madison Regional Library Defendants**

59. On April 14, 2026, JMRL Library Director David Plunkett requested to meet with plaintiff. At this meeting, which took place April 20, he blamed plaintiff for causing "disruptions" in the downtown Charlottesville public library and warned him that any further "disruptions" would result in deprivation of his library privileges. When asked what he meant by "disruptions," Mr. Plunkett stated that:

a. Plaintiff had caused him to search multiple times for surveillance video recordings as a result of Police reports plaintiff had made of criminal conduct against plaintiff inside the Library. It was annoying and time-consuming for Mr. Plunkett to have to search video recordings on account of plaintiff.

b. Plaintiff had caused many staff to be subpoenaed to appear in Charlottesville General District Court, which occupied their time unnecessarily.

c. Mr. Plunkett did not complain that plaintiff's personal conduct had been in any way disruptive inside the Library.

60. Plaintiff responded to Mr. Plunkett in their meeting of April 20 as follows:

a. The Library's surveillance cameras were in place in part for the reason of deterring and detecting crime. Therefore, any use of their recordings occasioned because of plaintiff was in keeping with the cameras' purpose and function in the public place of the Library.

i. The three instances to that date for which plaintiff had filed Police reports all involved criminal acts committed against his person or property inside the Library.

A. The first instance is referred to in paragraph 122(f) of Docket No. 313-1 and at greater length in paragraph 118 of Docket No. 285-1 in the Exxon

Mobil lawsuit. Timothy B. Trotter, an Exxon agent who follows plaintiff in the Charlottesville homeless population, was captured on the Library's video recordings supervising the theft from plaintiff's blue bicycle pannier of documents evidencing the Fossil Fuel Forces' wire fraud against plaintiff.

B. The Library's video camera recordings did not yield a culprit in the theft of one of plaintiff's bicycle lights from a charging stand on the ground floor of the Library because a concrete pillar obscured the video camera's view of the charging stand.

C. On February 14, 2026, Josiah Talley violated the Protective Order plaintiff has in place against him for assaulting and battering plaintiff by intentionally coming close to plaintiff on the ground floor of the downtown public Library. The Charlottesville General District Court convicted Mr. Talley for this offense, which was his second criminal conviction for violating the Protective Order inside the Library, on July 6, 2026. Exhibit 14 (judgment of conviction).

ii. Thus, the Library's video surveillance cameras had, in fact in two of the three instances, aided the administration of justice by providing evidence of crimes committed inside the Library. Mr. Plunkett could have one of his subordinates review video footage, if he did not have the time to do so himself.

b. To the date of their April 20, 2026 meeting, plaintiff had only ever once caused to be subpoenaed for Court a single JMRL Library employee, Circulation Manager Brittany Eversberg. Her testimony on September 22, 2025 led to the criminal convictions of both Izel Nelson for violating his Protective Order and Josiah Talley for both the substantive offense of assaulting and battering plaintiff and violating his Protective Order the first time. Any

and all other subpoenas of Library staff had been done to that date on behalf of those criminal convicts, by their defense counsel.

c. Therefore, Mr. Plunkett did not have any basis for accusing plaintiff of causing "disruptions" of the JMRL Library.

61. On July 16, 2026, Mr. Plunkett issued to plaintiff a letter suspending his JMRL Library privileges at all branches for three months, but inviting him to meet to discuss the matter. Exhibit 15.

62. When plaintiff met with Mr. Plunkett in his office on July 21, 2026, Mr. Plunkett began the meeting by saying that he had seen on livestream plaintiff's remarks delivered to the Charlottesville City Council the evening before. Those remarks are Exhibit 16 hereto.

a. In those remarks, plaintiff spoke in opposition to opening 2000 Holiday Drive as a low-barrier, emergency shelter for the homeless, because it would only serve as a more entrenched home from which the agents of Fossil Fuel Forces can operate against business opponents like himself and further their other intelligence and criminal aims in this area.

b. Mr. Plunkett then informed plaintiff that he was not going to lift the three-month suspension.

c. Mr. Plunkett stated that the suspension was a result of plaintiff's violation of Library policies. When plaintiff asked, Mr. Plunkett did not describe any instance of disruptive behavior by plaintiff. The meeting ended within a few minutes of its start.

63. Plaintiff's 17-page letter to Mr. Plunkett delivered on July 19, 2026 between the latter's suspension letter of July 16 and their meeting of July 21 attempted to address any and every conceivable basis for Mr. Plunkett's concluding that plaintiff had violated any Library policy or caused any disruption. Exhibit 17, plus its Exhibits 1 – 3 thereto. Plaintiff herein first

rebuts the three grounds listed for disciplining plaintiff in Mr. Plunkett's suspension letter of July 16, which Mr. Plunkett wrote the two discussed, without stating any specific details, at their meeting of April 20. Exhibit 15. Then plaintiff will turn to the incident on July 15 that was a pretext for Mr. Plunkett's issuing the three-month suspension of plaintiff, Exhibit 15, at the behest of the Fossil Fuel Forces.

a. In response to Mr. Plunkett's first dictate that, "All interactions with JMRL staff should be restricted to library business," Exhibit 15, plaintiff never had any interactions with Library staff that pertained to other than Library business.

i. The instance plaintiff guesses gave rise to Mr. Plunkett's complaint about this involved Reference Librarian Eric Buckenmeyer.

A. Mr. Buckenmeyer was working one evening in the fall of 2024 when, using the Library's public access computer terminals on the ground floor, plaintiff was unable to upload to the PACER portal of this Court a document he had prepared to file electronically in the Exxon Mobil lawsuit.

B. Despite trying different computer terminals, the Library's own account, and other methods, Mr. Buckenmeyer was unable to figure out why plaintiff could not upload his filing.

C. Because this snafu threatened to prevent plaintiff from meeting his filing deadline, he asked Mr. Buckenmeyer to write a short note of explanation to the Clerk of this Court, which request he kindly obliged and which note plaintiff believe he delivered to the Clerk the next day (or else, the problem resolved before delivery of Mr. Buckenmeyer's excuse note, plaintiff does not remember).

D. That afternoon, the problem did resolve itself, and plaintiff was able to make his federal filing before the deadline.

ii. In addition, on the evening May 11, 2026 of plaintiff's release from Jail after Officer Ryan and the Fossil Fuel Forces conspired to make him miss his 35th Year Law School Class Reunion for fear he could secure investment in POP Diesel thereat, plaintiff sat at a public access computer terminal on the ground floor of the downtown JMRL Library. Mr. Buckenmeyer was the sole Reference Librarian on duty.

A. Plaintiff was sending emails to some Classmates who attended the Reunion explaining as best he could in a plausible and light-hearted way why he had been absent, in the chance any might want to connect further on Zoom. (None did, as Anthony Arcinega, discussed next, laughing loudly the whole time nearby, knew they would not.).

B. The ground floor was empty, except for the man who goes by the pseudonym Anthony Arcinega, who sat at a terminal not far away. He is referenced in paragraph 144(e)(vi) of Docket No. 285-1 of the Exxon Mobil lawsuit, mistakenly therein as a U.S. Government agent, when he turned out later to be one of Exxon's fraudulent agents masquerading as such.

C. While plaintiff was writing and sending these emails, Anthony Arcinega laughed ostentatiously loud continuously for an hour in mockery of plaintiff's efforts, further indicating that Exxon follows plaintiff's Internet communications even on the supposedly secure access the JMRL Library affords patrons.

D. Plaintiff did not complain to Mr. Buckenmeyer about Mr. Arcinega's disruption, but showed him a photo of Mr. Arcinega a few days later that the latter

had allowed plaintiff to take, and asked Mr. Buckenmeyer if he remembered Mr. Arcinega's obnoxious behavior on the evening of May 11.

E. Mr. Buckenmeyer confirmed that he did, and also confirmed he knew his name as Anthony Arcinega.

iii. When it turned out in June 2026 that the Charlottesville Public Defender had subpoenaed two other JMRL reference librarians for Josiah Talley's criminal trial for his second violation inside the public Library on February 14, 2026 of his Protective Order extant for plaintiff's benefit (of which crime Mr. Talley was convicted on July 6, 2026), plaintiff informed the specially-appointed prosecutor, Page Higginbotham, the Commonwealth's Attorney for Orange County. Prosecutor and complaining witness agreed it might be necessary to subpoena Mr. Buckenmeyer to refute whatever the two other JMRL reference librarians had been subpoenaed to testify about at Mr. Talley's trial.

A. Thereupon, plaintiff inquired of Mr. Buckenmeyer whether he recalled to two incidents set forth in subparagraphs (a)(i) and (ii) foregoing.

B. Mr. Buckenmeyer responded that he did recall them.

C. Mr. Higginbotham later called Mr. Buckenmeyer directly to speak about his potential testimony.

D. In the end, a subpoena for Mr. Buckenmeyer to testify was never served on him because plaintiff bungled the downtown Library's street address in email communications to Mr. Higginbotham.

iv. Plaintiff's conversations with Mr. Buckenmeyer recounted foregoing were entirely about "library business," since Mr. Buckenmeyer as a staff member witnessed plaintiff's difficulties making electronic filings with this Court and was willing to

document same in his note that plaintiff was ready to deliver to the Clerk, and he witnessed the conduct of another patron which, he agreed, had been disruptive, even though plaintiff never complained to him about it.

b. In response to Mr. Plunkett's second dictate that, "All interactions with JMRL staff or other patrons should not disrupt the regular operation of library services," Exhibit 15, Mr. Plunkett never gave any details about any incidents in which plaintiff's speech of conduct was disruptive, other than plaintiff's twice initiating criminal complaints that led Police to come and investigate, the first time of which the miscreant Josiah Talley was arrested inside the Library for which he was later found guilty and the second time of which turned out to be equally valid, after the General District Court dismissed Officer Ryan's charge that plaintiff had made a false Police report concerning Izel Nelson's violation of his Protective Order.

c. In response to Mr. Plunkett's third dictate that, "While on JMRL property, you need to keep your personal belongings with you at all times," Exhibit 15, plaintiff informed Mr. Plunkett at their meeting on April 20 that Circulation Desk Librarian Steve (last name unknown) had offered without plaintiff's asking to keep his blue bicycle pannier in his office on those occasions when plaintiff had to leave the downtown Library temporarily for a short period of time.

d. After Mr. Plunkett's and plaintiff's meeting on April 20, plaintiff never took up Steve's offer again to store his belongings behind the Circulation Desk.

e. The wholly manufactured incident which prompted Mr. Plunkett's suspension beginning July 16, 2026, Exhibit 15, happened the day before, July 15, as follows.

i. First, as to background. One of the women who works behind the Reference Desk on the JRML Library's ground floor is in her 30s, with brown hair, and has a nose-piercing, but plaintiff does not recall her name.

A. In part showing the Fossil Fuel Forces integration into even the administrative hierarchy of JMRL Library, she was sent to work there to be friendly with plaintiff, along the lines of two others described in paragraph 83 of Docket No. 313-1 of the Exxon Mobil lawsuit.

B. Several times, she asked to accompany plaintiff to look for books in the stacks, when he told her he was perfectly competent to find them on his own.

C. He did not reciprocate her entreaties of friendship and intimacy.

D. Therefore in part, plaintiff believes, the following occurred on July 15.

ii. For the second day in a row, plaintiff's bicycle sustained a flat front tire, this time, while it was locked to a post outside the front entrance to the downtown public Library.

A. The day before, plaintiff had been aware of circumstances in which an agent of the Fossil Fuel Forces had punctured it by poking it with a wire, as confirmed by plaintiff's bicycle mechanic who changed the tube at Community Bikes. (As that mechanic will confirm, plaintiff's bicycle has not infrequently been the object of sabotage, even on occasion at night while he leaves it leaning against a tree next to the one-man tent where he sleeps in the Shenandoah National Park.).

B. Plaintiff observed the flat tire when he went outside the Library at around 10:30 a.m. on July 15.

I. Because he had to go somewhere nearby shortly and did not have time then to attempt inflating the tire, his blue bicycle pannier was too heavy for him to carry by hand on foot, and he intended to make a Police report at Police headquarters of this sabotage to his bicycle for the second day in a row that would have been captured on a Library video camera nearby, he thought to leave his blue pannier and other belongings inside one of two small conference rooms on the downtown Library's ground floor, for the time being.

II. Plaintiff inquired at the Reference Desk and both were available. He chose Conference Room A, put his pannier and other belongings inside it, and locked the door.

C. The place where plaintiff had to go that morning of July 15 was the food pantry at Holy Incarnation Roman Catholic Church, just behind the downtown JMRL Library. It is open Monday through Wednesday from 10:30 a.m. until noon. If plaintiff did not collect free food from that pantry that Wednesday morning, he would not have any food to eat for the two days of the weekend from Friday to Sunday when he was not fasting, after the last church soup kitchen ended on Thursday and before the first one resumed on Monday of the following week. Plaintiff walked to the Catholic Church's food pantry, collected two bags of groceries, and deposited them inside small Library Conference Room A with his other belongings there. Then he walked to First Presbyterian Church on Park Street for its serving of the free soup kitchen lunch that day, which ordinarily, he would have ridden his bicycle to, with blue pannier hitched to the side of the bike rack over the rear wheel and the two grocery bags tied to the top of the rack, but which he had had to leave in Conference Room A on account of

his flat front bicycle tire. Walking back to the Library following lunch, in order to avoid making any scene by calling the Police from the Library to investigate sabotage to his front bicycle tire, he stopped by Charlottesville Police Headquarters at 606 East Market Street to lodge his report there. Officer Nash said he would stop by the Library to view videotape to see if any culprit could be identified.

D. By the time plaintiff returned to the Library intending to occupy Conference Room A, it was after 1:30 p.m. on July 15.

I. Reference Librarian Supervisor Acacia Rodgers told him that because he had been absent for more than 30 minutes, staff had cleared Conference Room A of his contents, and they were being stored behind the Circulation Desk.

II. Plaintiff asked why staff had done that, when he was unaware of any 30-minute limit on being away from a small Conference Room.

III. She pointed to JMRL Procedure: Section 5.1, paragraph 7, which states in part: "JMRL rooms are not available to store supplies for groups or individuals." Exhibit 18.

IV. Plaintiff pointed out that neither the Procedure, nor anything else in writing, warned about a 30-minute limit for being absent from a small Conference Room.

V. Acacia's colleague at the Reference Desk stated that both small Conference Rooms were still available, and so plaintiff took out Conference Room B, collected his blue bicycle pannier and bags of groceries from behind the Circulation Desk, and deposited them in Conference Room B, to see if he might be able to inflate his flattened front bicycle tire parked out front.

E. Plaintiff's attempt to inflate his flat bicycle tire did not succeed. He returned inside the Library at around 2:30 p.m. on July 15 and told Circulation Manager Brittany Eversberg and Officer Nash, who were then watching surveillance video in search of any sabotage to his bicycle, that he believed the cause was a puncture. He left to walk his bicycle up Preston Ave. to have the tube replaced at Community Bikes. He was back at the Library right around 3 p.m., perhaps a minute or two after. Waiting for him at the front door was the Reference Librarian with the nose-piercing, who told him that because it was his second violation of the day for having been absent from Conference Room B for more than 30 minutes, he was suspended for the rest of the day.

F. In breach of the Library's own Procedure: Section 5.1, paragraph 7 stating that the Library will not store supplies for patrons, Exhibit 18, the Reference Librarian with the nose-piercing who had just suspended him for the day then offered to hold some of his belongings if he preferred to make two trips to transport his two grocery bags, blue pannier, and other belongings elsewhere. He declined her offer. Outside the front of the Library, he proceeded to hitch his blue pannier to the side of his bicycle rack and tie the two grocery bags and other items to the top of the rack of his newly repaired bicycle.

G. Then, again in violation of the Library's own Procedure: Section 5.1, paragraph 7 stating that the Library will not store supplies for patrons, Exhibit 18, and after the Reference Librarian with the nose-piercing had already expelled him from the Library for the day, as was recorded on video of July 15, Circulation Manager Brittany Eversberg and one of her assistants came outside to offer to plaintiff to keep and store the grocery bags while he traveled elsewhere by bicycle with his other belongings. He declined her

kind offer and rode away from the JMRL Library with all his belongings on board his newly fixed bicycle.

64. Mr. Plunkett's letter of suspension was waiting for plaintiff when he showed up at the downtown JMRL Library the next morning, July 16. Exhibit 15.

a. It accuses him of "repeated disruption of library service," but does not give any detail. Exhibit 15.

b. Nor did Mr. Plunkett ever give any detail when asked to do so after the meeting between the two of July 21. Email exchange between plaintiff and Mr. Plunkett dated July 21-22, 2026 (Exhibit 25).

c. Plaintiff has done the best he could foregoing, and did the best he could in his 17-page letter to Mr. Plunkett dated July 19 (Exhibit 17), to try to address any conceivable shortcomings in his conduct, which were insubstantial, at best, and trivial, at worst.

d. Given that plaintiff's contact with the Police inside JMRL Library was always lawful and within his rights of Protective Order enforcement, JMRL Library appears not to have identified any material flaws in plaintiff's conduct that would warrant any suspension, much less one lasting three months.

65. Therefore, the likely reason Mr. Plunkett did not rescind his suspension when they met to speak about it on July 21 could be, and was, plaintiff's remarks decrying the City's opening of a low-barrier shelter at 2000 Holiday Drive, which plaintiff delivered the night before to City Council (Exhibit 16), and which Mr. Plunkett made a point of telling plaintiff he had heard and seen on livestream, at the start of their meeting on July 21.

**The S&P Global Intelligence Defendants**

66. From the manner in which the Haven expelled plaintiff in favor of retaining the two agents of the Fossil Fuel Forces who were convicted of assaulting and battering him, and against whom he had secured Protective Orders barring them from setting foot inside the Haven for most hours of the day, plaintiff came to better understand the broader, sinister forces at work in Charlottesville opposed to his business, the Fossil Fuel Forces.

a. As recounted in paragraph 91 of Docket No. 313-1 of the Exxon Mobil lawsuit, the Haven's Executive Director Owen Brennan had tried to recruit plaintiff to serve on an Advisory Council established to promote plans for a low-barrier shelter for the homeless at 2000 Holiday Drive.

b. It was when plaintiff refused this invitation on the morning of October 21, 2025 that these Forces' contingency plan to finally expel him and frame him for trespassing at the Haven kicked in.

67. Thereupon, plaintiff thought to alert IMPACT that one of the three topics on which it had chosen to lobby elected leaders of Albemarle County and Charlottesville local government in its 2025-26 cycle, affordable housing, was dangerous, for its proximity to the issue of homelessness and any endorsement IMPACT might be seen to give to plans for a new and superfluous, low-barrier shelter.

a. Plaintiff attended a meeting on December 10, 2025 of the Research or Steering Committee of the Housing Issue held at Trinity Episcopal Church to alert them to this concern.

i. The Chair of this meeting, the Rev. Will Christians, allowed him to speak for a few minutes at the end of the meeting.

ii. Plaintiff presented his reasons for questioning the Haven's commitment to law adherence, including the perpetual drug-dealing it allowed inside its men's room, after it had expelled him for prosecuting Izel Nelson and Josiah Tally to conviction for assaulting and battering him for persisting in the Exxon Mobil lawsuit.

iii. He pointed out that:

A. A 200-bed low-barrier shelter (then the scale under consideration, later reduced to 80 beds) was unnecessary for a city Charlottesville's size, since 50 beds already offered by PACEM church shelters, plus 10 in the Salvation Army warm room, had proven without fail during the winter of 2024-25 to be sufficient;

B. Any additional bed space just opened the door to agents posing as transients who would wreak corruption and crime on this area;

C. The City of Richmond, multiple times bigger in population than Charlottesville, has total low-barrier bed-space for the homeless of 200, and;

D. According to Major Wilson, the Salvation Army would have nothing to do with low-barrier shelter beyond its 10 spaces because it lacked the manpower to police against organized crime infiltration and control of such a population.

b. The meeting Chair on December 10, 2025, the Rev. Will Christians, asked John Frazee, IMPACT's point-man on the Housing Issue, whether the organization needed to consider plaintiff's comments further.

c. Despite IMPACT's ostensible commitment to grass roots-level democracy and the valid questions plaintiff had raised, Mr. Frazee replied in the negative.

d. There was no further discussion of plaintiff's point.

68. When the Rev. Will Christians, who is also one of IMPACT's two paid staff leads and an Episcopal minister, came to give the homily at Trinity Episcopal Church one Sunday in early 2026, plaintiff asked to speak with him afterwards about the same concerns, but Rev. Christians brushed him off.

69. It was at IMPACT's Justice Ministry Rally held February 23, 2026 at Roman Catholic Church of the Incarnation that plaintiff suspected subterfuge might be afoot. Two City Councilors were present and subjected to questioning about IMPACT's second of three issues, Bus Transit Wait Times, but not the transformation of the former hotel the City had purchased at 2000 Holiday Drive into a big and unnecessary low-barrier shelter for the homeless.

a. In contrast, the multi-page Program that IMPACT distributed at the Justice Ministry Rally identified as part of the Ask of Albemarle County Supervisors on the Housing Trust Fund Issue, "Priority [be] given for projects that include [] help for the homeless" (Exhibit 19, page 3).

b. This Program was silent on IMPACT's Ask of the City Council on the Housing Issue. Exhibit 19.

c. Robert Law, IMPACT's Treasurer who had attended the December 10, 2025 meeting of the Housing Issue Steering Committee, noticed plaintiff sitting in the audience at the February 23, 2026 event.

70. Plaintiff understood that because of the business POP Diesel he ran and the Exxon Mobil lawsuit he was pursuing, his experiences living among Charlottesville's homeless population since July 2024, being subject to Fossil Fuel Forces pervaded upon him therein, gave him unique insights.

a. He felt an obligation to inform the grass roots membership of IMPACT that the Housing Research or Steering Committee might be missing the mark on support for what he understood to be an unnecessary low-barrier shelter that would likely serve to contribute corruption and crime to this region.

b. The multi-page Program that IMPACT distributed at its flagship Nehemiah Action on March 24, 2026 in the Martin Luther King, Jr. Auditorium at Charlottesville High School (Exhibit 20), in combination with the Justice Ministry Rally the month before, revealed that long-standing Charlottesville City Councilor Lloyd Snook was the only member of either City Counsel or County Board of Supervisors whom IMPACT was not questioning publicly at either of these events.

i. Councilor Snook, a local lawyer since the 1980s, has as part of his law practice in Charlottesville criminal defense for private clients who retain him.

ii. Plaintiff is aware from his own practice of primarily federal court-appointed criminal defense from 1992 to 1995 and from personal experience with the only client who retained him privately in a federal felony case during that period that those lawyers who earn income from a privately retained criminal defense clientele in felony cases are often paid by backers of their clients, who may happen to be affiliated with some organized crime element or another.

iii. The leadership of IMPACT, both its Board of Directors and its Research or Steering Committee on the Housing issue which as discussed below, Mr. Frazee claimed Chairmanship of, allowed Councilor Snook to be the only local government elected official to not be subjected to any public questioning at all, even though Councilor Snook had

apparently persuaded Mayor Juandiego Wade that the two of them should seek re-election in the last poll on a joint ticket making this issue their top priority.

c. John Frazee having completed any lobbying in the name of IMPACT of City Councilors on the Housing and low-barrier shelter issue in private or during the year preceding, IMPACT's Program for the Nehemiah Action of March 24, 2026 (Exhibit 20) again specified questioning of the two remaining City Council members (not counting Councilor Snook who escaped all public questioning by IMPACT) on the Transit Issue only.

d. All six members of the Albemarle County Board of Supervisors were present at the March 24, 2026 Nehemiah Action for questioning by IMPACT, making it a public meeting of the Board, in addition to the presence of 600 or so members of the public. Exhibit 20, page 2.

i. The sole topic presented Albemarle County Supervisors was the Housing Trust Fund, by John Frazee. Exhibit 20, page 2.

ii. Since past or private lobbying of City Councilors on the low-barrier shelter had succeeded in locking it in, the two City Council members present on March 24, Mayor Wade and Vice Mayor Natalie Oschrin, were asked about Transit Wait Times. Exhibit 20, page 2.

iii. The priorities for County Board members stated in the published Program now deleted mention of prioritizing homelessness, a change from the Program at the Justice Ministry Rally the month before. Cf. Exhibit 20, at 5 with Exhibit 19, at 3 ("Priority [be] given for projects that include [] help for the homeless").

iv. Instead, John Frazee pressed them on committing $10 million to the County's Affordable Housing Investment Fund (so that, words John Frazee did not speak

publicly, some of that money might support or free up other money for the City's low-barrier shelter). Exhibit 20, page 2.

e. Therefore, at 8:15 p.m. on March 24, when IMPACT's Nehemiah Action agenda was proceeding five minutes ahead-of-time, after all public officials had completed their remarks and IMPACT officials had finished their questioning of them, plaintiff rose from his seat at the front of the auditorium and turned to address the audience. He asked for two minutes to raise questions about the low-barrier shelter idea, since it seemed that IMPACT's leadership was not informing its citizen members of all the factors.

i. At that moment, John Frazee rushed from his seat across the stage and jumped down into the well of the audience to grab plaintiff's right upper arm rudely and angrily, and to stand in front of him, preventing plaintiff from continuing the two minutes of commentary he sought to share.

ii. Despite plaintiff's asking him to let go, Mr. Frazee held onto plaintiff's right upper arm with a strong grip for several minutes, speaking over him to his face to prevent his remarks from ever progressing.

A. Plaintiff repeatedly asked Mr. Frazee to release his grip on his arm, and he did not struggle in response, but Mr. Frazee held on.

B. During that time, Deacon Don Gathers of First Baptist Church descended from the stage, grabbed plaintiff's left arm, and also held on.

C. When plaintiff asked, Deacon Gathers let go.

D. As a result, Mr. Frazee also let go.

E. However, at least at one point, Mr. Frazee lunged back at plaintiff, grappling with his arms and torso, trying to wrestle him to the side of the audience well.

F. Plaintiff did not physically strike back at Mr. Frazee.

iii. At that point, Albemarle County Board of Supervisors Member Mike Pruitt came from his chair seated with the other five County Supervisors in the first row of the audience to plaintiff's right to ask Mr. Frazee to leave plaintiff be.

iv. After that, Mr. Frazee stopped physically attempting to manhandle plaintiff, although he continued sporadically to accost him verbally to his face.

v. Mr. Frazee remained nearby plaintiff standing in the audience well, and taking ownership of the outcome of plaintiff's attempt to speak and IMPACT's handling of it, the entire time plaintiff stood there peacefully bearing witness, after being forcibly silenced, for approximately 10 minutes.

vi. Undoubtedly prompted by Mr. Frazee's initiative, Deacon Gathers took the microphone Mr. Frazee handed him and told the audience that plaintiff's attempt to speak had been unexpected and he would be better served addressing the County Board at another of their public meetings, rather than this one, and the City Council on some other occasion.

71. IMPACT's video and audio compilation of the March 24 Nehemiah Action has been generally edited to shorten the program, including Mr. Frazee's assault and battery of plaintiff, but also in other important respects discussed following.

a. It remains to be seen if the original video and audio recording, subject to a discovery request in this lawsuit, is intact.

b. Plaintiff's letter to IMPACT's co-President the Rev. Alex Joyner four days after the Nehemiah Action informed him of a criminal charge lodged against Mr. Frazee for his conduct of a battery that evening and raised the possibility of civil litigation.

c. Therefore, IMPACT was on notice that original video and audio recordings would be evidence.

d. However, due to the S&P Global Intelligence defendants' conduct to date, plaintiff assumes that any "original" footage produced in discovery will also have been doctored.

72. The edited video produced to date of the March 24 IMPACT Nehemiah Action ("the edited video") shows that, after plaintiff stood and started speaking at the 1:27:50 mark of the edited video, there was a cutting and splicing done which was obvious by the video fading out and then back in, at the 1:28:03 point.

a. This obvious cutting and splicing removed several minutes during which Mr. Frazee held an iron grip on plaintiff's right arm.

b. Mr. Frazee more or less admitted to the preceding subparagraph (a) in his recorded testimony at his criminal trial for assaulting and battering plaintiff held on August 13, 2026.

c. Another event deleted was Deacon Don Gathers's grabbing of plaintiff's left arm, plaintiff's asking him to let go, and his complying, followed by Mr. Frazee's then following suit and releasing plaintiff's right arm.

d. The video fade back in at the 1:28:04 mark is the beginning of the doctored portion of the recording, "doctored" meaning with intent to deceive, versus the notorious fade-out and fade-in that preceded that point.

i. This doctored portion of the edited video shows Deacon Gathers standing on the stage above plaintiff's left shoulder and then descending to the audience well further to plaintiff's left, while John Frazee lunges anew at plaintiff's right side, followed by Member of the Albemarle County Board of Supervisors Mike Pruitt's entering the frame also

from plaintiff's right and asking Mr. Frazee to calm down, whereupon Mr. Frazee stopped attempting to manhandle plaintiff.

ii. However, in actuality, at the point when Mr. Frazee lunged anew at plaintiff's right side:

A. Deacon Gathers had already descended from the stage to the audience well, and was already at plaintiff's level standing to his left.

B. Deacon Gathers's descent from the stage had actually taken place during the few minutes removed following the fade out at the 1:28:03 point of the edited video.

C. Everything appearing in the edited vide thereafter concerning Deacon Gathers is doctored: a sophisticated digital cutting, splicing, separating of images, and remastering.

iii. There are several "tells" of the digital cutting, splicing and remastering portrayed in the edited video beginning at the 1:28:04 mark.

A. First, the picture frame shifts lower to exclude the podium and closes up / zooms in to focus on plaintiff's attempt to speak to the audience.

B. Second, concurrently, the wooden stage floor appears to become lighter and more reflective than it has appeared to that point in the edited video. That stage lightness remains until the 1:31:19 point, by which point, the digitally remastered video had cut back into original footage.

C. Once plaintiff's standing and facing the audience was digitally separated on the editing table (i.e., on the expert editor's computer) from Deacon Gathers's presence, the part deleted from Deacon Gathers's conduct on the editing table was

Deacon Gathers's grabbing with his right hand and holding onto plaintiff's left arm, plaintiff's asking him to let go, and Deacon Gathers's complying. Deacon Gathers's compliance is what caused John Frazee also to release the grip he had held on plaintiff's right arm for several minutes, all deleted from the edited video between the fade out and fade in at the 1:28:03 - :04 point, until after the fade-in, Mr. Frazee lunged in the edited video anew at plaintiff's right side in an attempt to haul him aside.

D. The audio track included in the edited video, which has also been doctored, has a "tell" as to when it and the corresponding video have been edited by a Deep Fakes expert.

1. At the 1:29:12 point of the edited video, Deacon Don Gathers twice says, "No, sir."

2. He was responding to plaintiff's question asking twice to be able to speak for two minutes through the microphone Deacon Gathers was holding in his hand.

3. However, the visual and audio clues to a viewer of and listener to the edited video of plaintiff's question asked twice, which Deacon Gathers's microphone would have picked up, have disappeared, because they were erased.

I. Deacon Gathers was actually standing more off to the left of plaintiff, so that both of their visages were in actuality in the original footage visible at that moment to the video camera in the center of the hall.

II. However, once the images of plaintiff and Deacon Gathers, having been separated during the sophisticated edit, were reunited, juxtaposed and remastered together, the edited video falsely places Deacon Gathers's body directly in front

of plaintiff in the line of the video camera, so that Deacon Gathers's head obscures plaintiff's vocalizing the question that he asked twice, "May I please have your microphone to speak for two minutes?"

E. The visual "tell" to this auditory edit (deletion of plaintiff's question asked twice, which would have been picked up by Deacon Gathers's hand-held microphone nearby) is that plaintiff's mouth, hidden by the fake juxtaposition of Deacon Gathers's head now directly in front of plaintiff, appears to move, but does not show him mouthing the words of the question quoted above that he asked Deacon Gathers twice, as evidenced by the latter's saying twice, "No, sir." The unusual, curtailed movement on the edges of plaintiff's mouth, resembling a common flaw with a Deep Fakes edit, is inconsistent with, and not long enough to permit seeing vocalized, the question he asked of Deacon Gathers twice at that point.

F. It is odd for the camera to zoom for a close-up in the edited video of an obviously unplanned fracas occurring below the stage, in the well of the audience.

1. Normal behavior for a professional videographer, in this instance paid by IMPACT, would not be to draw the camera's and viewer's attention to that unplanned and controversial event.

2. A paid videographer ordinarily would have shifted the camera's view away, so as to avoid recording any unpleasant scene.

iv. However, the actual, steady frame view to that point captured Deacon Gathers's standing to plaintiff's left and grabbing plaintiff's left arm, while Mr. Frazee hung fast to plaintiff's right arm.

A. Deletion of Deacon Gathers's grabbing ahold of plaintiff, which he relinquished on plaintiff's request, could only happen by cutting and then merging separate, edited images of these two in a reimagined and re-staged close-up of their interaction, pictured starting at the 1:28:04 point fade-in.

B. In the remastering, Deacon Gathers now stands directly in front of plaintiff, the former's head partially, though not completely, blocking plaintiff's mouth and question voiced twice of him.

v. Both the video and audio portions of the edited video following the 1:28:04 mark have been doctored in additional respects.

73. The reason S&P Global Intelligence bears responsibility for (a) deleting both John Frazee and Deacon Gathers's holding fast to both of plaintiff's arms, and plaintiff's question asked twice obscured by Deacon Gathers's head to borrow his microphone, and then (b) re-juxtaposing the images of them in the new light described above after the 1:28:04 point, is as follows.

i. Such subtle editing was beyond the capability of IMPACT, a bare bones non-profit organization, to perpetrate.

ii. The images removed helped to alter the perceived conduct of IMPACT's principal John Frazee and its affiliate volunteer Deacon Gathers as being more reasonable than they were, by deleting their physical seizing of plaintiff's body.

A. The resulting, edited video portrays Deacon Gathers's conduct as being altogether reasonable, when it was not.

B. This combination, along with the deletion of plaintiff's question asking Deacon Gathers to speak through the microphone for two minutes, enabled the

General District Court Judge at Mr. Frazee's trial to find him not guilty, and to blame plaintiff for creating and escalating a controversy that Mr. Frazee began by assailing plaintiff's body and fueled throughout.

iii. The video was edited several months after the IMPACT leadership's correspondence with plaintiff, discussed below, ended.

A. It was edited to turn over to the special prosecutor of Mr. Frazee of his criminal charge of assaulting and battering plaintiff, in order to assure Mr. Frazee's acquittal at his criminal trial.

B. The prosecutor first requested the video of IMPACT shortly after July 1, 2026.

C. That request by the prosecutor was not a subpoena *duces tecum*, as plaintiff had proposed it be, but an informal request of the IMPACT organization.

D. When plaintiff spoke with the prosecutor on the telephone on July 10, 2026, IMPACT had not yet produced to the prosecutor any video or audio recordings.

E. It finally did so on July 17, 2026, only after the prosecutor contacted IMPACT a second time on July 10 to remind that organization of his informal request for the recordings made a week-and-a-half earlier.

iv. Therefore, the video and audio recordings were *ex post facto* edited to fit the narrative IMPACT's leadership had already set forth in its first letter to plaintiff, discussed below, that it had been up to plaintiff to "request to revise the agenda to include public comments" or offer a "motion to that effect." Exhibit 21.

A. Plaintiff's very reasonable appeals made twice asking for Deacon Gathers's microphone for two minutes, if it had been visible in the edited video turned

over to Mr. Frazee's prosecutor, would have undermined the IMPACT leadership's narrative that plaintiff had acted improperly and his speech at the public Board of Supervisors meeting was out of order.

B. For this motive of deception, and the digital remastering done altogether to conceal Deacon Gathers's seizure of plaintiff's left arm, plaintiff predicts that "original" recordings produced in response to a request for production of documents and things in discovery will not contradict the edited and doctored video starting at the 1:28:03 point.

74. After the Nehemiah Action program ended that evening of March 24, 2026, plaintiff spoke with a few attendees. There was one person in particular he wanted to find. He wandered to the mezzanine level inside the auditorium, where pastors and the few staff of IMPACT were gathered, some standing and some seated on auditorium chairs ascending from the mezzanine level, conducting a post-mortem discussion of the event.

a. Mr. Frazee sat attentively to the side of them, waiting for the discussion to reach the point at which plaintiff had stood asking to speak for two minutes.

b. Because the person for whom plaintiff was looking was not around and had not appeared after plaintiff waited there for 15 minutes, Mr. Frazee obviously was intending to speak ill of plaintiff's desire to exercise free speech and to order the group to take decisive action against him, and there had been enough unanticipated conflict and controversy for one evening, plaintiff left.

c. Rather than allowing IMPACT's democratic and egalitarian ethic to rise to the fore, Mr. Frazee used plaintiff's absence to turn the leadership gathered there against plaintiff.

75. If John Frazee had not run across the stage, jumped down into the audience well, and physically attacked plaintiff for longer than five minutes until Supervisor Mike Pruitt asked him to stop and then plaintiff resumed his seat, and if Mr. Frazee had not immediately afterwards turned IMPACT's leadership gathered at the mezzanine level against plaintiff in their post-mortem discussion of the event, then, plaintiff submits, the story would have turned out differently.

a. Plaintiff would have spoken his two minutes.

b. The grass roots IMPACT membership, of whom approximately 500 were in attendance that evening, would have more information to guide IMPACT's leadership in the future.

c. The full Albemarle County Board of Supervisors would have heard his viewpoint.

d. Deacon Gathers would not have felt compelled by Mr. Frazee's aggressive lead and persistence in attempting to deny the public from hearing plaintiff's viewpoint to descend from the stage in support of Mr. Frazee.

e. Plaintiff would not have suffered the ostracizing the Fossil Fuel Forces have deployed against him since that incident, which both IMPACT and S&P Global Intelligence bear legal responsibility for causing. Background explanation will lead to the point in the following subparagraphs.

i. Plaintiff has had the great pleasure since November 2024 of meeting in person with a dozen pastors or associate pastors of Christian churches and one rabbi of a Jewish congregation in Charlottesville, while attending services weekly at their houses of worship since September 2025. He learned thereby that churches, and the synagogue and

mosque, are the moral pillars of the Charlottesville community, and from learning how to live with near-zero carbon footprint as a homeless man for two years, that they can serve as hubs for permaculture communities to help all of the people living this region weather a swift transition away from fossil fuels. For the foregoing reasons, he has pledged, publicly and repeatedly, hundreds of millions of dollars, if not more, whatever it takes, to bring this to reality, to help this region serve as a model for the rest of the country to follow, from any proceeds that may come the plaintiffs' way, with God's grace, from the Exxon Mobil lawsuit, whenever it is over and all appeals exhausted.

ii. There came a time in the spring of 2026 when plaintiff was considering formally joining Trinity Episcopal Church. He inquired of Pastor Cass Bailey about being baptized. Pastor Cass's response was that he would have to wait until the next baptism ceremony at Pentacost. Therefore, impatient, plaintiff sought out the Rev. Alvin C. Edwards, Sr. of Mt. Zion First African Baptist Church, with whom he had meet one year before, for a quicker baptism. However, the Rev. Alvin C. Edwards, Sr. had recently suffered a health setback, and plaintiff ended up meeting with his Assistant Pastor, the Rev. Savola Monroe, and his younger brother, the Rev. Kendrick Edwards of Zion Union Baptist Church, together.

A. They told plaintiff he did not need to be baptized, but they wanted him to confess his sins to Jesus Christ and join their church.

B. Plaintiff had to think about that, and wanted to speak to them or another pastor further.

1. Plaintiff is not sure that his sins can be washed away simply by accepting Jesus Christ as his savior.

2. Plaintiff's guru from India, Sri Mata Amritanandamayi Devi, has taught him that only by extinguishing his karma acquired over lifetimes of births will he be able to gain liberation, Enlightenment, the same thing Jesus attained, thanks be to God.

iii. When plaintiff started attending Trinity Episcopal Church every Sunday, Pastor Cass announced that St. Paul's Memorial Episcopal Church would be developing a closer relationship with it.

A. From St. Paul's and its parishioner Bruce Carveth came African Development Partners to Trinity, which upon plaintiff's searching the Internet, turned out to be an affiliate of World Neighbors, an Oklahoma and Texas-based faith organization that posed as a front for mining interests from the oil patch in those states to establish their grass roots networks in an attempt to gain control of developing countries' mineral resources on the African continent and elsewhere.

B. After African Development Partners hosted a Harambee at Trinity, whose true purpose was another attempt by Exxon to lure plaintiff into joining its intelligence service and gaining for it Africa's mineral riches, plaintiff decided in May 2026 to venture to other churches.

iv. Therefore, after the friendly meeting with Assistant Pastor Savola Monroe and the Rev. Kendrick Edwards some months before, plaintiff worshipped at her and the Rev. Alvin C. Edwards, Sr.'s Mt. Zion First African Baptist Church ten Sundays in a row.

A. Every Sunday after services, he asked to meet with her or the Rev. Alvin Edwards, and to invite anyone else from the Church leadership they chose to such a meeting.

B. (He wanted to explain why he never came down to the well of the Church to confess his sins to Jesus Christ and accept Him as his Savior – essentially, because he had had his "coming to Jesus" moment in India in 2005, and it was with an Indian female spiritual master, who taught he was fully accountable himself to God for his own sins. Nonetheless, he was always curious about spiritual exchange, whether his soul was missing any easier chance at redemption and salvation, than having to suffer through all of his personal karma.).

C. However, the Rev. Savola Monroe would never meet with him, despite their friendly relations, as evidenced by her calling him her brother in an SMS text message.

D. In addition, the Rev. Kendrick Edwards did not follow up his written promise to meet with plaintiff again, despite sincere efforts by plaintiff.

v. Hence, plaintiff came to First Baptist Church, where he learned of IMPACT's campaign instigated on John Frazee's lead on behalf of S&P Global Intelligence to slander him.

A. Pastor the Rev. Arthur S. Long, Jr., told plaintiff on the day of his first attendance at First Baptist Church on July 11, 2026 that he recognized him from the IMPACT Nehemiah Action on March 24, 2026, and they would meet that week.

B. But they never did. Nor did Pastor Long meet with him after plaintiff's having attended First Baptist Church several additional times, asking every time that they meet, and delivering several notes appealing for same.

C. Plaintiff understood as of July 11 why Pastor Long has never contacted him for their promised meeting.

I. That is Deacon Don Gathers's Church, of the IMPACT Nehemiah Action, who had, on John Frazee's lead, grabbed plaintiff's other arm, denied plaintiff's appeal for use of his microphone for two minutes (both erased from the edited video), and told the audience plaintiff's speech was out of order.

II. Deacon Alexander Jewett and his son Ryan Morton-Jewett were present on March 24, 2026 when plaintiff attempted to speak at the IMPACT event.

1. They took direction from IMPACT, functioning as its agents and therefore John Frazee's and his employer defendant S&P Global Intelligence's, to alienate plaintiff from anyone and everyone in their First Baptist Church.

2. They told Pastor Long on July 11 after he promised to call plaintiff that week not to meet with plaintiff.

3. After doing so, father and son followed plaintiff out the front door and closed the doors behind them while watching him load his bicycle and leave, as if to tell him their Church was safe from his presence.

III. The same day and place, plaintiff observed Deacon Alexander Jewett and Ryan Morton-Jewett also telling Bridget E. Gilbert, the proprietress of Mother and Daughters Vegan Creations, LLC ("MAD Vegan Creations"), that he had disrupted the IMPACT Nehemiah Action and abused that organization, directing her not to meet with plaintiff.

1. That was after she had given plaintiff free food many times when making use of the commercial kitchen at Trinity Episcopal Church, promised to donate her portable greenhouse and excess garden supplies to the Trinity gardeners from friendship with him, and welcomed him to her own, First Baptist Church.

2. Plaintiff had already invited Ms. Gilbert to come to West Africa to teach the people there how to cook and eat vegetarian. Reducing their demand for animal for protein will vitiate conflict between livestock herders and sedentary farmers over arable land diminishing due to global warming, thus reducing pressure points over land and in ethnic tensions, two causes of the terrorism there.[5]

76. Discovery will reveal any precise defamatory words Alexander Jewett and Ryan Morton-Jewett spoke to Pastor Long and Ms. Gilbert about plaintiff on July 11, 2026 at First Baptist Church. Any words along the following would be defamatory:

- "Convisser caused a violent disruption at the IMPACT Nehemiah Action," when in fact, it was the S&P Global Intelligence defendants' John Frazee who committed physical force for the purpose of denying his speech.

- "Convisser has his own agenda that undermines IMPACT and it is dangerous to allow him any platform to be heard, especially by your ears," when in truth, he has no personal agenda in sharing his insights against opening an 80-bed low barrier shelter, only the welfare of the Charlottesville community.

- something worse, which could be anything under the sun, since a Circuit Court Judge who has since recused himself from all matters involving plaintiff (Exhibit 12) ordered him to go for a mental health evaluation by Region 10, which condition of his pretrial release is pending appeal to the Virginia Court of Appeals.

---

[5]Similarly, since half of the water used from the Colorado River goes to irrigating grazing land for livestock, if everyone in America became a vegetarian, it would reduce by half the demand for that increasingly scarce resource and relieve the shortage of water that now threatens 40 million people living in the American Southwest.

77. Whatever specific words Alexander Jewett and Ryan Morton-Jewett said about plaintiff have caused a repeat of his isolation frustrating his spiritual inquiry and advancement at First Baptist Church, just as happened at Mt. Zion FABC.

78. It is certain that IMPACT's agent at Mt. Zion FABC, whoever that is, told Pastor Savola Monroe the same thing, or sorts of things, that Deacon Alexander Jewett and Ryan Morton-Jewett told Pastor Arthur S. Long, Sr. and Ms. Bridget Gilbert at First Baptist Church about plaintiff, and that IMPACT's agent also told Rev. Kendrick Edwards of Zion Union Baptist Church not to meet with him similarly.

79. The IMPACT network tricked into serving the interests of defendant S&P Global Intelligence will continue blocking plaintiff's spiritual quest for salvation, no matter which church he goes to.

80. In short, John Frazee's conduct concerning plaintiff's remarks intended for the public meeting at the IMPACT Nehemiah Action on March 24, 2026 was so violent, extreme and oppressive that it betrayed his underlying agenda on behalf of his employer defendant S&P Global Intelligence.

81. Mr. Frazee was afraid that any words spoken by plaintiff might upset his orchestration of handling of the homeless shelter issue to date, and which the Board of Directors and leadership of IMPACT go along with: hoodwinking the grass roots membership to enable behind-the-scenes realization of the low-barrier shelter at 2000 Holiday Drive, to suit the ends of the private intelligence services loyal to fossil fuels that want to house and cycle through Charlottesville their transient agents of intelligence and crime there, many of whom are presently in temporary quarters in the Rivanna River encampment on Charlottesville's eastern edge.

82. At John Frazee's trial for assaulting and battering plaintiff in the Charlottesville General District Court on August 13, 2026, retired Judge Robert H. Downer, Jr. ("Judge Downer") found the defendant not guilty.

a. He stated that while there was no doubt an unwanted touching occurred, depicted even on the edited video, there was no evidence that Mr. Frazee did so with rude or angry intent, which Judge Downer stated was an element of the offense.

b. Judge Downer criticized plaintiff for disrupting the Nehemiah Action meeting, stating he himself had attended IMPACT Nehemiah Actions and had never seen any member of the public try to speak at any of them.

c. Plaintiff had tried to explain in his direct testimony that he had only risen to speak on a matter of public concern because Mr. Frazee's business interest in establishing the low-barrier shelter for Big Tech's agents had prevented the public from becoming aware of the danger and lack of need for such shelter.

d. In his trial testimony, Mr. Frazee claimed to be the Chairman of the December 10, 2025 meeting of IMPACT's Housing Research or Steering Committee.

i. In fact, it was the Rev. Will Christians who had chaired the meeting.

ii. After plaintiff's three-minute exposition permitted at the end of that meeting, the Rev. Christians had asked Mr. Frazee if the organization should conduct any further research on plaintiff's points, or otherwise consider the matter.

iii. Mr. Frazee made the decision for the IMPACT organization when he replied, "No."

e. Mr. Frazee additionally testified falsely that the Housing Research or Steering Committee, and IMPACT in general, had nothing to do with the issue of homelessness, nor any low-barrier shelter on the site the City owns. This, despite page 3 of Exhibit 19, which states of IMPACT's ask of Albemarle County's Housing Trust Fund, which he likely wrote: "Priority is given for projects that include [] help for the homeless."

f. Undoubtedly because plaintiff had procured a warrant charging Mr. Frazee by filing a criminal complaint with a Magistrate, the prosecutor put in minimal effort in a number of ways. Most germane, he never subpoenaed the original video and audio recordings of the Nehemiah Action, but relied on the edited video that he had to ask the IMPACT organization twice for. As a result, defendant S&P Global Intelligence doctored the video to hide evidence favoring plaintiff's posture and harming its employee Mr. Frazee's.

83. In good faith, plaintiff wrote and delivered to one of the Presidents of IMPACT, the Rev. Alex Joyner of the First United Methodist Church, a solicitous letter on March 28, 2026 seeking to meet and work amicably through the challenges John Frazee's conduct imposed on plaintiff's relations with IMPACT and the hundreds of audience members present at the March 24 Nehemiah Action.

84. Rev. Joyner also hosts the staff and offices of PACEM inside his Church's offices, indicating he is a bridge of sorts between the synonymous interests of IMPACT's leadership attuned to the wishes and agenda of John Frazee and his employer S&P Global Intelligence and PACEM's, disclosed to plaintiff via its Deputy Director, as recounted in paragraph 83(a) of Docket No. 313-1 in the Exxon Mobil lawsuit.

85. Without receiving any response to his letter of March 28, 2026, again acting in good faith, plaintiff attended the Nehemiah Action Debrief held at the Anglican Church of the

Good Shepherd on April 14, 2026. He anticipated that this forum would allow for some discussion of the message he had tried to deliver on March 24.

a. However, showing again that IMPACT is a top-down driven organization, and one at the mercy of Fossil Fuel Forces led by John Frazee in whose thrall the IMPACT leadership seems beholden, rather than the grass roots-up one it fancies itself, the pre-arranged Program for the Nehemiah Action Debrief was scripted to prevent any feedback from the grass roots or new questions and ideas from percolating upwards. Exhibit 22. Every part of this Program involved group discussion of specific topics and questions pre-selected by IMPACT's leadership. Id.

b. Rev. Joyner began the Nehemiah Debrief on April 14, 2026 by saying that the IMPACT Board of Directors, following the lead John Frazee had set on March 24, had just met and adopted a new policy to deal with interruptions of the kind plaintiff had brought to the Nehemiah Action program.

i. Upon information and belief, this policy was at Mr. Frazee's instigation. It put the organization proactively on the track to painting plaintiff as a malcontent who disrupted the March 24 Nehemiah Action, and shielding Mr. Frazee from blame.

ii. At Trinity Episcopal Church, two women, Jane Perry and Barbara Oblinger, separately told plaintiff that his conduct on the evening of March 24, which they witnessed as part of an episode that Mr. Frazee's assault and battery shattered, was wrong, and it had injured their opinion of him and his reputation.

A. As a consequence, Barbara Oblinger has then spoken negatively to two others at Trinity about plaintiff, or at least, ensured he was unable to speak kindly with them.

B. The foregoing are representative of many similar conversations that have caused plaintiff to suffer big harm to his reputation, all arising from Mr. Frazee's intemperate response in loyalty to his employer to plaintiff's appeal to speak for two minutes on a matter of public concern on the meeting's agenda that evening.

c. Plaintiff asked for an opportunity to speak at the Nehemiah Debrief on April 14, to be able to say what he had wanted to say at the March 24 Nehemiah Action.

i. After 15 minutes of back-and-forth negotiation, during which IMPACT's Director Aidan Workman proved to be have most moderate attitude, Rev. Joyner agreed to allow a Question & Answer period at the end of the session, during which he would give plaintiff the microphone.

ii. However, when it was time for the promised Q&A session at the end:

A. John Frazee and the Rev. Will Christians walked out, rather than remain for any dialogue with plaintiff.

B. After nobody else raised a hand, Rev. Joyner reluctantly handed plaintiff the microphone.

C. As soon as plaintiff walked to the front of the room to speak to the 30 or so people present, IMPACT's Treasurer Robert Law walked to where plaintiff was standing with microphone in hand, turned to face the group, and announced he was leaving.

D. That prompted them all to walk out, while for good measure, Steve Brinkley shut off the lights to encourage the stragglers to leave, while plaintiff continued to speak.

E. Plaintiff was left alone, with only two people, both of whose names he knows, remaining.

d. As Steve Brinkley told the IMPACT audience at length beginning at the 47:50 mark of the edited video, he comes from a family of South Carolina bankers.

i. Plaintiff alleged beginning at paragraph 109 of Docket No. 285-1 in the Exxon Mobil lawsuit that the petroleum industry embodied in Exxon had predominant influence on a representative sampling of American banks in their interactions with upstart plaintiff.

ii. It stands to reason that Mr. Brinkley took the lead by turning out the lights on plaintiff's voice questioning its hidden advocacy for opening of an unnecessary City-run low-barrier shelter on behalf of the Fossil Fuel Forces who will seek to populate it with their agents.

e. Since IMPACT's Treasurer Robert Law came to the front to tell audience members at the Nehemiah Debrief to follow John Frazee's lead and walk out on plaintiff's remarks, together with Steve Brinkley, the IMPACT officials tied to the organization's sources of money were the ones who voluntarily took responsibility for carrying out defendant S&P Global Intelligence's agenda through its agent John Frazee.

86. Thereafter IMPACT sent plaintiff two sets of letters signed by Rev. Joyner and co-signed by his co-President of IMPACT, the Rev. Susan Karlson of the Charlottesville Unitarian-Universalist Congregation.

a. The first letter (Exhibit 21), sent not long after the April 14, 2026 Nehemiah Action Debrief, stated the following:

i. "[W]hile the Nehemiah Action was indeed a meeting open to the public, it was one with a formal agenda that did not include any time for individuals not listed on the agenda to address the gathered assembly. No request to revise the agenda to include public comments on new matters was made and no motion to that effect was offered." Exhibit 21.

*Plaintiff's reply:*

A. *Reference to procedure is fallacious. I raised two of my fingers and asked to speak for 2 minutes to the assembly and John Frazee and Deacon Don Gathers physically prevented that and denied me the microphone when I asked for it.*

B. *The Nehemiah Action did not have any published procedures that would have allowed any motion and my words were essentially a motion by attempt to comment which would have occurred had these two men not violently interceded.*

C. *My comments were not on any "new matter," but on the topic to which more time had been devoted on the agenda than any other, the Housing Fund, which each of the six Supervisors on the Albemarle County Board were asked to discuss.*

D. *The Action was five minutes ahead of schedule when I rose to speak at 8:15 p.m.*

I. *As the video shows, the person leading the next item, Summary & Next Steps, on the published Program agenda, Rev. Sara Dorrien-Christians, standing at the podium, graciously allowed plenty of time, at least five minutes, in which I could have spoken for two minutes, had Mr. Frazee allowed it, before she finally spoke for the first time at the 1:29:30 point of the edited video (from which several minutes of her waiting, while Mr. Frazee held fast to my right arm, were deleted).*

II. *This courtesy on her part would have accommodated my two minutes, had not John Frazee so swiftly, forcibly and deviously set the tenor for silencing my contribution.*

ii. "At the time you stood to address the assembly, [] there were still several agenda items that had not yet been addressed. The meeting had not yet been concluded." Exhibit 21. *Plaintiff's reply:*

A. *The two segments remaining when I rose at 8:15 p.m. after the end of the Responses from County Supervisors were the Summary & Next Steps, whose leader, as noted above, allowed me plenty of time to speak before she finally began, had John Frazee not been physically wrestling with me and speaking over anything I tried to say; and the Benediction and Closing Music.*

B. *Reference to "the meeting had not yet concluded" seems to indicate I might have been allowed to speak at the end, but the totality of the conduct of IMPACT leadership's conduct indicates they would not have allowed me to speak at the end of the Nehemiah Action expressing a viewpoint divergent from John Frazee's business interest.*

iii. "The actions taken by Mr. Frazee and others after you began to address the assembly outside of the published agenda were not taken at the direction of IMPACT or its leadership. [] While Mr. Frazee's actions were not authorized by the Board, we are confident that his actions were not taken with any intent to cause harm to you." Exhibit 21. *Plaintiff's reply:*

A. *My remarks at the Nehemiah Action would have been well within the main topic of discussion on the published agenda, the Housing Fund, on which all six*

*members of the Albemarle County Board of Supervisors were interviewed, and therefore, were not "outside of the published agenda."*

B. *It is true that my standing to speak to the assembly was "not taken at the direction of IMPACT or its leadership." Their criticizing me on this basis shows that IMPACT is not a grass roots, democratic organization that values input from individual members, but has a top-down hierarchy that defers to the business interests of John Frazee.*

C. *John Frazee latched onto my right arm for around 4 or 5 minutes and then tried to yank me away. Meanwhile, Deacon Don Gathers grabbed ahold of my left arm, but released his hold when I asked him to. Aside from the physical affront, John Frazee's actions, in particular, were definitely taken with the intent to prevent me from speaking. The IMPACT leadership's backing of John Frazee's stance denying my free speech, false accusations in their letters to me, and unjustified and pretextual sanctions against me afterwards all indicate ex post facto condonation of his conduct and in combination, displayed intent to damage my reputation among the rank-and-file membership and in the broader community.*

iv. "[A] delegation of IMPACT's Board of Directors can be made available to meet with you so that the issue of concern you wished to address the gathered assembly at the Nehemiah Action about can be heard." Exhibit 21. *Plaintiff's reply:*

A. *By the time I received this first letter from the two Presidents of IMPACT, which made a number of false accusations against me, I had already written two letters to Rev. Joyner, the first four days after the Nehemiah Action asking to meet with him and Aidan Workman and the second two days after the Nehemiah Debrief asking him to allow me to meet with Aidan Workman for an off-the-record conversation, both of which offers*

*Rev. Joyner did not accept. (I later wrote him two more letters asking to meet with Mr. Workman.). The limited scope of their proposed meeting with part of IMPACT's Board, excluding the topic of any reforms or the barring of John Frazee from future control as my letters had suggested, and too late to change their stance in the 2026 cycle, after the organization's leadership had squashed my viewpoint at the meeting intended for a post mortem, the Nehemiah Debrief, would not have been productive. It was another indication of the leadership's loyalty to Mr. Frazee.*

B. *Despite my third letter delivered after receiving all theirs reiterating my offer to meet with Mr. Workman in order to have genuine dialogue, they seemed more interested in following John Frazee's agenda of rushing through approval and opening of the 2000 Holiday Drive shelter, than in considering any thought-provoking questions that might prompt them to reconsider their position on such a development.*

b. The second letter signed by IMPACT's co-Presidents stated: "Due to your repeated behavior of disrupting and impeding us from conducting the business of our organization at our events, your threats of legal action against both the organization and its volunteer members, and your public slandering of the organization falsely alleging that IPACT and its volunteers are involved with organized crime, we are writing to give you formal warning that you are banned from IMPACT's future events." Exhibit 23. *Plaintiff's reply:*

i. *I spoke at a subsequent public meeting of the Albemarle County Board of Supervisors, and also to City Council, about IMPACT. I did not slander that organization. Exhibit 16 are the verbatim comments I delivered to City Council, similar to what I said to the County Board.*

ii. *The accusation that I had "repeated[ly ] disrupt[ed] and imped[ed IMPACT] from conducting the business of our organization at our events" shows that they were subsequently trying to blackball me for Rev. Joyner's offering to me of the microphone at the end of the Nehemiah Debrief on April 14, 2026 and to whitewash the atrocious conduct of Treasurer Robert Law in interrupting my remarks to lead a walk-out and Steve Brinkley's shutting the lights off after I began to speak. I repeat that when I rose to face the audience at the March 24, 2026 Nehemiah Action, the agenda was five minutes ahead of schedule and I raised two fingers and verbally asked for two minutes to address the public and Board of Supervisors gathered there.*

iii. *In no respect did anything I attempt to say or do prevent or impede IMPACT from completing its agenda at the Nehemiah Action and Nehemiah Debrief on schedule, which it did do. The foregoing conclusion considers Rev. Sara Dorrien-Christians' waiting at least five minutes silently at the podium to give me a chance to speak, which opportunity Mr. Frazee prevented the entire time.*

c. Two additional letters warned plaintiff that if he showed up at IMPACT meetings scheduled for April 28 and May 18, 2026, he would be arrested for trespassing.

87. John Frazee's employer, defendant S&P Global Intelligence, wants its ground-level agents housed at 2000 Holiday Drive for three reasons, so far as plaintiff can discern.

a. First, the University of Virginia is an attractive and prestigious target for training the elite corps of the Fossil Fuel Forces, a step up from James Madison University which they already control. With Rector Brown of Dominion Energy now in charge of UVA's Board of Visitors, this prize is within their reach. They would turn UVA into more of a mill of educated professionals for their ranks than it already is, to more effectively carry out their will.

b. Second, as discussed in paragraphs 77 to 86 of Docket No. 166-1 in the Exxon Mobil lawsuit, the organized crime Mafia side of the Fossil Fuel Forces that aims to expand the trade of marijuana and the hallucinogenic *iboga* plant in Africa wants to extend their reach to this area where they conduct this business from the eastern base of the Blue Ridge.

c. Third, they seek the means to be able to, and a venue permitting them to, counter, steal from, preempt, and squash all initiatives that business competitors like plaintiff present or surface in this area, even if they are outside the core biofuel business plaintiff aims to compete with them in. For example, within the last year alone:

i. Because plaintiff discovered Community Bikes and its wonderful service to indigents like himself, and plaintiff started speaking to its founder and Operations Director Jake Oswalt about taking the non-profit model he has pioneered national (again, with funding that plaintiff would provide, in the contingent event he secures proceeds from the Exxon Mobil lawsuit), in swooped Exxon's prolific intelligence service to make Mr. Oswalt an attractive, and certainly more immediate, offer. That offer was so generous, Mr. Oswalt had little choice but to accept. He did so despite plaintiff's warnings that their true agenda was to learn the identities of Community Bikes's used bicycle and parts suppliers. With that information, they could, and by his experience would, tie up such resources elsewhere across the United States, and thereby remove any threat from lower-cost competition in the used bicycle market for their favored electric bicycles ("E-bikes") that run on fossil-fuel charged batteries.

ii. Because of plaintiff's advocacy for state legislation to make fossil fuel-free, push-pedal bicycles more welcome on the roadways, which included founding Bicyclists for Safe Roads & Sidewalks with 48 members, plaintiff won nomination and appointment to serve on a Work Group created by legislation for the Virginia Department of

Motor Vehicles ("DMV") to make recommendations for improving the safety of electric bicycle operators and the general public.

A. However, this Work Group, under the direction of DMV leadership, does whatever the Virginia Bicycling Federation wants. Plaintiff met its Advocacy Committee during a 1-hour Zoom session with them in July 2025. It consists of men older than he (age 64) who ride electric bicycles fronting for fossil fuel interests seeking to maintain use of fossil fuel-generated electricity, instead of allowing push-pedal bicycles better standing on the roadways.

B. The main, concrete recommendation of the DMV Work Group appears as of this filing to be giving *carte blanche* to higher-speed electric bicycles and scooters traveling more than 23 miles per hour, rather than subjecting them to the kind of regulation and registration imposed on mopeds, gasoline-powered scooters, and motorcycles. From plaintiff's email correspondence with the national representative of the trade association for the electric bicycle manufacturing industry, PeopleforBikes, who participated in some sessions of the Work Group, E-bike manufacturers themselves oppose grouping these higher-speed E-bikes with push-pedal bicycles, and believe they should be separately regulated. The Fossil Fuel Forces are the ones responsible. Their goal is to make it easier for people to use E-bikes unregulated, whose batteries are powered by grid electricity that remains stubbornly fossil fuel dominated, than fossil fuel-free push pedal bicycles, regardless of the higher safety risk involved in electric motorized transport. Ultimately, plaintiff believes, they want to prohibit push-pedal bicycles from certain categories of roads beyond Interstate Highways, to force people to use E-bikes on them.

C. Since the DMV Work Group utilized Microsoft Teams to allow members to participate virtually, rather than Zoom, Fossil Fuel Forces were able through a back-door channel of this Bill Gates product to block plaintiff's headset and laptop microphone from enabling him to advocate verbally to its Committees for the sensible idea of requiring higher-velocity electric bicycles to register with DMV and pay a nominal, $50 insurance fee annually. Due to this inexplicable microphone blockage, which did not occur in Zoom conferences he conducted around the same time, during all but the first and last Work Group meetings, he was restricted to making contributions in Chat only.

iii. The Fossil Fuel Forces' sabotaging of plaintiff's relations with MAD Vegan Creations is discussed above in paragraph 75(e)(v)(C)(III).

88. Plaintiff is aware of circumstantial evidence pointing to the attempt by the Fossil Fuel Forces to force the public and City Council's hand to open 2000 Holiday Drive on an emergency basis to house people dislodged from the Rivanna River homeless tent encampment by September 1, 2026, as announced by Deputy City Manager Samuel Roman was an option at the July 20 City Council meeting.

a. First, from having eaten breakfast nearly every day at the Haven from August 2024 to October 2025 along with from fifty to one hundred other people daily, plaintiff observed and interacted with many of the guests who, like him, regularly ate breakfast there or hung out there during the day, as well as new people who would show up, some staying around for some period of time and others just passing through.

i. Of that group of Haven guests in its entirety, plaintiff knows that, by their words and interactions with him, most of them were on the payroll of Exxon's intelligence service, the organized crime biodiesel Mafia's, or Big Tech's.

ii. A sample of his assessments of individual Haven guests are stated in his various drafts of the complaint filed in the Exxon Mobil lawsuit.

b. Plaintiff's time spent in Ghana and Mali, West Africa preparing to start POP Diesel's integrated agricultural and industrial project in that region, approximately five of the years from 2014 to 2023, turned him into a potential asset for mining and other interests, due to the fact of *al Qaeda* in the Western Sahel's having accepted him as a neutral mediator to end the terrorism and warfare in that mineral-rich region. They have sought to recruit him to serve their interests since August 2021, when plaintiff first ventured to Mali, the epicenter of terrorism. Its desert north, the terrorists' stronghold, may be packed with the highest concentration of mineral deposits.

i. His encounters with specific agents of Exxon in Mali are detailed in Docket Numbers 166-1 and 285-2 of the Exxon Mobil lawsuit.

ii. Exxon's intelligence service, which its Queen Mother Brenda Powell told plaintiff in a meeting in Accra, Ghana in October 2023 was "vast," showed its numerical depth to him once, as a lesson to him, upon his arrival from a flight from Accra to Dulles International Airport in Northern Virginia, in around 2023. In the long queue of Americans to get through passport control on that occasion, it seemed that every third or fourth set of people in line with plaintiff were identical twins. He asked several of them, "Was there a convention of identical twins where you all are coming from?" but the response that came back was, "No." A security officer at one point asked how many people in the line of several hundred people had boarded a flight from London, which plaintiff had not, and everyone else in the line except him raised his or her hand. They had all descended on the queue he had gotten into, to

show their strength in numbers and make him aware by the duplication of twins that they could, and would, surround him with their agents, when they wanted to.

c. Here are two other examples, of which there are countless in number he could set forth, to show how private, perhaps also jointed by governmental, intelligence services can and do "swarm" around a target in this modern age.

i. First, as recounted in paragraph 374(d)(ii) of Docket No. 166-1 in the Exxon Mobil lawsuit, when plaintiff was residing in his parents' home in Falls Church, Virginia during the period of 2015 to 2017 (when he was not in Ghana), he used to go jogging many afternoons in the park nearby, a park he has known since childhood. During the late afternoons, after everyone had left the high school across the street, there would customarily be no one else present. On many afternoons, however, as soon as he showed up to jog the park's perimeter, hundreds of young Latino men would appear via car pools and start to play pick-up games of soccer inside the perimeter.

ii. When plaintiff visited one of the world's experts in *jatropha curcas* tree cultivation, a German national who had been born in India and had his plantations there, in Stuttgart, Germany in 2017, he ate for three weekday evenings in the same, nondescript pizza-type restaurant, where he was one of only a few patrons. His last weekday evening before departing the next morning, after he showed up there, all of a sudden dozens and dozens, more than fifty, other people appeared, and the restaurant was mobbed.

A. Either the German intelligence service, or Exxon's private intelligence service in Germany, was showing him they had been watching his every move while in their town, and were monitoring his interactions with "their" *jatropha* expert.

B. (It turned out that the company this expert worked for was a Swiss company. Thus, while plaintiff had email exchange with the Swiss man who fronted for its ownership, there is a high chance, given Switzerland's banking secrecy laws, that its true ownership was concealed, and was by the following account, in all likelihood, American-petroleum oriented. They supplied *jatropha* varieties this expert developed in India to the copiers of plaintiff's agricultural model in West Africa, after those copycats and thieves purposely killed all of the *jatropha* tree stands native to that region. Either this expert's varieties, or other strains Exxon's partner Koch Industries developed after a hostile take-over of the *jatropha* genome unlocked by Seeds, Genome Biofuel, a San Diego company, have been genetically modified to succumb to a pathogen that will be introduced to wipe out whatever commercial plantings they have made. That event will happen the moment plaintiff stops keeping the pressure on and agitating to have all such commercial cultivation under the coordination of his Company and under his leadership. Therefore, the Germans who showed up at the restaurant in Stuttgart were loyal to Exxon, just as the U.S. Central Intelligence Service used to and may still may be as concerns interactions with plaintiff, if they were not in the actual employ of Exxon's intelligence service.).

d. Similarly, plaintiff has eaten lunch at one of four soup kitchens run by four generous churches in downtown Charlottesville for four days of the week for the last two years. He recognizes the regulars who show up, and can spot newcomers, since by now, he one of the senior members of that group. The number of people who eat at each of these daily lunches fluctuates to a certain extent, depending on how far into the month people are from their benefit payments which usually come available the first of the month. Nonetheless, some marked trends, including plaintiff's own observations, indicate that the Fossil Fuel Forces were flooding

the so-called Charlottesville homeless population with their agents at the very time City Council was making its decision to open 2000 Holiday Drive as an emergency shelter to house people displaced from the City's shut-down of the Rivanna River tent encampment, and media attention was focused on that issue.

i. Liz Carter, a volunteer at Christ Episcopal Church, reported on Tuesday, August 4, 2026 that the First United Methodist Church ("FUMC") that serves the soup kitchen lunch on Mondays had logged 230 lunches, when their normal number is 150.

ii. Bridget Davis, the coordinator of the Holy Comforter Roman Catholic Church soup kitchen lunch on Thursdays, confirmed on August 6 that the numbers had of recent been extraordinarily high.

iii. Then, as soon as plaintiff started drafting this complaint in earnest on his laptop, on August 6, 2026, the numbers at the soup kitchen lunches plummeted. They fell so far that at the 1:00 p.m. close of the FUMC soup kitchen on August 10, 2026, Jon Shuman and another regular volunteer walked around the public Park next to the downtown Library, giving away extra, bagged lunches that filled two big boxes, left-overs too plentiful to refrigerate, which they had never had to resort to doing at that scale before.

iv. This flip-flop from flooding to drought shows additionally who is reading the keystrokes on plaintiff's laptop computer. They understood the direction of where this complaint is going. They did not want the pressure of numbers they were seeking to bear on public discourse over the emergency opening of 2000 Holiday Drive to be fodder for this lawsuit, and compensated by commandeering their numbers in the opposite direction.

v. Indeed, the day, August 12, and eight days after, August 19, plaintiff wrote the preceding clauses (i) through (iv) of this subparagraph (d), the Fossil Fuel

Forces, flushed out by plaintiff's keystrokes and figuring they might as well stick to their original agenda of creating demand for the opening of 2000 Holiday Drive to emergency transient housing for their agents of intelligence and crime, flooded the soup kitchen lunch at First Presbyterian Church anew with dozens of new arrivals into Charlottesville's supposed homeless population. On August 19, that Church's soup kitchen ran out of food to feed the large crowd for the first time that plaintiff is aware of in the last two years.

89. Having made good use of IMPACT through their agency of John Frazee, the Fossil Fuel Forces are now working through an ostensibly all-volunteer organization called Livable Cville to mobilize public support for the opening of the unnecessary and dangerous 80-bed, low-barrier shelter at 2000 Holiday Drive on September 1, 2026. It is evident Livable Cville is their front by the fact that it has a beautiful website beyond the means of a normal, volunteer organization and it advertises Charlottesville's E-bike lending library in the center of its home page.

**Participation of Charlottesville Police Officer Matthew Ryan**
**<u>in Articulating the Fossil Fuel Agenda against Plaintiff</u>**

90. Because Officer Ryan is a regular, if not daily, visitor to the downtown Charlottesville public library owing to his foot patrol of the nearby downtown Mall area, he has had unlimited opportunity in fulfillment of his personal animus against plaintiff to turn its staff, and Mr. Plunkett, against plaintiff.

91. In addition, plaintiff has observed buddying up to Library management Owen Brennan, Executive Director of the Haven, whom plaintiff has moved this Court for leave to add as a defendant in the Exxon Mobil lawsuit for its service to his organized crime biodiesel Mafia business opponents.

92. Although plaintiff will not join the City of Charlottesville to any legal action, its Police Officer Ryan, and by his condoning them, the head of the Charlottesville Police Internal Affairs Division, Lt. Jake Via, made significant contributions to the conspiracy against plaintiff.

a. Paragraphs 102 to 109 of Docket No. 313-1 in the Exxon Mobil lawsuit set forth Officer Ryan's personal animus against plaintiff and his vindictive motivation and actions.

b. From a half-hour recording on his body-worn video camera is evident Officer Ryan's attempts to ingratiate himself upon Owen Brennan and the other leadership of the Haven, which plaintiff maintains exists to serve organized crime interests. Officer Ryan aims to work for their intelligence and security service some day; there is no other reason why he would grovel in obsequiousness that his own father was a drug dealer who wanted to name him "Dank Weed," meaning potent marijuana (a name, according to this recording, his mother vetoed).

c. Following plaintiff's complaints in writing, Police Chief Michael Kochis designated Lt. Jake Via of Police Internal Affairs to meet with plaintiff and hear him out. However, Lt. Via refused to do anything to constrain Officer Ryan.

## LEGAL CLAIMS

93. Plaintiff drafted and submits the following without having had access legal research resources, due to his barring from the UVA Law Library, the only public law library within reasonable commuting distance of the Charlottesville area. He will be prepared to file an amendment, if necessary, after he regains such access.

94. Plaintiff's damages concerning the Counts that follow and his claim for relief are listed beginning in paragraph 144, after Count 5.

## COUNT 1

**Denial of Plaintiff's Rights to Procedural Due Process**
**in the Manner of Disciplining and Expelling Him**

**42 U.S.C. § 1983**

**against the University of Virginia Defendants and the JMRL Library Defendants**

95. Plaintiff reiterates paragraphs 1 – 94 and these paragraphs are incorporated by reference as if restated herein.

96. Both the Grounds and Law Library of the University of Virginia and all of the branch libraries of the Jefferson-Madison Regional Library are public institutions and premises, rendering them subject to the proscription stated in the Fourteenth Amendment to the United States Constitution that, "Nor shall any State deprive any person of life, liberty or property, without due process of law." ("due process").

97. Title 42 of the United States Code, section 1983 states in relevant part: "Every person who, under color of any statute, ordinance, regulation, custom or usage, subjects, or causes to be subjected, any citizen of the United States [] to the deprivation of any rights, privileges and immunities secured by the Constitution and laws, shall be liable to the party injured [] for redress."

98. Having suspended plaintiff from access to all University property except the Medical Center for a period of four years, Exhibit 6, the UVA defendants deprived him of his right to be at liberty to enter onto and enjoy the public property resources thereon secured by the Fourteenth Amendment.

99. Having suspended plaintiff from access to all of their branch libraries, the JMRL Library defendants deprived him of his right to be at liberty to enter onto and enjoy the public property resources thereon secured by the Fourteenth Amendment.

100. The question this Count I puts before this Court is whether the two set of defendants accorded plaintiff procedural due process in doing so.

101. These defendants' decision-making failed to follow their own procedures, subjected them to faulty facts which they failed to verify before imposing discipline, denied plaintiff an opportunity to be heard, sanctioned him for faulty behavior they had not given him fair warning they would hold him to account for, and penalized him excessively for innocuous conduct or on pretextual excuses, as set forth in the next paragraph with regards to the UVA defendants and the paragraph after it, paragraph 103 below, with regards to the JMRL Library defendants.

**The University of Virginia Defendants – Detail on Procedural Due Process**

102. The UVA defendants engaged in suspect procedures that poisoned their consideration of plaintiff's rights to retain access to University facilities to exercise his liberty and property interests, leading them to unconstitutionally impair his rights to petition the Government and to free speech.

a. Defendant Chief Longo's letter notifying plaintiff of the four-year ban dated June 30, 2026 relies on his having warned plaintiff beforehand by letter dated June 11 of behaviors complained on in the June 30 letter. Exhibit 6.

i. However, the letter dated June 11, Exhibit 9, was post-marked June 15, Exhibit 10, and it was never emailed to plaintiff, despite his requests to receive correspondence from Chief Longo by email. See, e.g., plaintiff's letter dated May 12, 2026 (Exhibit 8), at 1 ("please send any response by email, as mail sometimes takes longer than 10 days to reach my post office box").

ii. Therefore, because plaintiff had never actually received Chief Longo's letter of June 11 before he entered the Law School and Library on Saturday, June 27 in violation of its proscription, he did not knowingly violate any policy by conduct he had previously been warned against.

iii. Rather than exercise caution befitting his failure to assure plaintiff had received notice by his letter of June 11, Chief Longo assumed the worst and imposed the severe discipline of a four-year suspension. Exhibit 6.

A. Plaintiff explained in the first point of his letter of July 1, 2026, Exhibit 5, that he had not received Chief Longo's warning letter dated June 11 as of his alleged infraction of June 27.

B. However, Chief Longo, in his brief letter of the next day July 2, stuck by his guns, failing to reply to the merit-worthy substance of plaintiff's appeal and simply reiterating he had imposed the condition of a four-year ban, if plaintiff committed any future infraction. Exhibit 7.

b. Defendant Chief Longo's letter notifying plaintiff of the four-year ban dated June 30, 2026 admits that he imposed that decision based on second-hand information that he had not himself verified before transmitting the letter. Exhibit 6 ("I have been advised that… This information appears to be supported by video camera footage that was reviewed by law school administrators.").

i. Chief Longo failed to correct his mistaken, second-hand understanding of all the facts after plaintiff drew his attention to them. Point 4 in plaintiff's letter of July 1, 2026, at 2 (Exhibit 5) ("I encourage you to view the video footage yourself. [Y]ou will see that she held the door open for e so I could grab it and enter behind her.").

ii. The video defendant Chief Longo refers to therein will clearly show the "law graduate" holding the door open for plaintiff to grab and enter after her, an invitation by conduct. Exhibit 6.

c. The grounds cited in defendant Chief Longo's letter of June 11 (Exhibit 9) in which he refused to remove the condition of a four-year ban if plaintiff violated no trespassing policy in the future, grounds incorporated by reference in his letter of June 30 (Exhibit 6) imposing such a ban, were themselves procedurally suspect, and did not furnish a solid or reasonable basis for defendant Chief Longo to then impose the ban.

i. The first behavior of plaintiff's that defendant Chief Longo addressed was plaintiff's "repeated attempts to access the Law School during times when the library is not open to the public." Exhibit 9, at 1.

A. Although plaintiff does not have a photograph of the hours posted outside the Law Library's front doors, that notice does not differentiate between public opening of the library and times when it may be open only privately to law students and faculty. It simply states the hours during which the Law Library is open, to everyone. Therefore, Chief Longo's reference to "times when the library is not open to the public" is specious. Exhibit 9, at 1.

B. The Law School's exterior doors state hours when they are unlocked and hours when they are locked and subject to "Card access." Exhibit 1. However, even when the exterior doors were locked and friendly students and faculty let plaintiff inside, the Law Library's Circulation Desk was always staffed, to permit compliance with the notice posted on the exterior doors that "authorized visitors [] must sign in at the [] Circulation Desk"

(even though by custom, this staff never required him to sign in, as they all recognized and knew him). Exhibit 1.

ii. Defendant Chief Longo complained: "[F]rom time to time you have banged on the locked exterior doors and windows to persuade others to permit you access, or you gain entry by 'tailgating'" behind others with Card access. Exhibit 9, at 1. The falsity of this statement is exposed in paragraph 52(d)(ii) above.

iii. Furthermore, plaintiff once, in August 2024, had been "found asleep inside the Law School early one morning and had to be escorted from the building. [] It appears that you entered the building the evening before and remained inside after closure." Exhibit 9, at 2.

A. As of August 2024, the Law School had only recently, after plaintiff started frequenting its Law Library in preparation for filing the Exxon Mobil lawsuit, begun locking all of the exterior doors, including one at the front entrance that previously had been left unlocked 24/7/365.

B. Plaintiff never again slept, and was never again found asleep, inside the Law School, and a repeat of that conduct of a single occasion in August 2024 did not form the primary basis for any of the three, partial or total No Trespass notices of May 5 (Exhibit 2), May 9 (Exhibit 11), and June 30, 2026 (Exhibit 6) that led to the four-year ban in place today.

C. Therefore, it was improper to impose a long-term ban on plaintiff covering all University grounds except the Medical Center in part for a single violation of the policy against sleeping thereon in August 2024, when he never repeated such conduct.

iv. Chief Longo's letter of June 11 cited plaintiff for making use of printers "without permission or assistance, [and then also] making copies that far exceed the permissible amount." As set forth in paragraph 52(f) above, his engaging in this conduct was open and notorious; Library management knew about it; even Director defendant Amy Wharton did not reprimand him for it in her letter of May 5 (Exhibit 2, at 1); and nobody ever cautioned plaintiff against his printing activity or told him not to, prior to Chief Longo's letter of June 11, which plaintiff did not receive until after Chief Longo imposed the four-year ban.

v. Lastly, "when policies are called to your attention, you become confrontational, argumentative, and consequently, cause others to be uneasy and fearful for their safety." Exhibit 9, at 2. This is addressed in paragraph 52(g) above.

A. In addition, if an official defendant has a view different from plaintiff's reasonable position that he was entitled to be present inside the Law Library whenever its doors were open and he lawfully gained entry to the building, then that person has no reason to attribute any uneasiness to plaintiff's pointing out that fact and law to her.

B. If, simply because someone is on the losing side of a reasonable argument or stance, the person becomes fearful for her safety, without any other aggravation caused by the other party (of which none was ever attributed to plaintiff), then the person may need to go for a mental health evaluation for being over-sensitive and for over-reacting.

d. The only grounds defendant Chief Longo cited in his letter of June 30 for imposing the four-year ban was plaintiff's having entered "the Law School and Law Library during hours when the facility was closed to members of the public" on June 27. Exhibit 6.

i. As set forth above in paragraphs 42(f) and 102(c)(i)(A), except for closure to non-law student members of the public during student exam period, the Law Library remained open to everyone pursuant to its posted hours, during which it was open without discrimination to Law School affiliation or otherwise. Only access to the Law School building was restricted, pursuant to the terms stated on the notice posted to the exterior doors (Exhibit 1), as set forth above in paragraph 42(a)(iii).

ii. Since plaintiff had never, before entering the Law School building on Saturday, June 27, received notice that the University of Virginia defendants considered his weekend entry, on the welcome of a Card key holder, to be trespassing, he had never been forbidden from doing so.

A. While Chief Longo's letter of June 30 maintained that Library Director Amy Wharton had told plaintiff that he was "not allowed to access the facility on weekends," Exhibit 5, even if she did tell him that once, plaintiff reasonably relied on the decision of Police Officer T. Poe, after checking with defendant Stephen Parr and higher authorities, not to expel plaintiff on the day of the tornado warning in March 2026, during which the Law School building was closed, but the higher authorities than defendant Stephen Parr permitted plaintiff to remain inside the Law Library. <u>See</u> paragraph 22(f) above.

B. It is a violation of plaintiff's procedural due process rights to revoke his right to entry to the public facility therefore, when such action would not hold up in a Virginia court, as measured by Virginia Code section 18.2-119 (agent must have authority to forbid trespasser, which authority plaintiff disputes the Library Director had, when in addition, she did not forbid him, but merely said he was "not allowed to access the facility on weekends," and when he only ever gained access on the invitation of others).

iii. As a measure of his good faith and law abidance, and his ignorance of the no-weekend condition as of the date June 27 of his weekend entry to the Law School building on the invitation of the "law graduate" who held the door open for him to grab, plaintiff pledged, as soon as he became aware of the weekend no trespass proviso from defendant Chief Longo's letter of June 30 (Exhibit 6), to abide by the "now clear instruction of no access on the weekends." Point 4 of plaintiff's letter of July 1, 2026 (Exhibit 5), at 2.

e. Defendant Chief Longo never ruled on plaintiff's appeal dated May 12, 2026 of the third No Trespass Warning and received by his office on that date (Exhibit 8) within the time period he was required to do so, pursuant to its stated Procedures: "The Associate Vice President shall issue a decision upholding, modifying, or withdrawing the Trespass Warning within twenty-one (21) calendar days of receipt of the written appeal." Exhibit 11, at 2.

i. Chief Longo only rescinded the third No Trespass Warning on plaintiff's inquiry on the 22nd day, June 3. Chief Longo's letter dated June 3, 2026 (Exhibit B to Exhibit 5) (Exhibit 5, at 6).

ii. Therefore, defendant Chief Longo's and the UVA defendants' imposing the condition of a four-year ban as part of that belated rescission (Exhibit 5, at 6) is a display of bad faith, laches, and unclean hands by which they cannot now seek to enforce that ban, the condition, according to the UVA defendants, plaintiff's having violated, which he disputes.

f. Defendant Amy Wharton suspended plaintiff starting May 5, 2026 "during the remainder of our exam period" from Law Library access for "impedance of students' printing" while inside MyLab the day before. Exhibit 2, at 1.

i. Law student exams ended Friday, May 8, 2026. Plaintiff confirmed from Law Library staff that the Library was open over the weekend of May 9 and 10, which was the weekend of Law School Graduate Reunions, including plaintiff's 35th, involving the Class of 1991. However, her letter suspended him through Sunday, May 10, 2026; the suspension did not stop with the end of student exams on May 8.

ii. Furthermore, the Orange Pass does not specify where the bearer is allowed to do or is restricted from doing his or her printing and photocopying inside the Law Library. Exhibit 2, at 2. Therefore, plaintiff did his printing on May 4 from the MyLab printer on the Law Library's second floor, just as he had usually done until defendant Amy Wharton asked him on that day to move to the ground floor printers.

iii. Defendant Amy Wharton's letter (Exhibit 2) fails to mention the fact that plaintiff did exactly as she asked him to do upon her coming across him inside MyLab, which was to relocate to the ground floor.

iv. Defendant Amy Wharton's letter of May 5, 2026 (Exhibit 2) contained several additional, false and curious statements.

A. "At least one student appeared to be trying to use the printer at that time." Exhibit 2, at 1. As any surveillance video-recording would show, plaintiff let the student finish her printing before he began his.

B. Defying her attempt to claim that plaintiff's use of the printer inside MyLab on the second floor of the Law Library on May 4, 2026 after a law student had finished using it caused any impairment to preparation for student exams, that is not the only high-capacity printer available to students on that floor. Exhibit 2, at 1. There is another one in a small room northward, behind the Library staff's offices.

C. Defendant Amy Wharton then changed to the plural, accusing plaintiff of "impedance of students' printing." Exhibit 2, at 1 (emphasis added). There was only ever a single student inside MyLab on May 24 at the same time as plaintiff, and she finished using the printer machine before he started his printing.

D. "It is estimated that you had been in MyLab for at least 30 minutes before I informed you that you needed to relocate." Exhibit 2, at 1. In fact, plaintiff repeatedly entered and exited MyLab during that time period. His recollection is that he went repeatedly to check on material on the book shelves and to bring some inside MyLab for use.

E. "Visitors may check out a badge at our circulation desk [] for the sole purpose of briefly visiting the stacks to peruse and retrieve materials." Exhibit 2, at 1. The Orange Pass, which is page 2 of Exhibit 2, does not say anything about the "perusing and retrieving [of] books" having to be brief.

g. Given the foregoing, the monstrosity of a four-year ban from the Law School, Law Library, and all University property except the Medical Center was uncalled for and is grossly disproportionate to any wrong plaintiff did, or could conceivably be held accountable for actually having done, leading up to or contributing to it.

i. The UVA defendants did not find that he repeated any kind misconduct it had alleged he committed in the first instance, after he received notice from an officer with authority forbidding him from repeating it.

A. He did not sleep a second time after his barring for having done so a first time in August 2024.

B. Nor did he ever receive actual notice from any UVA official, before defendant Chief Longo imposed the four-year ban on June 30, 2026 (Exhibit 6),

not to enter the Law School on the weekends, after UVA Police Officer T. Poe inquired of both defendant Stephen T. Parr and Officer Poe's superiors within the UVA Police Department and then told plaintiff on the day of the tornado warning in March 2026 that his presence inside the Law Library, while the Law School building remained closed, was permissible.

C. Repeat of the same kind of misconduct might have justified, for the purpose of deterrence or punishment, an escalation of discipline against plaintiff beyond the level the UVA defendants meted out as a result of their unilateral imposition of the first three No Trespass Warnings, suspensions lasting, each one, a couple of to 22 days in length.

D. However, even accepting the validity of the three No Trespass Warnings, no such repeat of any specific, offending conduct ever occurred, after notice plaintiff received of its impropriety.

ii. Defendant Chief Longo rescinded the first two of the three No Trespass Warnings he issued within a couple of days of receiving plaintiff's appeal.

A. Then, he demonstrated his lack of concern about the third one by failing to rule on plaintiff's appeal within the time-frame of 21 days in which the University's own Procedures stated plaintiff was entitled to a ruling.

B. Therefore, none of them furnished any basis for imposing a four-year ban.

iii. A four-year ban for the kind of conduct the UVA defendants maintain plaintiff committed, even if it was well-grounded in fact and plaintiff had repeated any of it more than once, which he never did, would be inordinate to any harm plaintiff committed, and unwarranted for preserving the University's stated mission of "pursui[ing] academic excellence." Exhibit 9, at 1.

A. A step approach to discipline by public institutions is appropriate, if the ultimate sanction is to deprive a person of his right to gain access to their public facilities, which approach is measured and proportionate to any harm done or threat remaining.

B. Plaintiff's presence occupying a single chair among the two-thirds of all chairs on the Law Library's second floor that were unoccupied at the peak of demand during law student exam period, and his use of a printing machine after the only law student present inside MyLab finished using it, did not pose any risk of harm at all to the University's pursuit of academic excellence.

C. Even if this conduct by plaintiff had caused the Law Library, Law School, or University any injury at all, which it did not, such harm would be so minuscule as to justify, at most, a reasonable appeal to plaintiff to conduct himself in a more restrained way in the future, rather than justify an outright ban for four years.

D. In fact, plaintiff accepted Library Director Amy Wharton's intervention as just that, relocated downstairs as she requested, and never entered MyLab or was (falsely) charged with selfish printing again.

iv. The over-riding mission of the Law Library is not the "pursuit of academic excellence." Exhibit 9, at 1.

A. Nowhere in Chapter 22 of Title 23.1 of the Virginia Code does it state that is the mission of the University of Virginia.

B. While that is certainly a laudable objective for any educational institution, particularly a flagship state university, to have, plaintiff understands, as

many members of the Virginia General Assembly will agree, that UVA's mission is more broadly to serve the public's need for education and knowledgeable and accessible use of its resources.

C. A public Law Library whose posted opening hours do not expressly and at any time restrict access only to Law School students, faculty and staff is, and should be, open to all members of the public, especially Virginia Bar members, whenever they can gain entry through lawful means, which is only ever what plaintiff did.

v. In short, there was a complete disconnect between plaintiff's conduct and the UVA defendants' procedures deployed for depriving him of access to its public facilities, which violated his rights to procedural due process.

**The JMRL Library Defendants – Detail on Procedural Due Process**

103. The JMRL Library defendants failed to engage in inadequate and sufficient procedures, which failures poisoned their consideration of plaintiff's rights to retain access to JMRL Library facilities to exercise his liberty and property interests, and his rights to petition the Government and to free speech.

a. First, the JMRL Library defendants failed to give plaintiff notice of any specific, past wrongdoing to allow him to correct his conduct and prevent the more serious discipline it subsequently imposed.

i. Defendant David Plunkett's letter of July 16, 2026 (Exhibit 15) suspending plaintiff from all JMRL branches for a period of three months is devoid of specific facts, and makes only generalized allegations of wrongdoing by plaintiff. Exhibit 15.

A. Therefore, it is an inadequate document on which to base any discipline against plaintiff.

B. It alleges simply that plaintiff committed "further disruptions of library service." Exhibit 15.

C. Since defendant David Plunkett failed to provide any further detail at their meeting on July 21, 2026, or in response to plaintiff's prompting him to do so by email immediately afterwards (Exhibit 25), then the JMRL Library defendants have no evidence that was ever presented to plaintiff, giving him a chance to respond, to justify their 3-month barring of him.

ii. Plaintiff avers that when the two first met on April 20, 2026 to discuss plaintiff's conduct, defendant David Plunkett did not offer any examples of plaintiff causing any disruption, other than incidents in which plaintiff sought to exercise his authority granted by the Charlottesville General District Court to seek enforcement of two Protective Orders entered for his benefit and safety, or to make lawful and rightful use of Library surveillance video to apprehend, and thereby deter, criminal conduct on site. Exhibit 17, plaintiff's 17-page letter to defendant David Plunket, amply supports his averment.

iii. Nothing occurred between their April 20 meeting and defendant David Plunkett's letter of suspension dated July 16, 2026 (Exhibit 15) that gave additional grounds for disciplining plaintiff, beyond the mild sanction he received on July 14 of a suspension for the remainder of that day for leaving his belongings in a small conference room twice for 30 minutes each time unattended, the first time he being unaware of any 30-minute time limit since it was nowhere put in writing, while he attended to the life necessity of fixing his flat bicycle tire outside the Library and collecting food from the food pantry next door to the downtown Charlottesville library to survive through the week.

iv. Similarly, at their meeting of July 21, 2026, defendant David Plunkett, when prompted, merely said plaintiff had violated "policies" of JMRL Library, without specifying what they were. When plaintiff again offered him the chance immediately after that meeting to identify any "disruptions" plaintiff had caused which JMRL faulted him for, defendant David Plunkett did not, and could not, state any. Exhibit 25.

b. Second, the JMRL Library defendants never stated any factual grounds supporting their supposed reason for suspending him for three months, a disruption of library services, which he might have been able to challenge in any review meeting of the kind David Plunkett gave him twice or by letter appeal.

i. With regards to the specific incident, or incidents, that took place on July 14 giving rise to defendant David Plunkett's letter of suspension the next day (Exhibit 15), defendant David Plunkett did not offer any facts to dispute the account set forth in plaintiff's email to him of July 21, 2026 sent at 4:39 p.m. denying the reason stated in that letter for his suspension, that he had disrupted library services. Exhibit 25 (their email exchange afterwards).

ii. When asked again, defendant David Plunkett failed again by email to come forth with any way in which plaintiff had committed any kind of a disruption. Exhibit 25, at 2-3.

iii. Plaintiff addresses the pretextual grounds for suspending him in Count 3 below, indicating a retaliatory motive.

c. Third, the JMRL Library defendants imposed discipline of a three-month suspension from all of its branches that was grossly disproportionate to any misconduct plaintiff committed.

i. From their interactions dating back several years, David Plunkett should know that plaintiff is a reasonable man. If plaintiff had inflicted any unreasonable harm on Library operations, if it had been drawn to his attention in writing or verbally, he would have offered, committed to, and carried out rectifying his conduct.

ii. In fact, plaintiff did exactly that.

A. He never again changed from his rain clogs to his shoes or removed his trousers exposing his bicycle shorts underneath behind the enclosed space of a computer terminal in the downtown Library, after the reference librarian with the nose-piercing told him not to because it might make people nearby feel uncomfortable (even though there were no patrons nearby when he did this, and she had somehow divined he had done this as she walked from the Reference Desk at the base of the stairs to the table he was at all the way in the back of the ground floor).

B. Nor did he ask Circulation Desk librarian Steve to store his bicycle pannier again, after Steve had originally offered to do so, but David Plunkett told plaintiff on April 20, 2026 that staff would no longer store his belongings behind the Circulation Desk when he had to leave the Library for a short period of time to make a filing in state court or for some other, similar errand.

104. The UVA and JMRL Library defendants' actions set forth above proximately caused plaintiff damages which are described in the section following Count 5 below.

## COUNT 2

**Denial of Plaintiff's Substantive Due Process Rights to Gain Access to the Public Forums of the Law Library, All Other University Grounds, and All Branches of the JMRL Regional Library**

**42 U.S.C. § 1983**

**against the University of Virginia Defendants and the JMRL Library Defendants**

105. Plaintiff reiterates paragraphs 1 – 104 and these paragraphs are incorporated by reference as if restated herein.

106. The First Amendment to the U.S. Constitution guarantees to everyone the rights to free speech and to petition the Government for redress of grievances.

107. The "very purpose" of a library "is to aid in the acquisition of knowledge through reading, writing and quiet contemplation." Kreimer v. Bureau of Police for Town of Morristown, 958 F.2d 1242, 1261 (3rd Cir. 1992).

a. For the purpose of First Amendment expressive activities, a library is a designated or limited public forum, in which "constitutional protection is afforded only to expressive activity *of a genre similar to those that government has admitted to the limited forum*." Id. (emphasis supplied).

108. "The First Amendment right to petition the government for the redress of grievances extends to the courts in general and applies to litigation in particular." Woodruff v. Mason, 542 F.3d 545, 551 (7th Cir. 2008).

a. Impairment of plaintiff's petitioning activity inside the premises of the defendant libraries is entitled to a more strict standard of scrutiny than would be applied to First Amendment expressive activities.

b. Plaintiff did not seek to speak on their premises, only in preparing petitions to the courts, to engage in "the very purpose" of the libraries' existence: "acqui[ring] knowledge through reading, writing and quiet contemplation." Id.

**The University of Virginia Defendants – Substantive Due Process Analysis**

109. "'[O]nce a limited forum has been created, entities of a 'similar character' to those allowed access may not be excluded.'" Goulart v. Meadows, 345 F.3d 239, 250 (4th Cir. 2003) (quoting Warren v. Fairfax County, 196 F.3d 186, 194 (4th Cir. 1999) (*en banc*)).

a. Thereby, the University of Virginia defendants correctly allow all members of the public who wish to use its legal research resources to gain access to the limited public forum of the Law Library by signing in at the Law Library Circulation Desk. Exhibit 1.

b. The UVA Law School premises, including its Library, were open from time immemorial to all members of the public, until sometime in the autumn of 2024.

i. At that time, all of the exterior doors began to be locked 24/7 and became "Card access" during the evenings and nights and on weekends.

ii. Despite the addition of notices posted to the exterior doors stating hours of "Card access" and requiring visitors to check-in at the Circulation Desk, hours posted at the Law Library entrance did not discriminate between law and JAG students, faculty and staff and other members of the public; the Law Library remained open, unrestricted, to all, except during law student exam period beginning December 2024.

c. As between "the internal standard" and the "external standard" of First Amendment analysis applying "[w]hen a particular forum is classified as a designated/limited public forum," Goulart, 345 F.3d at 250, the "internal standard" applies to the University of Virginia defendants' exclusion of plaintiff from the Law Library during hours posted on the Law

School's exterior doors as "Card access" when during those "Card access" hours, the Law Library's own hours remain open. Cf. Exhibit 1 with Law Library hours stated in paragraph 42(a)(v) above.

d. "The 'internal standard' applies to situations 'where the government excludes a speaker who falls within the class to which a designated (limited) public forum is made generally available.'" Id. (cites omitted).

110. "If the government 'excludes a speaker who falls within the class to which a designated public form is made generally available, its action is subject to strict scrutiny.'" Id., 345 F.3d at 249.

a. "[T]ime, place or manner regulations that limit permitted First Amendment activities within a designated public forum are constitutional only if they are 'narrowly tailored to serve a significant governmental interest, and … leave open ample alternative channels for communication of information.'" Kreimer, 958 F.2d at 1262 (cites omitted). Accord: Goulart, 345 F.3d at 248 and 250.

b. With changing times and a need for some heightened security to guard against terrorists and criminals, plaintiff concedes that the University of Virginia defendants had a "significant governmental interest" in limiting public access to the Law School building after the hours that daytime staff was normally present.

c. The question remaining is whether, first, a regulation is "narrowly tailored" barring a member of the public from the public Law Library during hours the Building's doors could be opened only by "Card access" but the Law Library remained open, and second, it left "ample alternative channels for communication of information" open. Kreimer, 958 F.2d at 1262; Goulart, 345 F.3d at 248.

111. Plaintiff is aware of students from other Schools of the University who would come to the Law School and gain entry in the same way he did, by invitation of a Law School student or faculty member with Card access, to study in the quiet and comfort of the Law Library, although these students were not there to use the legal research resources which he was there to use. Plaintiff is not aware that the Law School ever disciplined any of them for gaining access after-hours to use the Law Library for purposes other than the legal research and writing which is its *raison d'etre*, for which he sought to use it.

112. Therefore, if the regulation was meant to exclude everyone but Law students, faculty and staff, as one reading of the door notice, Exhibit 1, might arguably state, it was not narrowly tailored, because not enforced by a strict reading of its terms against University students from Schools other than the Law School who relied, like plaintiff, on a Law student for a welcome and access.

a. As to the first element of "narrow tailoring," id., a member of the Virginia State Bar on active status needing to use the Law Library's legal research resources and quiet legal writing space on a near-daily basis, plaintiff was of a "'similar character'" to law students and faculty. Goulart, 345 F.3d at 250.

i. Given further that "'once a limited forum has been created, entities of a 'similar character' to those allowed access may not be excluded,'" id., the regulation absolutely barring plaintiff from weekend and evening hours was not narrowly tailored, given the episodic demands of litigation that compel evening and weekend access to legal research facilities.

ii. (Even if plaintiff had sufficient funds to subscribe privately to an online case and statutory legal research database, such as LEXIS or Westlaw, which funds he

does not have, having been educated at the Law School in book research, he believes it produces far better results, faster, than online. He submits he would be disadvantaged if forced to rely after hours on such limited online resources.).

iii. A properly narrowly tailored regulation would either allow Circulation Desk personnel to come to the exterior door and admit a member of the Bar like plaintiff, either on his showing proof of Bar membership or having registered such status beforehand with the Library.

A. Plaintiff submits that such access should also be afforded any member of the public who verbally states or signs stating a *bona fide* need to conduct legal research and writing after hours.

B. In the alternative, persons holding plaintiff's status as Bar members would be issued Cards allowing access, provided they use the access only to go directly to and from the Law Library. (The exterior door notices state, "Your image may be recorded," which would guard against, and help punish, any abuse of such privilege. Exhibit 1.).

C. In the second alternative, a narrowly-crafted regulation would not be enforced against active Bar members, and the exterior door notice should be altered to state an express exception for Bar members.

b. As to the second element of "narrow tailoring," 345 F.3d at 248 and 250, the regulation, as the University of Virginia defendants interpreted and enforced it, leaves no "alternative channels" for plaintiff to gather the legal information he can only gain from inside a law library, much less "ample alternative channels." Kreimer, 958 F.2d at 1262; Goulart, 345 F.3d at 248.

i. Although a complete, updated set of the Virginia Code Annotated is available inside the Albemarle County Circuit Courthouse, there are no other public law libraries within 120 miles of Charlottesville, so far as plaintiff knows, the closest being the public law library in the Fairfax County Circuit Courthouse.

ii. (There is none in Richmond that plaintiff could find while there, and he is not sure if the Washington & Lee Law School Library in Winchester is open to the public.).

iii. Therefore, lawyers in plaintiff's position, restricted due to poverty to bicycle riding, are for all practical purposes left without any channel for gathering the legal information they need to practice their profession and appear before courts.

113. In sum, the restriction on plaintiff's access to the Law School after its Building is closed to the public, but the Law Library remains open, fails as a matter of law as an unconstitutional restraint on his First Amendment rights to free speech and to petition the government.

a. The Law Library concededly has a "significant interest" in limiting non-Law School patrons' access during law student exam period, which the UVA defendants have done for 18 days twice yearly starting in December 2024. Id. Taking the restriction at face value (and not oriented to plaintiff, which he argues in Count 3 is the case) stated on the Orange Pass that, "[Y]ou may not sit anywhere in the library other than in the Klaus/Reading Room to the left of the circulation desk on the first floor," Exhibit 2, at 2, this is a restriction on the "manner" of gaining access to legal information that is subject to the same standard stated above. Id.

b. On the supply side, given that the majority of the seats remained empty and open for use, even during the height of demand during law student exam period studies (and

exam-taking itself is prohibited inside the Library), this restriction is not narrowly tailored to achieve the Law Library's interest in preserving a quiet and comfortable place for law students to excel in preparing for their exams.

c. On the demand side, given that Library Director Amy Wharton admitted that the Orange Pass system was implemented at plaintiff's request, Exhibit 2, at 1, and he posits that he was one of its only users during the three 18-day periods spanning May 2025 to May 2026 in which it was operational, there is no reason for this restriction on seating to exist.

d. Even if the Orange Pass restriction on seating anywhere but the Klaus/Reading Room on the Law Library's first floor is evaluated by a "reasonableness" standard, 345 F.3d at 250, there was no "reason" for it.

e. Likewise, even if there was a reason justifying a regulation barring a single recognized and authorized Law Library patron from sitting in a chair on its second floor during law student exam period, "do not read the rule to bar permanently a patron from reentry to the Library['s second floor] once the patron complies with the requirements in the absence of pervasive abuse." Kreimer, 958 F.2d at 1264. However, that is what Library Director Amy Wharton's letter of May 5 does: bar him through Law School Reunion weekend for sitting in a chair, even though plaintiff complied with her request to relocate to the Klaus Reading Room on the first floor. Exhibit 2, at 1.

f. Therefore, the UVA defendants' barring plaintiff from May 5 to 11, 2026 because he sat in a chair in MyLab on the Law Library's second floor while intermittently collating papers for as long as thirty minutes on May 4 was an unconstitutional restriction on his First Amendment rights to access to the Law Library's full legal research and allied space resources during law student exam period.

g. Subsequent discipline, including the four-year suspension based on his three prior "strikes," if that is what it was, was consequently premature and itself, a violation of both his substantive and procedural due process rights stated more fully in Count 1.

114. In the alternative to the Court's declining to find the foregoing regulations unconstitutional as a matter of law, "narrow tailoring" compels an interpretation of the regulations in a way that favors plaintiff. If the following factors do not support his claim for breach of substantive due process, they support his claim for retaliation in Count 3 for showing disparate treatment of him in violation of the equal protection of the laws.

a. The notice posted on the Law School's exterior doors expressly indicated that an "authorized visitor" would be, or was, someone who signed in at the Law Library Circulation Desk, clearly implying that such person would not be considered a trespasser. Exhibit 1.

b. Everyone who worked at the Circulation Desk knew plaintiff and they allowed him to enter the Law Library without signing in. They condoned his technical failure to sign in. Nor did any figure of authority ever cite him for failing to sign in, whether retroactively or proactively.

c. Plaintiff always proceeded from the exterior door to the Law Library, or early in the morning, if it had not opened yet, *i.e.*, before 8 a.m., to waiting on a bench or sofa in the lounge just outside it for it to open.

d. The notice posted on the Law School's exterior doors did not state that someone would be trespassing for entering without possessing a card key in his or her name when the doors were locked between 6 p.m. and 7 a.m. Monday through Friday and all day on the weekends. Exhibit 1.

i. In other words, this notice did not state that access was prohibited to everyone but students, faculty and staff when the doors were locked.

ii. In plaintiff's case, a friendly person with card access always welcomed him inside to proceed directly to the Law Library, with very few exceptions.

115. Lastly with regards to the substantive due process violations that the University of Virginia defendants inflicted on plaintiff, the four-year ban on access not only to the Law Library, but also all University facilities except the Medical Center, including other libraries where he might at least gain access to LEXIS, undoubtedly amounted to an impairment on his liberty and his property interest in having access to public resources, as well as his First Amendment rights. Whether these restraints are permissibly constitutional or not depends on the rest of Counts 1 through 3 against these defendants.

116. Because the Law Library by signs that began to be posted in 2025 discouraged use of its public access computer terminals for the conduct of personal email, and because plaintiff had suffered repeated interference with his email account and ability to upload electronic filings to federal and state courts therefrom, and for the same reason, he did not use his smart phone or laptop computer for these purposes, therefore, he conducted all of his email activity and electronic court filings (until interference therewith from the Fossil Fuel Forces compelled him to seek leave from all courts to make paper filings) from public access terminals at the branches of the JMRL Library defendants. He also conducted general book and online research in support of his legal petitions at these branches; contemplated on and wrote his petitions; and engaged therefrom in other searching for information, reading and writing that is integral to exercise of free speech and petitioning activity in other contexts, and for pleasure.

**<u>The JMRL Library Defendants – Substantive Due Process Analysis</u>**

117. With regards to the JMRL Library defendants, plaintiff is not aware of, and does not comprehend, any manner in which he disrupted library services, the ostensible reason for barring him for three months, unless these defendants maintain that Protective Orders which the Police and Charlottesville General District Court found could be enforced on Library premises, in fact and law are not enforceable thereon. Therefore, he evaluates the JMRL Library defendants' abridgement of his First Amendment rights by banning his access to its facilities in the context of the rules it cited initially on July 14.

118. "[R]estrictions that do not limit those First Amendment activities the government has specifically permitted in [a] designated public forum need only be 'reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view.'" <u>Kreimer</u>, 958 F.2d at 1262 (cites omitted).

a. Plaintiff addresses viewpoint discrimination in Count 3 below.

b. The JMRL Library defendants stated plaintiff violated two regulations in imposing his rest-of-the-day ban on July 14, which David Plunkett's letter of the next day cited for the three-month suspension. Exhibit 15 ("[O]n multiple occasion yesterday, Central Library staff had to talk to you about violating JMRL's policies.").

i. First, Reference Supervisor Acacia Rodgers pointed to JMRL Procedure: Section 5.1, point 7: "JMRL rooms are not available to store supplies for groups or individuals." Exhibit 18.

A. This rule is reasonable on its face.

B. However, it is all a matter of degree, as "to store" is not defined. Whenever a person occupies a conference room and enters with belongings apart from his or her person, such items are "stored" in the room, even while the person is in the room.

C. In addition, "supplies" forbidden from being "stored" are also not defined. Again assuming personal belongings, a bicycle saddlebag and some food, of the kind plaintiff brought into small Conference Rooms A and B are considered "supplies," then a person's merely entering a conference room with personal belongs apart from his or her person may be in violation of this rule.

ii. Second, Ms. Rodgers faulted plaintiff for leaving his things in Conference Room A for longer than 30 minutes unattended.

A. This rule may be reasonable, with emergency exceptions of the kind that faced plaintiff on July 14, but since it was not in writing, plaintiff was not aware of it, and cannot be held responsible for awareness of it, before she told him about after expelling him from Conference Room A.

B. He was undoubtedly aware of this rule when the Reference librarian with the nose-piercing charged him a few hours later with violating it for the second time that day and suspended him for the day. However:

1. Library surveillance video will show whether plaintiff was away for 29 minutes or 32 minutes; his absence was somewhere within that time range.

2. Given that plaintiff was unaware of the 30-minute rule before his first infringement of it, the additional punishment of suspension for the remainder

of the day, and then using these two incidents, as Library Director David Plunkett did, to justify a three-month suspension was unreasonable.

iii. "[D]o not read the rule to bar permanently a patron from reentry to the Library once the patron complies with the requirements in the absence of pervasive abuse." Kreimer, 958 F.2d at 1264. Violating both of the foregoing rules twice in one day did not amount to "pervasive abuse" and under the circumstances, did not warrant even suspension for the day of May 14, much less the three-month suspension David Plunkett meted out the next day. Exhibit 15.

A. Plaintiff did not "store supplies" in either small Conference Room A or B. He left his personal belongings. Exhibit 18.

B. He did so under emergency circumstances.

I. His bicycle parked in the front of the downtown Library had a flat tire.

II. He had to go to the food pantry next door that morning, before it closed at noon, to get food to survive through the weekend.

III. On foot, his bicycle pannier would have been too heavy to lug in his arms or hands.

IV. There was a significant risk, from his past experience, that his saddlebag would have been tampered with, something stolen from it, if he left it unattended in a public space of the Library.

V. Director David Plunkett had told him in their meeting of April 14 that the Circulation Desk would no longer store his pannier when he had to leave the downtown Library for short periods of time.

VI. Therefore, he took out small Conference Room B while trying to repair his bicycle's flat tire on the spot.

VII. Unfortunately, his bicycle required taking to the mechanic.

VIII. He hurried back to the Library as soon thereafter as he could, and may have walked in the door less than 30 minutes after departing.

119. In sum, the JMRL Library defendants' regulations were unreasonably enforced against plaintiff on July 14 and 15, which lack of reason deprived him unconstitutionally of his substantive due process rights to have access to the JMRL branch libraries for a period of three months.

120. The UVA and JMRL Library defendants' actions set forth above proximately caused plaintiff damages which are described in the section following Count 5 below.

## COUNT 3

### Retaliation for Plaintiff's Exercise of First Amendment Rights to Free Speech and to Petition the Government for Redress of Grievances in Violation of His Fourteenth Amendment Right to Equal Protection of the Laws

### 42 U.S.C. § 1983

### against the University of Virginia Defendants and the JMRL Library Defendants

121. Plaintiff reiterates paragraphs 1 – 120 and these paragraphs are incorporated by reference as if restated herein.

122. According to the U.S. Court of Appeals for the Fourth Circuit:

> A plaintiff seeking to assert a § 1983 claim on the ground that he experienced government retaliation for his First Amendment-protected speech must establish three elements: (1) his speech was protected, (2) the "alleged retaliatory action adversely affected" his protected speech, and (3) a causal relationship between the protected speech and the retaliation. Suarez Corp. Indus. v.

> McGraw, 202 F.3d 676, 685-86 (4th Cir.2000). Of note, our causal requirement is "rigorous." Huang v. Bd. of Governors of the Univ. of N.C., 902 F.2d 1134, 1140 (4th Cir.1990). "[I]t is not enough that the protected expression played a role or was a motivating factor in the retaliation; claimant must show that 'but for' the protected expression the [state actor] would not have taken the alleged retaliatory action." Id.

Raub v. Campbell, 785 F.3d 876, 885 (4th Cir. 2015).

a. "[A] plaintiff seeking to recover for retaliation must show that the defendant's conduct resulted in something more than a '*de minimis* inconvenience' to her exercise of First Amendment rights." ACLU of Md., Inc. v. Wicomico County, Md., 999 F.2d 780, 786 n. 6 (4th Cir.1993).

b. Applying this standard for speech to plaintiff's activity petitioning the Government, he has met his burden with regards to the first two factors.

c. The remainder of this Count 3 focuses on whether his protected activities were the "but for" cause of his four-year suspension from all University grounds except the Medical Center and of his three-month suspension from all JMRL Library branches.

**The University of Virginia Defendants - Retaliation**

123. At a minimum, the University of Virginia defendants are charged with knowledge of Plaintiff's first lawsuit against Law Library restrictions and thereby, the pendency of the Exxon Mobil lawsuit.

124. An indication of the Law Library's favor of Big Tech's online research tools over books arose when plaintiff proposed it keep a second copy of *Virginia Rules Annotated*, the previous year's edition, on its shelves, in addition to the one in the reference section.

a. He would have liked to have been able to check it out on occasion to bring to a state court hearing.

b. Leslie Ashbrook, Assistant Library Director, told him the Library lacked shelf space for such a book, a response he informed another Library staff member of at the time.

125. Plaintiff submits that online legal research tools favored by Big Tech and the Law Library are inferior to book research because:

a. The algorithms can be manipulated to give different results to different searchers based on the same search, as related to plaintiff by two law students and as based on his own experience.

b. The databases lack important resources found only in print, as evidenced by a search for a scholarly legal article included in a LEXIS print volume but not found in the online version.

c. Book research permits the human eye to see at once multiple content data points on two pages at a time and serendipitous flipping of pages forward and backwards, as compared to the sequence an online tool presents on a screen, which only permits scrolling from page to page.

126. Plaintiff relies on circumstantial evidence to show that his protected speech and petitioning were most likely the cause of the UVA defendants' adverse action against him, or at least, to present *prima facie* evidence on that element to warrant discovery of more direct evidence.

127. The UVA defendants took action to bar plaintiff from their premises after the failure of Fossil Fuel Forces' prior attempts at the Law School to lure him into succumbing to their will and surrendering POP Diesel's business mission of replacing as much as one-sixth of petroleum diesel consumption with pure plant oil. At least three female University students were agents coached in enticing plaintiff into a personal relationship, which they would then use to

distract and divert him from POP Diesel's mission and the Exxon Mobil lawsuit: the first one referenced in paragraph 46(a) of Docket No. 313-1 of the Exxon Mobil lawsuit and the other two who worked evenings and weekends behind the Law Library's Reference Desk: a lascivious undergraduate student and a law or graduate student born in India.

128. A reasonable inference that plaintiff's protected activities were the cause of the UVA defendants' four-year suspension of him arises from the accumulation of the following. Chief Longo did not even bother to rule on plaintiff's appeal of the third No Trespass Warning (Exhibit 11) within the 21 days its procedures prescribed; only on plaintiff's inquiry on the 22nd day did Chief Longo rule by rescinding that Warning; but in so doing, Chief Longo attached the nonsensical and disproportionate condition of a four-year ban should plaintiff commit any future violation of the University's policies, even if minor, as plaintiff complained of in his letter of June 10, 2026 (Exhibit 4); in response to which Chief Longo failed to reply, until the date June 15, 2026 that Big Tech tycoon David LaCross (Exhibit 27) and his wife Kathy finalized a $43.4 million gift to the University's School of Education, which gift was announced the next day, June 16 (Exhibit 13). The final inference that imposition of the four-year ban was a *quid pro quo* condition of this gift is from the set-up the UVA defendants then put plaintiff through, as follows.

a. For the sake of appearances, given that UVA is a public institution and its defendants and their confederates knew they could be held to some form of account, Chief Longo had to respond to plaintiff's letter hand-delivered June 10, 2026, Exhibit 4, asking him to repeal the condition of the four-year ban, should plaintiff violate any University policy in the future, no matter how insubstantial.

b. Therefore, the UVA defendants, by Chief Longo, wrote the best letter they could, which was Exhibit 9, which letter they pre-dated to June 11, the day after plaintiff's of

June 10 (Exhibit 4), but did not transmit to plaintiff by U.S. mail (Exhibit 15) *ex post facto* until June 15 (Exhibit 10), and never sent him by email, the channel plaintiff had asked Chief Longo to correspond with him due to delays in his receiving U.S. mail, had their exchange been mutually in good faith, rather than one side trying to get rid of the other on any fabricated excuse.

c. Chief Longo's letter dated June 11 attempting to justify the condition of a four-year ban on any future infraction of University policy by plaintiff, but not sent until the date that David LaCross's gift to the University of $43.4 million was finalized, June 15 (Exhibit 10), which gift was announced the next day, June 16 (Exhibit 13):

i. Listed past violations of policy by plaintiff that:

A. the University of Virginia defendants had already excused, by Chief Longo's rescission of the three original No Trespass Warnings;

B. cited a past violation, sleeping on the premises, which plaintiff never repeated again;

C. cited him for a violation, excessive printing without calling on the assistance of Library staff, which he had never been told was a problem, and which Library management had to that point condoned;

D. claimed for the first time, coming from Chief Longo (given that Officer T. Poe had allowed plaintiff to remain in the Law Library on the day in March 2026 of the tornado warning when the Law School building was closed, after checking with his superiors), that "the library is not open to the public" when the Law School building is closed (Exhibit 9, at 1), and that plaintiff had therefore gained unlawful entry thereto by accepting the invitations of Law School students and faculty, and;

E. charged him for the first time with being "argumentative, [which] cause[d] others to be uneasy and fearful for their safety," which, without any corroborating detail of aggression or violence, of which there was none, is so gross an exaggeration of plaintiff's style as to be an absurdity, and;

ii. Was never received by plaintiff before Saturday, June 27, when Chief Longo charged him with entering the Law School building "in clear violation of University and Law School policy," Exhibit 6, which due to the invitation by conduct of the "law graduate" who held the exterior door open for plaintiff to grab, he did not do unlawfully. Regardless, plaintiff did not have advance notice that Chief Longo considered the Law School building to be off-limits to him on the weekends, since plaintiff had not received Chief Longo's letter dated June 11 but never emailed him and only sent in the mail on June 15, the day David LaCross's generous gift to the University was finalized.

d. Without plaintiff's having received their notice to him by Chief Longo that weekend visits to the Law School were forbidden, the University of Virginia defendants knew that plaintiff would attempt to gain access to the Law School building as he was accustomed to doing on the weekends. They just had to wait until he committed such act. He did that on Saturday, June 27, on the invitation by conduct of the "law graduate" who told him she was not supposed to let him in, but then did so by holding the door open for him to take and enter by, as recorded on video.

e. Then like an ostrich, Chief Longo, conveniently relying on a viewing of the dispositive video by "law school administrators" (Exhibit 6), declined plaintiff's request (point 4 of Exhibit 5, at 2) that he investigate personally by watching said video recording of plaintiff's entry to the Law School building on June 27, which showed plaintiff was welcomed,

and which fact would have torpedoed the UVA defendants' construct of a monumental, four-year ban imposed on him.

f. The imposition of the four-year suspension on plaintiff from all University grounds, done on the foregoing contrived circumstances, did not arise from whole cloth on the day David LaCross finalized his gift of $43.4 million, June 15. It was in the works before then.

i. The UVA defendants may have thought they had gotten rid of plaintiff with imposition of the third No Trespass Warning on May 9, 2026 (Exhibit 11).

ii. However, since plaintiff reminded Chief Longo by visiting his assistant Christine Haines on June 3 that the time period for the Chief to respond Yea-or-Nay to his appeal of the third No Trespass Warning 22 days before had lapsed, the University defendants understood or realized plaintiff would not simply abide by it, and they would have to do something further to bar him from the Law Library, to spite his patience in awaiting a ruling in the Exxon Mobil lawsuit or appeal therefrom.

iii. Therefore, the organ Ms. Haines cited as "Threat Assessment" came up with the condition of the four-year ban.

g. That Officer Ryan and his colleague officer were able to confine plaintiff to the Regional Jail beginning Friday, May 8 for the weekend of his 35th Year Law School Reunion, based in part on a prior charge of making a false Police report which was subsequently dismissed, merely cemented the UVA defendants' intent, evidenced by Library Director Amy Wharton's flawed letter suspending him from the Law Library from May 5 until Monday, May 11, 2026 (Exhibit 2) for sitting in a chair, and by the third No Trespass Warning served on him on May 9, 2026 (Exhibit 11), that he not be present therefore, thereby causing him to miss any opportunity to raise funds from Classmates in support of his business venture, his conduct of the

Exxon Mobil lawsuit or its appeal, or his contingent gift to the University proposed therefrom of $500 million.

129. Plaintiff would like to believe that everyone serving on a University's Board of Visitors would do so without any consideration for competing conflicts of interest. Nonetheless, in the foregoing circumstances, plaintiff posits that discovery will show that Visitor Elizabeth Haile Hayes, a retired partner from the Akin Gump law firm representing the lead defendant in the Exxon Mobil lawsuit, played a part in giving direction to the University defendants' handling of plaintiff's expulsion from University grounds for four years.

a. A University official should not, and the evidence shows from the number of its officers copied on Chief Longo's email (Exhibit 5, at 5), that he did not, decide to expel a graduate of its Law School and lawyer on active status with the Virginia State Bar in isolation, despite reliance on flimsy, pretext grounds for doing so. Any consideration given to plaintiff's ten-page letter delivered June 22, 2026 to the President, Rector, and Visitors of UVA will be germane to discovering direct evidence that his petitioning this Court was a but-for cause of the University defendants' actions.

b. Similarly, any communications between Rector Carlos Brown of Dominion Energy, University President Scott Beardsley, former Dean of the Darden Business School who from Exhibit 27 has past experience welcoming substantial gifts from Mr. LaCross, and that donor will be relevant discovery to this Claim of retaliation.

**<u>The JMRL Library Defendants - Retaliation</u>**

130. Evidence is both circumstantial and direct that plaintiff's First Amendment-protected speech and petitioning was the but-for cause of the limit thereon that the JMRL Library

defendants have subjected him to by suspending him for three-months from all their branch libraries.

a. Directly, Library Director David Plunkett opened their meeting of July 21 by remarking he had seen via livestream plaintiff's comments delivered to Charlottesville City Council the night before. Exhibit 16. Plaintiff's viewpoint in dissent was in the minority of those spoken that night. The City Council, who is a main funder of defendant JMRL Library, disregarded it in deciding to move forward to open 2000 Holiday Drive as an emergency homeless shelter by September 1, 2026. Mr. Plunkett's remark puts plaintiff's speech on a matter of public interest at the center of his decision announced at their July 21 meeting to retain his three-month suspension issued July 16 (Exhibit 15), despite plaintiff's 17-page appeal sent two days before (Exhibit 17).

b. As set forth above, there were no valid grounds, other than trivial infractions in which JMRL Library staff seemed to target plaintiff which, to justify the imposition of any suspension of plaintiff's right to visit their libraries beyond the one-day suspension which the Reference librarian with the nose-piercing imposed on him on July 15, 2026. David Plunkett's attempt by his letter of July 16 (Exhibit 15) to document an accumulation of infractions by plaintiff, or to present the form of a final action following repeated antecedent warnings, fails for lack of substance. To suspend a public patron of a public library for three months is a grave step that requires severe misconduct which the JMRL Library defendants simply cannot muster concerning plaintiff.

c. Plaintiff's patience and persistence with the Exxon Mobil lawsuit motivated those Fossil Fuel Forces, by Officer Ryan and Owen Brennan of the Haven, to turn

JMRL Library staff, including David Plunkett, against him, in order to cut off his second and last library resource in this geographical area, after the UVA Law Library.

131. The UVA and JMRL Library defendants' actions set forth above proximately caused plaintiff damages which are described in the section following Count 5 below.

**COUNT 4**

**Assault and Battery**

**against the S&P 500 Intelligence Defendants**

132. Plaintiff reiterates paragraphs 1 – 131 and these paragraphs are incorporated by reference as if restated herein.

133. On March 24, 2026, as the principal of defendant IMPACT and an agent of defendant S&P Global Intelligence, John Frazee committed repeated and prolonged assaults and batteries of plaintiff lasting longer than five minutes by grabbing ahold of his right arm and admittedly refusing to let go when asked, lunging at him and attempting to manhandle him aside, and yelling in his face, in a manner that was both objectively injurious and offensive and that caused plaintiff subjective apprehension for his safety and physical well-being and offense, which Mr. Frazee did with intent to do so, in an angry and rude way.

134. Mr. Frazee had no authority or excuse for engaging in the foregoing conduct, particularly at a public meeting of the Albemarle County Board of Supervisors at which plaintiff was seeking to speak on a matter of public concern that was on the agenda of the meeting for that evening.

135. The remainder of this Count 4 explains that Mr. Frazee played the role of, and functioned on March 24, 2026 as, the principal of defendant IMPACT and an employee of defendant S&P Global Intelligence acting within the scope of that employment.

136. Mr. Frazee controls IMPACT's words and actions on the Housing and homelessness issue, which is the most important issue to both its organization and the City of Charlottesville and Albemarle County, among those it chose to highlight at its Nehemiah Action in 2026 and during the years leading up to it.

a. With regards to the other two issues selected for IMPACT's 2025-26 focus, Community Safety and Bus Transit Wait Times:

i. Charlottesville Police Chief Michael P. Kochis publicly agreed to the demand IMPACT first raised at the March 24, 2026 Nehemiah Action regarding Community Safety, which was to commission a study by a nationally-recognized organization on how to conduct community policing better.

ii. The third issue, Bus Transit Wait Times, is one that IMPACT has fought and won in previous years, the 2026 ask being only for the City to accelerate its hiring of 10 new bus drivers.

b. John Frazee claimed in testimony on August 13, 2026 to have Chaired the December 10, 2025 meeting of IMPACT's Research or Steering Committee on Affordable Housing, and to have made the determination of whether plaintiff would be allowed to speak to the Committee.

i. Two people ostensibly more senior in the IMPACT organization were present in the courtroom to hear his testimony, among nearly a dozen from IMPACT on Mr. Frazee's request, and were present at that meeting. They both failed to contradict or correct his claim to have run by Chairing the December 10 meeting: co-President of IMPACT the Rev. Susan Karlson in her actual testimony, and staff member the Rev. Will Christians, who himself was the Chair of that meeting, sitting in the audience of the courtroom.

ii. Mr. Frazee's exaggeration in this regard, done in front of two senior leaders of IMPACT whom he expected would go along, which essentially made them complicit, is a demonstration of how much he dictated with impunity that organization's tactics, strategy, messaging, and decisions on its most important issue, indeed, only controversial issue in the 2025-26 cycle, of affordable Housing and homelessness.

c. At the December 10, 2025 Housing meeting, its actual Chair, the Rev. Will Christians, left it entirely to John Frazee's discretion to decide how to handle the valid points plaintiff had raised at that meeting.

i. In brief remarks, plaintiff told the Research or Steering Committee on Affordable Housing that:

A. He was relating an insight he had gleaned from having become aware of it within the six weeks prior; hence, this was his first opportunity to raise his information within the IMPACT organization, which he was doing as a service to its public members.

B. After the Haven expelled him in welcoming the return of the two men convicted of assaulting and battering him in retaliation for his continuing with the Exxon Mobil lawsuit.

C. His experience at the Haven had instructed him, as Major Donny Wilson of the Salvation Army had expressly advised him, that the organized crime Mafia would infiltrate and rotate its agents living at, any low-barrier shelter the City opened, which additional bed-space was unnecessary to begin with for a City of Charlottesville's size.

ii. Mr. Frazee announced to the Committee in response to Rev. Christians's query that there would be no consideration given plaintiff's new information.

d. As is evident from the edited video in the segment of interaction with Members of the Albemarle County Board of Supervisors before plaintiff's appearance, John Frazee, though ostensibly only a citizen volunteer, is obviously the sole person who from the stage of the Nehemiah Action, was making the determination for the entire IMPACT organization, on the spot, of whether, or the degree to which, local elected officials' answers to his and the organization's questions on March 24 complied with IMPACT's ask of them. That decision represented the culmination of an entire year's work by that organization on its most important issue, left entirely to him to rule on.

e. Immediately after the close of the Nehemiah Action on March 24, 2026, Mr. Frazee took command of IMPACT's response to plaintiff's attempt to speak thereat by telling the group of ministers assembled at the post-mortem that plaintiff was a reprobate whom the organization should publicly ostracize.

f. Mr. Frazee signaled to the IMPACT leadership present at the Nehemiah Debrief on April 14, 2026 to continue stonewalling plaintiff's view opposed to his own master, defendant S&P Global Intelligence, by ostentatiously leaving just before plaintiff's hard-bargained opportunity to speak during a Q&A session added at the end for his benefit. As a result, the two money men in the IMPACT leadership, Treasurer Robert Law and banker Steve Brinkley, led everyone else to walk out, and shut the lights off while plaintiff spoke to the couple of people who remained to the very end.

g. Mr. Frazee's aggressive alienation of plaintiff from a supposedly bottom-to-top, grass roots, democratic organization, foreshadowed on December 10, 2025 and begun the moment plaintiff stood to speak publicly on March 24, 2026 countering Mr. Frazee's very purpose in shepherding the low-barrier shelter a/k/a Fossil Fuel Forces' agent-housing to reality,

and his directing hostility towards plaintiff, rather than openness and toleration of differing viewpoints, by IMPACT's leadership gathered immediately after the Nehemiah Action ended on March 24, shaped IMPACT's response to plaintiff after the Nehemiah Action and Debrief.

h. IMPACT has treated him like vermin as a result, while its agents spread lies about him among its 29 congregations and beyond, at the behest of defendant S&P Global Intelligence, stymieing his spiritual progress.

i. In short, IMPACT's formal leadership are lapdogs to Mr. Frazee and his employer, S&P Global Intelligence.

137. Defendant S&P Global Intelligence, by turn, is the master or principal of Mr. Frazee, in that it controlled his conduct with regards to the IMPACT organization, as well as at its own worksite and in the internal halls of its business.

a. It is responsible for the expert doctoring of the edited video of the Nehemiah Action that obscured some of the reasonableness of plaintiff's conduct that evening, for instance, in asking Deacon Gathers to speak from his microphone for two minutes, while masking Deacon Gathers's own assault and battery of plaintiff (which he ceased when plaintiff asked) and most of Mr. Frazee's.

b. Mr. Frazee deceived the membership and possibly also the leadership of IMPACT of his past and behind-the-scenes advocacy of the Charlottesville City Council in favor of erection of an 80-bed, low barrier shelter for the homeless, to safeguard the hidden sponsorship of defendant S&P Global Intelligence and other Fossil Fuel Forces.

i. At no public meeting or meeting of the Research or Steering Committee on the Affordable Housing issue during the 2025-26 cycle did Mr. Frazee, as that

Committee's point man, ever put any questions to any member of City Council on the topic of a low-barrier shelter or homelessness.

ii. On Mr. Frazee's direction, at no public meeting or IMPACT Committee meeting during the 2025-26 cycle was City Councilor Lloyd Snook put to any questioning at all.

iii. Mr. Frazee testified falsely at his criminal trial on August 13, 2026 that IMPACT was not at all concerned about homelessness, when in contrast:

A. The Justice Ministry rally brochure advertised that homelessness was IMPACT's priority on the affordable housing issue in 2026.

B. The City's opening of an 80-to-200 bed, low-barrier shelter for the homeless at 2000 Holiday Drive had been at the forefront of IMPACT's agenda with City Council in the 2024-2025 cycle.

iv. Meanwhile, Mr. Frazee and others on behalf of the Fossil Fuel Forces, such as Livable Cville, advocated to individual members and the entirety of City Council in favor of opening this low-barrier shelter in 2026.

c. Mr. Frazee committed all acts complained of within the scope of his agency for defendant S&P Global Intelligence.

d. The course of Mr. Frazee's conduct, described above, after plaintiff stood asking to speak in derogation of defendant S&P Global Intelligence's interest for two minutes on March 24, 2026, was so single-minded in preventing any word of dissent from plaintiff from reaching the tender ears of public IMPACT members held in naïveté that it could only belong to a man on a mission. The mission belonged to the Intelligence service he works for.

e. Yet after plaintiff first alleged Mr. Frazee's hidden principal, defendant S&P Global Intelligence sought to shield itself from identification with his single-minded cause.

i. It removed the word "Intelligence" from the big sign on its building that occupies the block at 212 7th Street, N.E., Charlottesville, leaving display of its mission in the world the more opaque "S&P Global."

ii. It also altered its website to show branch offices around the world and to emphasize teaching the benefits of artificial intelligence, which information was not present before plaintiff filed a criminal charge against Mr. Frazee on March 25, 2026.

f. Circumstantially, Mr. Frazee attends St. Paul's Memorial Episcopal Church, the same one that sent African Development Partners to have a Harambee at Trinity Episcopal Church in a vain attempt to lure plaintiff into giving up and going to work for Exxon's intelligence service in Africa.

i. Pastor Cass Bailey announced one Sunday in the autumn of 2025 that representatives of that Church sought to merge into smaller Trinity, resulting in two of the three members appointed to serve on Trinity's lay Vestry (Executive Committee) until 2028 being migrants from St. Paul's.

A. He made this announcement after plaintiff had started attending regularly.

B. He made this announcement knowing that St. Paul's was taking an interest in Trinity because plaintiff had started attending its worship services regularly.

ii. The adult son of the third of the three Vestry members whose appointments expire in 2028, Randy Ruffin, recently sustained "an accident," which plaintiff suspects was another incident of purposeful harm committed by the Fossil Fuel Forces in

retaliation for and deterrence of Ms. Ruffin's sympathy with plaintiff's perspective, which she informed plaintiff of and undoubtedly, voiced in Vestry meetings. Helping her son to recover from this "accident" has kept Ms. Ruffin and her husband Dick away from Charlottesville and meetings of the Vestry for the last several months.[6]

138. The UVA and JMRL Library defendants' actions set forth above proximately caused plaintiff damages which are described in the section following Count 5 below.

139. Discovery will show:

i. communications between Mr. Frazee and his superiors and colleagues at defendant S&P Global Intelligence guiding his conduct with regards to IMPACT and its Housing and homelessness issue, of primary concern to the principal, and;

ii. that Mr. Frazee was aware of plaintiff before the two first met in person on December 10, 2025 from defendant S&P Global Intelligence's information previously gathered about him.

---

[6]Plaintiff does not mean to suggest that anyone affiliated with Trinity was involved in this scheme to harm a friend of plaintiff's who served on the Vestry. Simply, wherever plaintiff goes, the Fossil Fuel Forces follow, and electronically surveille the goings-on, to be able to make interventions of this sort, which they seem to think will help their cause at his and POP Diesel's expense.

The count of persons whom Exxon is responsible for murdering among plaintiff's associates and those it killed to block POP Diesel's progress is up to seven in Ghana and, including Martin Convisser, four in the United States. It has poisoned plaintiff, and others, countless times, most recently by giving him a summer cold that knocked him out for two days, after he rebuffed the overture of Sholanda discussed in the next footnote.

## COUNT 5

## Civil, Common Law Conspiracy

## against the S&P 500 Intelligence Defendants

140. Plaintiff reiterates paragraphs 1 – 139 and these paragraphs are incorporated by reference as if restated herein.

141. In the alternative to an agency theory of liability for assault and battery, by which defendant IMPACT functioned as an agent of Mr. Frazee in facilitating whatever he wanted on the Housing and homelessness issue, condoning his assault and battery of plaintiff and misrepresenting his conduct, words and demeanor in the community, and by which Mr. Frazee interacted with IMPACT and plaintiff dutifully for his official employer defendant S&P Global Intelligence, is common law civil conspiracy.

a. If the trier-of-fact finds that IMPACT, John Frazee, and defendant S&P Global Intelligence acted independently and not as one unified organization carrying out the will of defendant S&P Global Intelligence, then they agreed to combine to injure plaintiff by committing one or more of the following criminal, tortious or unlawful acts, or the additional unlawful act set forth in subparagraph (b)(ii) below:

i. They altered the evidence of the original video and audio recordings of plaintiff's appearance during the March 24, 2026 IMPACT Nehemiah Action to diminish John Frazee and Deacon Don Gathers's physical assault of plaintiff and to make his behavior appear more unreasonable than it was, so that then:

ii. Acting by their agents Alexander Jewett, Ryan Morton-Jewett, and others, they misrepresented plaintiff's conduct and speech to the IMPACT general public membership and to church pastors and congregants in defaming him by stating that he "took

over" the Nehemiah Action, was untrustworthy, and therefore should be isolated from their company, counsel, blessings and affection. Their statements about plaintiff were false and carried an unsavory inference that injured him in his reputation and relations with others.

b. The S&P Global Intelligence defendants combined with Don Gathers in the manner described foregoing and in paragraph 1(b)(ii) above, he being aware of their unlawful intent and assenting to their commission of at least one of the foregoing unlawful acts, or the additional unlawful act set forth in subparagraph (ii) following, to shape his testimony in the defense of John Frazee at the criminal trial of the latter for assaulting and battering plaintiff on August 13, 2026. Their goal was to keep Deacon Gathers from having to testify to the truth that would debunk their editing of the original video and audio recording of March 24, 2026.

i. They needed the doctored video to remain unimpeached by him in order to misrepresent plaintiff's conduct and words that evening as "taking over" the Nehemiah Action and to defame him accordingly, and in defense of Mr. Frazee against the criminal charge and plaintiff's claims herein which they anticipated he would file.

ii. In the alternative and in addition to conspiring with Deacon Gathers to keep him outside the courtroom during Mr. Frazee's criminal trial while the edited video played in evidence so that he could testify firstly that he had not seen it and thereby be forced in testimony to impeach it, when in truth according to his recorded testimony secondly, he had seen it, and they caused him to perjure himself in testifying firstly that he had not seen it.

142. In the alternative that the trier of fact does not find that the S&P Global Intelligence defendants defamed plaintiff pursuant to Virginia common law, they purposefully engaged in a concerted campaign to destroy his reputation and personal relations in Charlottesville and environs, which actions and words support his claim for damages.

143. The S&P Global Intelligence defendants' actions set forth above proximately caused plaintiff damages which are described in the next section.

**PLAINTIFF'S DAMAGES AND RELIEF REQUESTED**

144. Plaintiff reiterates paragraphs 1 – 143 and these paragraphs are incorporated by reference as if restated herein.

**The University of Virginia and the JMRL Library Defendants**

145. Without any access to the UVA Law Library, the only public library in this area, plaintiff, who can only afford his bicycle for transport, has been hard-pressed to keep up with his law cases. Plaintiff ordinarily would have completed drafting of this complaint in one week; instead it has taken him five weeks. The final product may be deficient due to his inability to conduct proper legal research on the book shelves, use free online LEXIS and Westlaw accounts available thereat, and confer with reference librarians.

146. Denial of access to all of the branches of JMRL Library defendants has prevented plaintiff from being able to construct any work-arounds to his impairment set forth in the preceding paragraph, such as by ordering law hornbooks from other law libraries and non-law books in the University's collections via inter-library loan.

147. The foregoing restrictions will soon cause prejudice to four related legal actions of plaintiff's pending in the Virginia Court of Appeals, which that Court allowed to proceed without has paying fees or costs, pursuant to Virginia Code section 17.1-606.

a. The first is plaintiff's appeal of the condition of his bond for pretrial release on the charge that he committed an assault and battery of Izel Nelson by serving on him a one-page notice of a civil hearing, for which Virginia Code section 19.2-124(C) authorizes an expedited hearing. While Judge Worrell recused himself, Exhibit 12, he did not vacate or alter

any of his pre-existing Orders, including the Order that plaintiff undergo a mental health evaluation by Region 10. Given the statute favoring expedited consideration, it is to plaintiff's advantage to file his opening brief as soon as possible, for which the window should open on August 31 and close 30 to 45 days later. (A scheduling Order should issue any day now.). If he delays and imperils this appeal, it could lead to his pretrial imprisonment.

b. The other three are civil actions plaintiff filed in Circuit Court following his father Martin Convisser's murder on December 31, 2025, having to do with custody of his mother Colette Marie Convisser, administration of his father's estate, and defamation committed against him by several parties not defendants in this lawsuit. The Circuit Court Judge at one point read from one of this Court's rulings in the Exxon Mobil lawsuit; therefore, this Court's handling of that Case is bearing upon plaintiff's civil actions in state court. Plaintiff expects a scheduling Order to issue any day giving him a deadline of 30 days in which to prepare and file his three opening briefs.

148. In addition, plaintiff has other civil actions pending in Circuit Court, and defense of the charge that he assaulted and battered Izel Nelson by serving on him a notice of a civil hearing on plaintiff's motion to tighten his Protective Order against Mr. Nelson, for which plaintiff needs access to a law library to prepare filings and to prepare. He has one hearing scheduled to take place within two weeks which he really needs Law Library access to prepare for, and additional hearings in state court after that.

149. If plaintiff does not gain access to the UVA Law Library urgently, then he risks defaulting on, or committing legal malpractice in, any and all of the foregoing legal actions, with potentially catastrophic consequences to himself personally and professionally and to others reliant on him.

150. Denial of access to the UVA Law Library and JMRL Libraries has severely impaired plaintiff's ability at all to do any work, which he expects otherwise, should lead to future income. He has no place where he can sit and draft legal papers or do any other kind of work at his laptop computer during a good part of each day that is not outside in the oppressive heat and under the sun.

a. Given plaintiff's homeless status; the Haven's barring of him on October 23, 2025, which plaintiff has proposed to make a subject of the Exxon Mobil lawsuit; and Exxon's continued stymieing of investment in POP Diesel,[7] there remain only two Cooling

---

[7]The latest incident took place August 16-18, 2026. Plaintiff rode his bicycle 120 miles from Charlottesville to Reston, Virginia to attend the evening program of the senior disciple visiting from India of his Indian guru. Lacking funds for a hotel room, he planned to return by bicycle that night. A woman who called herself "Sholanda" (*i.e.*, "Show Land-a," to cultivate jatropha trees on) sat near him and offered him the carpeted floor of her apartment on which to sleep the night. Because he had failed to consume sufficient bananas in the days leading to this trip, his legs cramped up like they never have before, but he was able to survive the night; if that had happened *en route*, he would have had more difficulty. After his return to Charlottesville the next day, she called and, though he had never raised the subject of investment, suggested he speak to her "ex-boyfriend," whom she described as an angel investor and member of the royal family of Denmark. It was a scam, a dare playing on Hamlet, in which Exxon was offering to involve him in its copycat *jatropha* cultivation projects designed to preempt and displace POP Diesel. She threatened to dox plaintiff if he did not go along.

The remainder of this footnote, anecdotes related to the foregoing, reminds this Court of plaintiff's allegation that the Fossil Fuel Forces will never cease their harassment, attempts to intimidate, and force plaintiff and POP Diesel into surrender, and he will never submit to them until a final judgment is entered and all appeals exhausted in the Exxon Mobil lawsuit. On the bike ride to Northern Virginia, his bicycle chain fell off at the quick link, whose axel had been loosened by sabotage before plaintiff's departure from Charlottesville. Bicycle mechanic Jake Oswalt had never heard of such a failure happening and confirmed the likely cause as sabotage. A very kind stranger took plaintiff to the one bike shop open on a Sunday afternoon in Fairfax, who upon learning of plaintiff's advocacy in Richmond for push-pedal bicycles, did the fix for free.

Within the last few weeks, two people in Charlottesville, both former Peace Corps volunteers in West Africa, have approached plaintiff about visiting copycat *jatropha* tree cultivation projects they are involved in around the tropical world, of the kind started by Clarence W. Bowen set forth in paragraph 142(b)(iii) of Docket No. 313-1 of the Exxon Mobil lawsuit. A third person, a "travel agent," obliquely made such an invitation. The name on his business card states "Forney Shell." Who is Phony Shell? Exxon, Shell's senior partner in

Centers available to him in Charlottesville: the Herman Key and Tonsler Recreation Centers. They both had day camp for children through July 31, 2026, which meant they did not open to the public until 6 p.m. Since August 1, they open to the public at noon, but that has left him without any place he can work during the mornings, except sitting outdoors or visiting a private establishment, which he dares not do often, since he never buys anything. He has sweated at his laptop through the outdoor heat of July and August, and found that the heat significantly impairs his ability to think clearly and properly. Therefore, both the quantity and quality of his work product suffer. When the weather cools, it will become difficult for plaintiff to maintain comfortable body temperature and unfrozen fingers, to be able to work at his laptop outdoors.

b. The JMRL Library afforded plaintiff a free, private Internet connection that is about as secure as he is ever going to have, absent lots of money to establish his own, secure connection. He suffers incalculable loss without that.

i. If he uses a non-secure, WiFi Internet connection open to the public, his email communications are interfered with, regularly.

A. He does not use the data feature on his Samsung smart phone to conduct Internet activities because he found over many experiences that his phone would take on viruses and his email communications thereby would suffer interference.

B. For the time being, he has access to a church's secure Internet connection on his laptop, but only if he sits outdoors in one spot, which is in the glaring

---

Exxon Mobil Exploration and Production Ghana (Deepwater) Limited, discussed at paragraph 16 of Docket No. 313-1. The two petroleum majors function as alter egos across West Africa. Plaintiff will not get involved with these copycat projects because their founders do not know what they are doing, they are committing more harm than good by even attempting to start them, and they are throwing good money after bad.

sun for most of the day. That church could revoke his permission to use its secure Internet at any time.

ii. Use of plaintiff's laptop to gain the Internet puts the confidentiality and security of his laptop's contents at greater risk than if he can make a connection using a separate desktop computer, such as the ones the JMRL Library defendants make available in all of their branches to members of the public. He has good reason to believe that all of the Fossil Fuel Forces are presently reading all of his keystrokes, which imperils his confidential attorney and business mental impressions and secrets.

151. Given the foregoing, the UVA and JMRL Library defendants have not only deterred by chilling plaintiff's specific and intended exercise of his rights to free speech and petitioning, but also, they have damaged his ability to engage in such speech and related activity more broadly.

152. The denial of plaintiff's travel to University Grounds other than the Law School has prevented him from having access to other library resources and departmental faculty whom he occasionally consults.

153. Denial of a normal place to sit, read, and write quietly indoors afforded all other members of the public by both the public library systems in the Charlottesville area has forced plaintiff to attempt to sit and work outside, wherever he can find an electrical outlet to plug his laptop into, for good portions of every day. This in turn has affected his health. Without a proper chair with a sturdy back to sit in, his lower back is giving him a lot of pain, and could seize up, immobilizing him on his back, which would imperil his ability to travel to get food and water daily to survive on.

154. The JMRL Library defendants' suspension ends October 15, 2026. However, if this Court does not enjoin them, so that they may behave more cautiously in the future, they will simply engage in a repeat of their nonsensical, injurious and discriminatory conduct towards plaintiff.

155. Plaintiff requests emergency, temporary, preliminary, and final injunctive, and pursuant to 28 U.S.C. section 2201, declaratory relief against the University and the JMRL Library defendants.

156. Plaintiff requests payment of his reasonable attorney's fees accrued and legal costs incurred pursuant to Title 42, United States Code section 1988(b) and (c).

**The S&P Global Intelligence Defendants**

157. On August 21, 2026, plaintiff told Pastor Cass Bailey of Trinity Episcopal Church that he would file this lawsuit soon. He said he had sent four letters to IMPACT's President asking for dialogue and he would not collect any damages awarded from that defendant.

a. Pastor Cass replied that he was aware plaintiff would file this lawsuit soon, and he said, "That is what happens when you take over a meeting."

b. Obviously, Pastor Cass receives word from and listens to IMPACT's network blaming plaintiff for causing a disturbance at the Nehemiah Action, regardless of having witnessed John Frazee's violent instigation.

158. As set forth above, Deacon Alexander Jewett and Ryan Morton-Jewett are representative examples of those agents spreading IMPACT's, and thereby the S&P Global Intelligence defendants', message destroying plaintiff's standing in the Charlottesville and Albemarle County communities. Pastor Cass Bailey, who has been very gracious to plaintiff since they first met in September 2025, is a representative example of someone, a man of

intelligence and discernment, who is unwilling to part from the narrative against plaintiff the S&P Global Intelligence defendants, under Mr. Frazee's direction, have propagated.

159. After Mr. Frazee's acquittal on August 13, 2026 of the criminal charge of assaulting and battering plaintiff, Deacon Alexander Jewett was waiting for plaintiff outside the courtroom of the Charlottesville General District Court, with his Bible in hand. The S&P Global Intelligence defendants, certain of the trial's outcome in their favor, told him to go there, wait, and meet with plaintiff afterwards. The two men sat on a wooden bench and had friendly conversation. Deacon Jewett was there and ready to capitalize on any feelings of loss and lack of direction plaintiff might be enduring as a result of Mr. Frazee's criminal vindication, to bring plaintiff, at that moment, to the eternal salvation of Jesus Christ. However, since his superior at First Baptist Church, the Rev. Arthur S. Long, Jr., continues to decline to meet with plaintiff for learned spiritual discussion at a higher level due to Deacon Jewett's own intervention described above, plaintiff remains lost in the wilderness of spiritual uncertainty and angst.

160. As a result of Mr. Frazee's assault and battery of plaintiff, the ensuing ostracizing of plaintiff by the S&P Global Intelligence defendants, and their unlawfully conspiring to secure his acquittal, plaintiff suffered diarrhea, quivering in his right hand while bringing food to his mouth, upset stomach, nightmares, inability to concentrate on his work, social isolation, loss of pastoral counseling and guidance, emotional distress, pain and suffering, and loss of professional and personal reputation.

161. Plaintiff's compensatory damages at the hands of the S&P Global Intelligence defendants are ongoing, continuing and deepening, amounting to $50 million

162. Plaintiff claims, in addition, consequential damages for foreseeable harms the S&P Global Intelligence defendants have inflicted upon him, whose dimension and magnitude are not yet clear, but will become clear over the course of time, and will be provable at trial.

163. The S&P Global Intelligence defendants are jointly and severally liable for all of the damages any one of them has caused to plaintiff.

## JURY DEMAND

164. Plaintiff requests a jury on Counts 3, 4 and 5.

## PRAYER FOR RELIEF

Plaintiff Claude David Convisser, by counsel, respectfully requests that this Court grant the relief pleaded above and such further relief as is just.

Further your affiant and plaintiff sayeth naught.

______________________________
Claude David Convisser

Commonwealth of Virginia )
) ss.:
City of Charlottesville )

Subscribed to and sworn to before me, a Notary Public, this 31st day of August, 2026:

______________________________ Heather J. Burcham
Notary public, signature Notary public, print name

My commission expires: 12-31-2027

Heather Jeanne Burcham
Notary Public
Reg. #7067140
Commonwealth of Virginia
Commission Expires 12-31-2027

Respectfully submitted,

CLAUDE DAVID CONVISSER,
Plaintiff, by counsel

Claude David Convisser,
Attorney at Law
Virginia State Bar No. 33799
P.O. Box 7206
Charlottesville, Virginia 22906
5013 South Louise Ave., # 262
Sioux Falls, South Dakota 57108
Tel. 703-438-0071
cdc@popdiesel.com

**CERTIFICATE OF SERVICE AND PURSUANT TO RULE 65(b)**

I hereby certify that on this 31st day of August, 2026, I caused a true copy of this document, its 27 exhibits, and my Motions for Leave to Proceed *In Forma Pauperis* and for Leave to Make Filings by Paper to be served by electronic mail on the two persons listed below, the first on behalf of the University of Virginia defendants and the second on behalf of the JMRL Library defendants. I will also serve on them by email my Motion for a Temporary Restraining Order under Rule 65(b) of the Federal Rules of Civil Procedure, as soon as I have finished drafting it.

Barry T. Meek, University Counsel
University of Virginia
Madison Hall
1827 University Avenue
Charlottesville, Virginia 22903
btm2b@virginia.edu

and

David Plunkett, Director
Jefferson-Madison Regional Library
201 East Market Street, Third Floor
Charlottesville, Virginia 22902
dplunkett@jmrl.org .

Claude David Convisser